Per Curiam :
This case was referred pursuant to Rule 45 (since April 1, 1964, Rule 57) to Trial Commissioner Herbert N. Maletz with directions to make findings of fact and recommendation for conclusion of law. The Commissioner has done so in an opinion 'and report filed December 10,1963. Exceptions to the Commissioner’s findings were taken by the parties, briefs were filed and the case was submitted to the court on oral argument of counsel. Since the court is in agreement with the opinion, findings and recommendation of the Trial Commissioner, as hereinafter set forth, it hereby adopts the same, with correction of inadvertent minor errors, as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover of and from the United States in the sum of $71,241.33 and the defendant, United States, is entitled to recover on its counterclaim from the Seaboard Surety Company, intervenor, in the sum of $13,145.37.
OPINION OF COMMISSIONER
This is a suit for damages for an alleged breach of contract by the Army in terminating a contract for default. The principal issue is whether the termination was justified or not. An unusual feature of the case is the Government’s challenge of an administrative determination by the Armed Services Board of Contract Appeals on behalf of the Secretary of the Army that the alleged grounds asserted by the contracting officer for the default termination were not supported by the evidence of record. The Government maintains (1) that the administrative findings are devoid of support in the record, and (2) that in any event, since the ultimate issue in the case is one of law, i.e., a breach of contract, the determination, though on a question of fact, is not final or conclusive.
Plaintiff also seeks damages for various delays allegedly caused by the Government during performance of the Army contract and reimbursement for increased costs resulting from underground obstructions, etc. It further contends *697 that wrongful termination of the Army contract was responsible for its default on a Navy contract and that the latter default was, therefore, due to causes beyond its control and without its fault and should be treated as one for the convenience of the Government.
In early June 1950, plaintiff, Dale Construction Co. (Dale), submitted the low bid on a bid invitation issued by the Army which called for replacement of a deteriorated 16" cast-iron high service water main at the Boston, Massachusetts Army Base and for installing in its place an estimated quantity of 6,794 linear feet of new water pipe, consisting of 2,080 feet of 16" diameter cast-iron pipe, 3,884 feet of 16" cement-asbestos pipe, and 880 feet of 12" cement-asbestos pipe. Dale’s bid was in the amount of $164,400, which was an estimate since payment was to be made on the number of feet of pipe actually installed. When bids were opened, Dale discovered that its proposed price was some $75,000 less than the next lowest one. It then sought to withdraw its bid on the ground that the disparity indicated a mistake in. computation; however, it rescinded the attempted withdrawal and executed a contract with the Army on June 27, 1950, after receiving assurances from the contracting officer and the post engineer that it would not be required to do anything unnecessarily expensive or unreasonable and that the Army would assist it and make the work easier. As prescribed by the contract, the contractor furnished performance and payment bonds in the amount of $164,000 issued by the Seaboard Surety Company.
The contract required operations to begin on July 17,1950, and to be completed by January 12, 1951, but difficulties in obtaining pipe and other materials as a result of the Korean hostilities, delayed the start until October 24, 1950, when Dale proceeded with a section of the cement-asbestos replacement line along Dry Dock Avenue[1] which is located on the adjacent South Boston Navy Yard Annex.

*698
Claim for Damages in Connection With Failure of City of Boston To Turn Off Water Supply

At the beginning of the job the post engineer had issued instructions to the contractor that the valves on the Army-Base were not to be turned off or on unless performed and/or ordered by his office. In accordance with these instructions Dale, on October 25 (the day after it started work on the contract), notified the post engineer that it needed the water shut off in a specified locality so that it could remove the old pipe. The day after tills an employee of the post engineer instructed the City of Boston’s- Water Department to shut, off the water supply to the locality in question. On the following day a representative of the contractor checked with the post engineer’s office and was assured that the water supply had been turned off by the City. In view of this assurance, Dale’s work force started to crack the old pipe preparatory to taking it out of the trench and replacing it with the new cement-asbestos pipe. But unbeknownst either to the contractor or the post engineer, the water supply had not, in fact, been turned off by the City. As a consequence, a large amount of water began gushing out of the cracked pipe and eventually filled the trench excavation and spilled over to an adjoining area. An emergency crew from the City Water Department was called to the site and found that the department had turned off the wrong valve; it also found that the proper valve was imbedded in asphalt in the street and was, therefore, not visible. In any event, Dale found it necessary to undertake rather extensive pumping and dewatering operations; also it was delayed in its contract operations for some 5 days. Plaintiff filed a claim with the contracting officer who denied it and expressed the opinion that it should be submitted to the City. Dale’s appeal to the ASBCA was dismissed on the ground that it was untimely.
It is, of course, settled that absent fault or negligence or an unqualified warranty on the part of its representátives, the Government is not liable for damages resulting from the action of third parties. United States v. Foley, 329 U.S. 64 (1946); Ozark Dam Constructors v. United States, 153 Ct. Cl. 120, 129, 288 F. 2d 913, 918 (1961); Ben C. Cerwich v. *699 United States, 152 Ct. Cl. 69, 77, 285 F. 2d 432, 436 (1961); George A. Fuller Co. v. United States, 108 Ct. Cl. 70, 101, 69 F. Supp. 409, 415 (1947); Standard Accident Insurance Co. v. United States, 102 Ct. Cl. 770, 790 (1945), cert den. 325 U.S. 870. It is in this context that the record clearly establishes that the post engineer was not at fault in this incident; hence the Government may be held liable in damages only if the circumstances show that it extended a warranty to the contractor which was breached. In essence a -warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself. Thus, a warranty amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue. Metropolitan Coal Co. v. Howard, 155 F. 2d 780, 784 (2d Cir. 1946). Cf., The Fred Smartley, Jr., 108 F. 2d 603, 606 (4th Cir. 1950); Pennsylvania Railroad Co. v. McAllister Brothers, 137 F. Supp. 788, 794 (SDNY 1956). The facts here appear to fall squarely within this concept. In assuming responsibility to have the water supply turned off and assuring the contractor that this had been done, the post engineer, in effect, gave plaintiff an unqualified assurance upon which the latter was entitled to and did actually rely; further, that assurance plainly was intended by the parties to relieve the contractor of any obligation to ascertain the facts for itself. Plaintiff is, therefore, reasonably entitled to recover $822.54 — the amount of loss it suffered when the assurance on which it relied turned out to be incorrect. Cf., Maxwell v. United States, 156 Ct. Cl. 72, 297 F. 2d 554 (1962); Lenry, Inc. v. United States, 156 Ct. Cl. 46, 297 F. 2d 550 (1962).[2]

Suspension of "Worh

Dale continued work on the cement-asbestos section along Dry Dock Avenue until the end of December 1950 when the *700 weather became so cold that there was danger that the water in the pipe that was to be removed would freeze upon excavation of the trench.[3] Since this might present a hazard to the Base’s water supply, the post engineer advised Dale that he preferred that operations not be continued in these weather conditions; for that reason, work was largely suspended until the latter part of March 1951 when work was resumed on the cement-asbestos line in the Navy Yard on Dry Dock Avenue.[4]

Claim for Damages Resulting From Delays Caused by Government'’s Failure To Malee Work Space Available

In the latter part of April 1951, Dale’s work force approached an area in the Navy Annex leased to the Corps of Engineers where excavation and pipe-laying work was required to be undertaken. Despite the need for the space, the Corps of Engineers refused for a week to prevent its employees from parking their cars in the area. The plaintiff was ultimately forced to place barricades around the area so as to prevent further parking until its pipe-laying operations were completed. Though this was done, the Corps of Engi-ners’ refusal to have the parked cars removed when the space was first needed unnecessarily delayed plaintiff’s performance for several days — a delay for which the Government is liable in damages. For in the absence of a right reserved in the contract or an exculpatory provision “it is ... an implied provision of every contract, whether it be one between individuals or between an individual and the Government, that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance.” George A. Fuller Co. v. United States, 108 Ct. Cl. 70, 94, 69 F. Supp. 409, 411 (1947). See also Allied Contractors v. United States, 129 Ct. Cl. 400, 124 F. Supp. 366 (1954); Arundel Corp. v. United States, *701 121 Ct. Cl. 741 (1952); Cauldwell-Wingate Co. v. United States, 109 Ct. Cl. 193 (1947); Speck, Delays-Damages on Government Contracts, 26 G.W.L. Rev. 505, 518 et seq. (1958); Seltzer & Gross, Federal Government Construction Contracts: Liability for Belays Caused by the Government, 25 Ford. L. Rev. 423 (1956). It is found that a reasonable amount of damages for the delay is $230.00.

Claim for Damages Resulting From Belays Caused by Government's Requirement for Bacteria Testing

The specifications required that each section of completed water pipeline be sterilized with a specified dosage of chlorine before that section would be accepted for domestic operations. As an additional safeguard, the post engineer, in accordance with Army policy, insisted that Dale have samples of water taken from the completed section and sent to an Army Medical Laboratory for bacteria testing; furthermore, until the test report for that section was received from the laboratory, found satisfactory, and the completed section placed into service, the post engineer would not permit Dale to proceed with work on the next section of the line. The principal reason for this was that the post engineer considered that the need for maintaining an adequate water supply to certain storage areas on the Base in the event of fire required that not more than one or two sections of the line in such areas be serviced by a temporary hose connection. About four days usually elapsed before a test report on a completed section was received from the Army laboratory, during which time Dale’s operations were delayed or brought to a standstill. In all, a total of 20 days of delay was caused for which recovery is now sought.
In connection with this claim, it may be observed that while bacteria testing was required by Army policy as specified in a Corps of Engineers’ manual, the provisions of that manual were not incorporated in the contract expressly or by implication; nor did the contract otherwise contain any requirement for bacteria testing. Moreover, the record fails to establish that such testing was standard industry practice. In light of these considerations, plaintiff could not *702 reasonably have contemplated that bacteria testing would be required by the post engineer, let alone that pending receipt of a test report, forward work on the line would be forbidden. And even were it assumed that bacteria testing should have been contemplated, plaintiff could not have anticipated, when it executed the contract, that four days would be required before a test report on a completed section would be received from the Army laboratory during which time it could not proceed with the next section. The issue is not the Government’s right to test, but its right to do so at the contractor’s expense by causing unreasonable delay. See e.g., Donald M. Drake Co. v. United States, 153 Ct. Cl. 433, 443 (1961), Continental Ill. Nat. Bank v. United States, 126 Ct. Cl. 631, 638-39, 115 F. Supp. 892, 896 (1953). Cf., Crown Goat Front Co. v. United States, 154 Ct. Cl. 613, 292 F. 2d 290 (1961). Plaintiff is reasonably entitled to recover $2,000.00 as damages for 20 days of delay.

Olaim for Increased Oosts Due to Underground Obstructions

Within a month after the start of contract operations and continuing thereafter during the progress of the work, Dale encountered some 79 underground obstructions on the job site, none of which were visible above ground, shown on the contract drawings, or indicated in the specifications. Such obstructions (which included buried wood piers and heavy timbers that had been filled over many years before; a concrete block weighing almost 2 tons; a concrete encasement; cables; etc.) materially slowed the progress of the work. For when the contractor encountered an underground obstruction, it had to dig out the excavation around the old pipe by hand rather than by using a backhoe in accordance with its normal practice; thus, the delay represented the difference in time between that required for the backhoe to dig out the excavation and the time required for laborers to dig it out by hand. As an indication of the extra time required, an area 8 feet wide, 8 feet long and 10 feet deep can be excavated by a backhoe in about 20 minutes, while *703 excavation of the same area by hand requires the labor of two men working an entire day.
Plaintiff made frequent verbal reports to the post engineer as the obstructions were encountered, and the parties eventually agreed that the matter would be determined at the end of the contract, prior to final settlement. Such determination did not, in fact, take place because of the events discussed below. The evidence establishes that approximately 95 calendar days were required to overcome the obstructions and that plaintiff, for reasons which are considered later, is reasonably entitled to recover the sum of $7,449.50 for the increased costs that resulted therefrom.

Claim, for Damages Resulting From Incorredt Representations on Plans

Dale also claims damages as a result of incorrect representations on the plans with respect to 10 specified items consisting of valves and pipes that had to be replaced. The plans showed the items to be of a specified size, whereas on excavation they were found to be of a different size so that the contractor was required to obtain different materials than were originally scheduled to be used in that portion of the work. In addition, in several instances the plans were incorrect in depicting the location of these items.
As illustrative of the nature of the incorrect representations, in February 1951, a 16" valve was discovered upon excavating in the Navy area instead of a 12" valve as represented in the plans. Also in that area, a 12" low surface water line was found to be closer to the pipe that had to be replaced than was shown on the plans so that special precautions had to be taken to protect the 12" line. In April 1951 an 8" cast-iron lateral, completely encased in concrete, was found instead of a 6" uncased pipe depicted in the plans. In May 1951 a manhole, completely covered with asphalt paving, was discovered in the pipeline system in a different location than shown on the plans.
The record leaves no doubt that the plans with respect to the 10 items in question were in error. It establishes also that plaintiff was fully justified in relying on the represen *704 tations contained therein. For not only would an investigation of the facts represented as to these underground items have been entirely impractical, the plans themselves failed to include any caveat that the representations might be incorrect. Moreover, plaintiff could not have been able, by searching other sources furnished or made available to it, to ascertain the facts as to these subsurface items. In short, the contractor was misled since it neither knew nor had reason to know that the representations were not correct. The Government is, therefore, liable for damages caused by the incorrect representations. See e.g. Hollerbach v. United States, 233 U.S. 165 (1914); Christie v. United States, 237 U.S. 234 (1915); Flippin Materials Co. v. United States, 160 Ct. Cl. 357, 365, 312 F. 2d 408 (1963), and cases cited in footnote 8, Spiers v. United States, 155 Ct. Cl. 614, 296 F. 2d 757 (1961). It is found that a reasonable amount for such damage is $625.00.

Claim for Damages Resulting From Nmy's Removal of a Temporary Bridge Belonging to Dale

In August 1951 the Navy, without knowledge of the contractor, removed a prefabricated, temporary wooden bridge belonging to Dale. (The bridge was used for the purpose of enabling pedestrians and vehicles to cross trench excavations.) Dale reported the bridge’s disappearance to the post engineer and some two months later two sections of the birdge were recovered. This action by the Navy constituted, of course, a breach of defendant’s implied obligation not to hinder or delay performance of the contract for which plaintiff is entitled to damages. Plaintiff is reasonably entitled to the sum of $180.00 for delays incurred in not having the bridge available and for the expenses of its repair.

Claim for Replacement of Rusted Pipe

In October 1951 the contracting officer approved a schedule submitted by the contractor which, among other things, called for installation of a temporary 2%" section of pipe to service Army vessels with drinking water. Dale installed a new black-iron pipe, which it had acquired for the pur *705 pose, but due to exposure to tbe elements, tlie interior of the pipe had become somewhat rusted. Quite understandably, the Government inspector rejected the pipe and insisted on galvanized pipe. The contractor complied and submitted a claim for extras in the amount of $64.18 which was disallowed by the contracting officer on the ground that the inspector had used sound judgment in rejecting the rusted pipe. Apart from the fact that timely appeal was not taken under the disputes clause, disallowance of the claim was reasonable.

Glaim for Damages in CJormection With Repair of Leah in Pipe

In October 1951 a leak was discovered in certain cement-asbestos pipe which Dale had installed near the Maritime Restaurant area of the Base. This leak, it is found, was due to loosened lead caulking in the joints caused by vibrations from a gigantic pile driver being operated in the area by another Army contractor. Dale’s claim in the amount of $97.23 was denied by the contracting officer on the ground that the leak was in existence prior to the advent of the other contractor on the job. While this finding is not supported by the evidence of record, plaintiff has failed to produce any evidence that the damage was attributable to any fault on the part of the Government and the claim must, therefore, be disallowed.

Claim for Damages Resulting From, Bursting of Pipe Joints

On November 6, 1951, Dale, in accordance with prior instructions, requested that on the following day the Government inspector turn on the water supply for a section of a newly-installed section of the cement-asbestos line. At the time of the request, the pipe had not been braced by backfilling, but the contractor anticipated this would be done by the next day. In fact, this expectation did not come to pass because a longshoremen’s strike prevented delivery of the sand needed for the backfill. The inspector, however, was unaware that the pipe had not been braced by backfilling *706 and he turned the water supply on as had been requested. Since the pipe was unbraced, the pressure of the water caused it to move ahead with consequent bursting of the joints. Plaintiff was required to replace the pipe for which it now seeks damages of $100.00. It is clearly not entitled to recover inasmuch as the Government inspector (as plaintiff has conceded) was in nowise to blame for the occurrence.

Claim for Damages in Connection With Repair of Hydrant

On several occasions during progress of the work, the contracting officer called Dale’s attention to a leaking hydrant in a particular locality on the Base. In November 1951 Dale and the contracting officer agreed that the contractor would repair the valve; they also agreed that if the repairs were found to be caused by debris from Dale’s operations, the plaintiff would bear the cost, but that if the repairs were found to be required by normal wear and tear, the cost of the repairs would be considered air “extra” under the contract. The evidence establishes that the leak was partially Dale’s fault and partially the Government’s. Dale was partly to blame since some jute yam of a type it used in pipeline installation had gotten into the hydrant; the Government was partly to blame because the rubber gaskets and valve parts of the hydrant were 30 years old and completely inoperative due to age and deterioration. Dale claims that the repair cost of $110.00 should be split equally and that on this basis it is entitled to $55.00. This claim has merit and should be allowed.

Controversies Between Parties as WorJe in Cement-Asbestos Area Progressed

During progress of the work on the cement-asbestos section of the pipeline, growing differences developed between the contractor, on the one hand, and the post engineer and the Government inspector, on the other. For example, Dale objected on the ground of delay to an order of the post engineer prohibiting the opening or closing of valves unless 24 hours advance notice was given;[5] the post engineer de- *707 dined to allow the contractor permission to use two crews on the ground that traffic conditions at the Base had increased appreciably after the start of the Korean emergency; on various occasions payment to the contractor for work that had been completed was unreasonably delayed. Controversy also developed over the contractor’s failure to shore, brace and support a number of railroad tracks, with the contracting officer insisting that this be done while the contractor complained that the post engineer had given pre-award assurances that only two critical railroad lines would have to be shored and that traffic over the other tracks would be re-routed. (This matter was eventually resolved to the contracting officer’s satisfaction.)
Another source of controversy resulted from the post engineer’s insistence, beginning in mid-August 1951, that Dale submit a weekly schedule setting forth the time and location of its operations for the succeeding week, so that he could have advance notice and make working space available for the contractor’s use.[6] While not invariably true, the post engineer ordinarily would not permit Dale to proceed with the work until he had approved the schedule. In this connection, it was necessary on a number of occasions for the post engineer to make repeated requests to Dale before it submitted a schedule; and not infrequently, the contractor failed to complete a portion of the work in accordance with the estimates set forth in the schedule.'
Beyond this, Government representatives complained about the manner and quality of Dale’s work in the cement-asbestos section of the job and cited specific deficiencies, most of which were later corrected in a manner acceptable to the contracting officer.
Also, as worked progressed, personal relations between the parties grew increasingly bitter. For one thing, the Government inspector developed an intense personal dislike for Dale’s foreman. Thus, in his official reports to the post engineer he referred to the foreman in such terms as an “upstart (who) just doesn’t give a damn”; as a man whose “weakness is his egotistical pride in his rank as 1st Lieutenant in the *708 active Reserve . . . (who) is supposed to belong to a group of untouchables who are in no danger of being called up for full active service — what a pity? as a person “on record for falsehoods and evasion of responsibility on several occasions” ; and as a person with whom he felt “very insecure in being obliged to work . . The inspector’s reports also contained various ad hominem comments reflecting on the contractor’s honesty and integrity — comments which find no support in the record. In addition, the post engineer (who was described by the Government inspector and one of defendant’s witnesses as a “rigid sort of person”) refused to talk to the contractor’s foreman after a heated argument in which the latter, in a fit of temper, made an unfortunate comment about the post engineer’s veracity. Later, relations between contractor-personnel and the post engineer became so strained that the contracting officer found it necessary to direct the contractor to channel all communications through his office.

Extension of Completion Date

On October 27, 1951, Dale wrote to the contracting officer requesting an extension of time to complete the contract on the ground of delays caused by unforeseen and other specified circumstances. (Previously the completion date had been extended from January 12,1951 to September 28,1951). The contractor stated that if it were able to work through the winter “we may expect to be completed by March 1952” but that “due to cold weather which may interfere with the temporary water supplies, we may have to stop operations when real freezing comes in; and in that case we expect to resume work in the spring (probably late March) and complete in mid-summer.” [7] Upon receipt of this request, the contracting officer discussed the matter with the contractor and agreed to extend the time for contract completion to June 2, 1952, but insisted that the work be definitely completed by that date. About a month later the contracting officer wrote Dale that “Steps are now being taken to advance the date of com *709 pletion (final acceptance) from 28 September 1951 to 2 June 1952,” adding that he would “insist on this contract work being accomplished and accepted on or prior to June 2,1952.” The contracting officer stated further that he saw “no reason to curtail activities due to winter weather, since the new 16" line immediately East of Building #4 could be installed at that time, as no temporary water lines would be involved;” and that “It is of paramount importance that your company bend every effort toward pushing this contract work to successful completion, in order to meet the final completion date of 2 June 1952.” [8] The contracting officer also commented that the delays cited by the contractor as justification for the extension “were caused ... (by) your inability to set a schedule and adhere to it... ”

Sheathing and Pressure Testing Requirements m Respect to the Oast-Iron Section of the Pipeline

By late November 1951 Dale had completed the installation of some 4,300 feet of the cement-asbestos section of the line and had submitted a schedule proposing to work next on the cast-iron portion.[9] There then began a series of rather confusing events — stemming from controverises over sheathing and pressure-testing requirements under the contract— which culminated in the termination for default. In order *710 to place these events in proper focus, it is necessary to consider now the contract requirements in question.
Paragraph 2-03 of the specifications required the contractor “to completely sheathe the trench excavation along the cast-iron pipe replacement line.”[10] The area along that line consisted of filled land reaching out into the Boston Harbor and the post engineer anticipated that the soil when excavated would be highly unstable because of its mud and clay content. Thus the sheathing provision was included primarily for safety reasons, that is, to protect the men working in the trench excavation from cave-ins. By contrast, because of the expected compact nature of the soil in the cement-asbestos pipe replacement area, the specifications contained no requirement for sheathing trenches in that area. However, the provisions of a “Safety Requirements” handbook were incorporated in the contract and required (1) that all trenches over 8 feet in length and 5 feet or more in depth in hard compact material be braced by skeleton sheathing; and (2) that all trenches 4 feet or more in depth in partly saturated, filled or unstable soils be secured by the use of continuous vertical sheet piling and suitable braces.[11] Article 27 of the contract provided that if the contractor failed or refused to comply with these safety requirements, the contracting officer was empowered to issue an order stopping all or any part of the work; the article also provided that when satisfactory corrective action was taken, a start order was to be issued.
With respect to pressure testing, paragraph 2-05 of the specifications provided that after the cast-iron pipe was laid, the joints completed and the trench partially backfilled (but only to a point where the joints were still visible), the newly-laid pipe was to- be subjected to a pressure test. The paragraph also permitted pressure testing when the joints were' not visible but only where immediate backfilling to grade level *711 was necessary because the pipe was laid below water level or where the joint was made with a material (e.g. sulphur) which expanded with age. As to these provisions, in early July 1950 (after the contract had been executed but before work was started)[12] the post engineer had advised Dale that he would permit a variation so that the contractor could pressure test a section of newly-laid cast-iron pipe either after the trench had been partially backfilled and the pipe joints were still exposed or after the trench had been backfilled to level and the joints were no longer visible.[13] Also in the early part of July 1950, the post engineer had approved a method of operations proposed by Dale under which it would excavate a section of pipe at a time, remove the old pipe, install the new cast-iron pipe, cover it with limestone (as required by the specifications), backfill immediately to the level of the trench and then pressure test the pipe. The contractor anticipated that under this approved method of operation, backfilling to level would obviate the need for sheathing the trench in the cast-iron pipe area.

Termination of Army Oontraot for Default

It is in this setting that Dale, on November 26, 1951, started excavation and pipe-laying work on the cast-iron portion of the line in accordance with a schedule approved by the post engineer a few days before. The soil in the excavation area proved to be firm and compact — -far superior, in short, to the unstable conditions the post engineer had anticipated. Indeed, the soil was of such compactness that sheathing was, in fact, unnecessary from an engineering standpoint. Against this background, the contracting officer wrote Dale on November 28 stating that he had noted that the contractor had “started operations on the 16" C-I pipe laying”. He added: “Regarding sheathing you are well.aware of the *712 requirements, but we will leave this matter up to the inspector and the Safety Engineer.”[14]
By December 3 the contractor had installed 2 lengths of cast-iron pipe and proposed next to backfill the trench immediately to level and then pressure test the joints — a method of operation that the post engineer had previously approved and which, Dale contemplated, would obviate the need for sheathing. The inspector, however, considered this method of testing the joints “risky” and would not permit Dale to backfill to level; he insisted instead that the joints remain exposed and pressure tested by visual examination. In such *713 circumstances, the inspector cautioned Dale that it must use some accepted type of trench sheathing. Dale interposed no objection and indicated that material for such sheathing was on the ¡way to the site. However, in view of the inspector’s instructions, a conference was held on December 5 between the post engineer and Dale, at which time the post engineer told Dale that he would not allow any limestone or partial backfill to be placed around the newly-laid pipe before an entire section was pressure tested — a directive that appears contrary to the contract specifications which provided in part that “After the pipe is laid, the joints completed, and the trench partially backfilled, leaving the joints exposed for examination, the newly laid pipe . . . shall be . . . subject to a pressure test . . .” In any case, Dale stated that it would request the pipe manufacturer to send a representative to the job site to determine' whether or not complete backfilling of the trench to level prior to pressure testing was appropriate. In addition, the post engineer issued oral instructions at the conference that Dale sheathe the trench excavation immediately, and the latter agreed to do so.[15]
By December 6 Dale had excavated some 125 feet of trench, removed the old pipe, and laid new cast-iron pipe. However, the entire trench had been left open in view of the post engineer’s instructions prohibiting any backfilling prior to testing of the pipe; furthermore, the trench had not been sheathed as of that time. It may be further noted that as of December 6 the soil in the trench excavation was of such compactness that the work in the 125-foot section could have been completed within two or three days without sheathing. In any event, Dale obtained on December 7 a small quantity of lumber for sheathing but did little work on the open trench itself between December 6 and 12. It advised the inspector that since the post engineer had disapproved of its *714 proposed method of operations under which it proposed to backfill before testing, it was awaiting advice from the pipe manufacturer as to whether testing could be performed after the trench was backfilled, and that pending the arrival of the expert it was unable to continue excavation, pipe-laying and backfilling. On December 12 the manufacturer advised Dale that a visit by its expert to the site was unnecessary, adding that on many pipe jobs, tests had been made after the line was completely backfilled and that the practice of backfilling or not prior to testing was normally covered in the specifications for each individual job.
On December 12 the contracting officer wrote Dale directing it to sheathe the trench immediately. Upon receipt of this letter, Eobbins (Dale’s representative) had a conference on December 13 with the contracting officer at which time the latter indicated that the contractor could proceed with skeleton sheathing. In Eobbins’ words the following conversation took place:
I said to Mr. Curtis (the contracting officer) : “We are under the impression that all orders relating to this contract are to come directly from you, and I received a letter stating that you want the trench sheathed now. And this varies with the prior instructions and the approved schedule under which we are operating, and we are forced to change our method of operation. All we can do is put a claim in. It will change it, and we will put a claim in for having started under one method of operation, and then the other.”
So Mr. Curtis said: “Isn’t there some compromise we can make ? Suppose you put in the trench to satisfy the engineers so that they won’t lose face and you won’t lose face,” as he put it, “sheathing consisting of planks about every four or five feet, braced.” And that is known in the trade as “stay sheathing” or “stay bracing,” as opposed to continuous sheathing. And he said: “That won’t cost you very much and you can do it.”
And I agreed to it.
The day after this conversation, Eobbins directed 3 members of the contractor’s work force to install skeleton sheathing in the open trench; however, they reported back that the post engineer had ordered them out of the trench on the *715 ground that he would not approve skeleton sheathing.[16] Robbins then went to see the contracting officer who again stated that he would allow Dale to resume and put in skeleton sheathing. Also at this time, the deputy post commander wrote Dale complaining that the work was proceeding very slowly and that he wanted a letter from Dale stating its intention to vigorously prosecute the work from then on.
On December 18 the contracting officer met with Robbins in order to have Dale resume operations at a rate that would eliminate the 125-foot open trench. At this time the contracting officer understood that Dale was having difficulties with the post engineer and accordingly requested that in the future it channel all further communications through his office. On the next day, several of Dale’s workmen again started to install skeleton sheathing in the open trench but left the site in the afternoon because of the cold weather. For the remainder of December, a succession of cold weather, storms, snow and then rain, prevented the contractor from accomplishing any significant work in the trench area.
Meanwhile, the contracting officer wrote Dale on December 20 calling attention to 8 specified deficiencies in connection with the work, including “16” C-I pipe in place in 125' trench approximate, untested, unsheathed for over three weeks.”
On December 26 Dale wrote the contracting officer complaining that the post engineer had, some few days before, stopped its men from backfilling a small portion of the line with limestone and that as a result the men went home because of lack of work. The contractor indicated it was in a quandary as to what it was supposed to do.[17]
On December 27 Robbins again met with the contracting officer and agreed to correct immediately all deficiencies that had been specified. On the following day the contracting *716 officer wrote Dale confirming the agreement. He also wrote that one of the contractor’s “first acts should be to comply with the directive in the letter dated 12 December 1951 to sheathe the trench and that “. . . the specification calls for complete sheathing of the entire length of any trench in which iron pipe is to be laid.” This was a reversal from the position he had taken on December 13 when he advised Dale that only skeleton sheathing was necessary.
On January 2, 1952, the contractor had 5 men at the job site to install continuous sheathing in the open trench. By this time storms, snow and rain had caused the sides of the trench to cave in so that the pipe was covered by mud and earth. In these circumstances, Dale’s efforts to install continuous sheathing without re-excavating the pipe were unsuccessful. The contractor concluded that it would be necessary to remove all the cast-iron pipe that had been installed, re-excavate the trench, and re-install the pipe as was originally done, with the exception that this time the trench would be sheathed and left open. On January 12, 1952, Dale wrote the contracting officer setting forth in detail the events that had occurred, adding that it was confused over the conflicting stories and methods it was asked to proceed on, and requesting the contracting officer to set forth in detail each step-by-step procedure he wanted plaintiff to follow. Enclosed with the letter was a claim for $648.60 which Dale stated was the estimated cost, profit and overhead for excavation of a 150' trench, installing about 130' of 16" cast-iron pipe, removing the pipe and backfilling the trench. Upon receipt of this communication, the contracting officer requested Dale to submit a new schedule. In accordance with this request, Dale wrote the contracting officer on January 15, 1952, enclosing a proposed schedule for completing the work, as to which it requested the contracting officer’s reaction. Under this schedule the contractor proposed no work until March 1 because of the winter weather and estimated that the contract would be substantially completed by August 1.
Pending word from the contracting officer on the proposed schedule, Dale, during the period from January 8 to January *717 18, corrected most of the deficiencies (with the exception of the sheathing) that had been called to its attention previously by the contracting officer. On January 18 Dale wrote the contracting officer that it had received no word on the proposed schedule; that the weather for the past few days had been good and that it could, therefore, accomplish some of the work if it knew how the contracting officer wished it to proceed. It also indicated that pending receipt of the contracting officer’s reply to the proposed schedule, it was taking care of the deficiencies.
On the same day — January 18, 1952 — the contracting officer, after consulting with the post engineer, sent a letter[18] to Dale terminating the contract immediately for default[19] on the basis of the following findings:
(1) Deficiencies occurring in past peformance were not corrected within a reasonable time after notice thereof and some still remain uncorrected.
(2) Progress is not being made at a rate that will insure completion by the date specified, as extended.
(3) Instructions to proceed in accordance with specifications, first verbally and then directed in letter of 12 December (1951) have not been complied with. There has been little activity since that date and at present no work has been done for a considerable period of time.
The notice for default read further:
In view of the foregoing, there is no recourse but to declare the contract inexcusably in default. Pursuant to the authority vested in the Government in Article 9 of the contract, your right to perform thereunder is terminated immediately upon receipt of this letter.
It is the Government’s intention to prosecute the work to completion by contract or otherwise and to hold you and your surety liable for any excess costs occasioned the Government thereby. The Government reserves all rights and remedies provided by law or under the contract in addition to charging excess costs.
*718 This notice constitutes a finding of fact pursuant to Article 15 (Disputes) of the contract, from which you have the right of appeal as specified therein.
As to the first of these findings that “Deficiencies occurring in past performance were not corrected within a reasonable time after notice thereof and some still remain uncorrected”, the record shows that on various occasions the contracting officer, the post engineer and the inspector had called Dale’s attention to specified deficiencies in its work. These included, in addition to a number of minor deficiencies, failure to sheathe the trench excavation in the cast-iron pipe area; to brace and support various railroad tracks; and to complete the paving in the Navy area. Since the failure to sheathe the trench excavation constitutes the principal basis for the third finding, it is treated in connection therewith. The evidence establishes that most of the other deficiencies were corrected in a manner acceptable to the contracting officer prior to the notice of termination, although not always within what the contracting officer regarded as a reasonable time. However, the record does not support the conclusion that these past delays in correcting deficiencies were such as to have prevented the contractor from completing the work by the specified date. The purpose of the default provision in a Government contract is to get the work finished on time. See National Surety Corp. v. United States, 102 Ct. Cl. 671, 680 (1945). Apart from that, there is no warrant for the Government to cancel a contract for default on the basis of deficiencies later corrected to its satisfaction. See Pigeon v. United States, 27 Ct. Cl. 167, 175 (1892). Nor can the few deficiencies that still existed on the date of termination support .the default action: such deficiencies were minor in nature; the contractor had evidenced a clear intent to correct them promptly; and the time needed for their correction would not have prevented the contract from being completed on time.
With respect to the second finding that the contractor was not making progress at a rate that would insure completion by June 2, the evidence demonstrates that at the time of termination Dale had completed about two-thirds of the work and that barring further delays resulting from subsurface obstructions or Government-caused delays of a na *719 ture that had hitherto retarded progress of the work, it could have completed the work by June 2, 1952, if the contracting officer required it to work during the winter months.[20] The evidence further shows that excluding Government-caused delays and delays due to unforeseeable causes beyond its control, Dale’s progress in its past performance of the contract had been such that it could have completed the job by the specified time. Indeed, the contracting officer testified that provided Dale did not stop work until March, it could have finished the job by the extended time.
Nor does the record demonstrate that the contractor abandoned or intended to abandon the work. On the contrary, at the time of termination Dale was not only ready, willing and able to proceed with the work to completion in accordance with contract specifications, it had on the job site all the cast-iron pipe needed for the remainder of the work, together with several carloads of limestone and various items of heavy equipment. It is quite true that on January 15, 1952, Dale had, in accordance with the contracting officer’s request, transmitted for the latter’s approval a schedule proposing to suspend work during the winter months, to resume on March 1 and have the job substantially completed by August 1. But this communication was not an indication of the contractor’s intention to shut down the job or to abandon the work; it was simply a proposal sent to the contracting officer for his reaction and pursuant to his request — a proposal which the contracting officer could have accepted or rejected as he saw fit.
The third finding that the contractor had failed to comply with verbal instructions and instructions contained in a letter of December 12, 1951, has reference, of course, to the controversy regarding sheathing of the trench in the cast-iron area. It seems apparent that the failure complained of was occasioned not by inexcusable fault on the part of the contractor but, rather, by the conflicting nature of the instructions themselves. It will be recalled that on Decem *720 ber 5 the post engineer had issued oral instructions that the contractor sheathe the trench excavation immediately and that on December 12 the contracting officer had sent Dale a written directive to the same effect. Yet, a day later — on December 13 — the contracting officer (who was the authorized representative of the Government, not the post engineer) advised plaintiff that it could proceed with skeleton sheathing. Nevertheless, when the contractor’s work force started to proceed with skeleton sheathing, the post engineer, in effect, countermanded the contracting officer’s directive and ordered the crew out of the trench on the ground that such sheathing would not suffice. The contractor was thus caught in a cross-fire, with the contracting officer authorizing work to be done one way and the post engineer demanding it be done another. And it was not until December 28 that this conflict was ironed out, when the contracting officer advised plaintiff that “complete sheathing” of the entire length of the trench was necessary.
The record shows, in brief, that a large part of the blame for the lack of progress in December on the cast-iron pipe area must be laid at the door of the Government representatives. Furthermore, once the directive of December 28 was issued, making it clear that continuous sheathing was required, plaintiff, within a few days, sent 5 members of its work force to the trench area to proceed in accordance with the directive. This negatives any conclusion that the plaintiff did not intend to comply with the specifications. While this sheathing work was unsatisfactory, it seems evident that if the contractor had been allowed to proceed along the lines suggested in its letter of January 12, 1952 (which included continuous sheathing of the trench), it would have completed on time all the work called for by the contract.
Withal, it appears that the major reason for the termination was not the contractor’s lack of diligence but rather its submission on January 12,1952, of a claim for extras. Thus, the contracting officer testified:
Q. . . . And there was nothing to lead you to believe that he could not have completed the work prior to 2 June 1952 ?
A. If he began or continued instead of stopping until March, yes.
*721 Q. . . . There was no point in January of contacting the plaintiff and telling them that they must go ahead and complete the work otherwise you were going to default them?
A. It seemed to me we were in an impasse that had not been resolved.
Q. What was the impasse?
A. Having to do with the sheathing of the trench.
Q. And this was his (sic) main thing that bothered you, the fact that if they did sheathe they intended to put in a claim for extras ?
A. That is correct.
Q. And you felt that they had absolutely no right to do this, the contract was clear ?
A. I felt I had no right to authorize such a thing.
Q,. . . . And you felt that they had no right to even ask it because the contract specifications were clear?
A. I felt the specifications were clear.[21]
Of course, there was no justification for cancelling the contract for default because Dale asserted a claim; were this the case, a contractor would risk termination every time it submitted a claim.
In summary, the conclusion is inescapable that the termination for default was unreasonable and unjustified. See e.g., Largura Const. Co. v. United States, 88 Ct. Cl. 531 (1939) ; Coast Coaling & Eng. Co. v. United States, 60 Ct. Cl. 857 (1925); Universal Power Corp. v. United States, 112 Ct. Cl. 97 (1948). And it is settled that “if the Government terminates a contract without justification, such termination is a breach of the contract and the Government becomes liable for all the damages resulting from the wrongful act. . . . The damages will include not only the injured party’s expenditures and losses in partially performing the contract, but also, if properly proved, the profits that such party would have realized if he had been permitted to complete the contract. The objective is to put the injured party in as good a position pecuniarily as he would have been in if the contract had been completely performed. . .” G. L. Christian and Associates v. United States, 160 Ct. Cl. 1, 11 (1963), 312 F. 2d 418, 423, cert. den. 375 U.S. 964.

*722
ASBOA Decision on Termination of Army Contract

These considerations aside, it is not without significance that the contracting officer’s superior, the Secretary of the Army (acting through his representative, the ASBCA) had previously determined in 1954 that the alleged grounds asserted by the contracting officer terminating the contract for default were not supported by the evidence of record. Specifically, the ASBCA found, on the basis of an extensive record (consisting of 8 days of hearings and voluminous documentary data), that the alleged deficiencies cited by the contracting officer in his first finding had been corrected before the notice of termination; that the fact that Dale had completed the installation of more than two-thirds of the required quantity of new pipe tended to negate the conclusion that it could not have completed the contract by June 2,1952; and that the contracting officer did not terminate the contract because of the slowness with which the work was proceeding but rather because of disagreement as to the sheathing requirements of the contract. The board found that the contractor’s failure to sheathe, when advised, was due to this disagreement and as to who would pay for the cost of complete sheathing; that if the contractor had been permitted to proceed along the lines suggested in its letter of January 12, 1952, which included complete sheathing of the trench, it would have completed all the work called for by the contract; and that the contractor’s assertion of a claim did not afford an adequate basis for terminating the contract for default.[22]
The Government strongly assails these findings (which are, of course, findings of fact, Holpuch v. United States, 102 *723 Ct. Cl. 795, 804, 58 F. Supp. 560, 564 (1945)), insisting that they are devoid of any valid, evidential basis. The Government further contends that the ultimate issue in the case is one of law, i.e., a breach of contract, and hence says that neither the contracting officer nor the head of the department (on appeal) has the authority to finally decide the legal question of breach; and thus that the board’s decision— while on a question of fact — may not be accorded finality under the Wunderlich Act.[23] The plaintiff argues, on the other hand, that the ASBCA decision is supported by substantial evidence and that it is res adjudicate/,.[24]. In plaintiff’s view the parties clearly intended that the Government would abide by its administrative decisions when favorable to the contractor — otherwise, it says, the entire administrative procedure established by the Government would be of no avail.
As to these contentions, it is sufficient to observe that it could well be argued that the board decision is entitled to weight — at least as an acknowledgment or admission by the Secretary of the Army that plaintiff was not in default, especially since examination of the administrative record makes it apparent that the board’s findings are supported by substantial evidence. But in the last analysis, neither that question nor the issue of finality need here be decided. For a trial de novo has (over plaintiff’s objections)[25] been held in this court — and the record of that trial, without more, demonstrates that the termination was unreasonable and *724 unjustified. This being the case, it is unnecessary for this court to consider the force and effect of the previous administrative findings.

Claim for Damages Resulting From Army's Taking Possession of Materials and Equipment Belonging to Plaintiff

Upon termination of the contract, the contracting officer, in accordance with Article 9,[26] took possession of various materials on the job site that were necessary for finishing the work and turned them over to the surety which utilized them therefor.[27] Plaintiff seeks recovery for the value of these materials which included some 1800 feet of cast-iron pipe, several carloads of limestone and a small amount of lumber; it also seeks reimbursement for the cost of unloading the pipe. As previously pointed out, the Government’s improper termination of the contract constituted a breach of contract for which plaintiff is entitled to recover such amount as would put it in as good a position pecuniarily as it would have been had the contract been fully performed. In the circumstances of the present case, this “amount would be the value of the payments . . . which would have come to (plaintiff) if the contract had been fulfilled, less the cost (it) would have incurred in completing (its) own performance. . . If, having proved the damage on this basis, (plaintiff) recovers the full value of the expected benefits, then there is no place for a recovery of (its) expense incurred for performance. The expenditures were the price of the benefits.” McCormick on Damages (1935 ed.) § 142. See also United States v. Behan, 110 U.S. 338 (1884) .[28]
*725 Plaintiff also makes claim for the reasonable market value of various other items taken by the Army on termination. In this connection, the record shows that the contracting officer not only took possession of materials necessary for completion of the work, he also took possession of some 200 other items belonging to Dale that were found on the job site, most of which were neither necessary for, nor utilized in, completion of the contract. These included such items as a complete clutch and pressure plate, oil filters, cargo hooks, grease guns, auto and building jacks, hardware poles, surplus 16" cement-asbestos pipe, empty drums, a spare starter motor, truck tires, hand tools of various kinds, rubber boots, etc. Dale made several complaints to the contracting officer about the matter and succeeded in having returned a few pieces of equipment needed for a Navy contract, and some scrap lumber; however, it was not successful in obtaining release of the great majority of the items. Plaintiff is entitled to recover the reasonable market value of such items which is found to be $4,000. Guerini Stone Co. v. Carlin Constr. Co., 248 U.S. 884 (1919); Suburban Contracting Co. v. United States, 76 Ct. Cl. 533, 544 (1932); Kennedy v. United States, 24 Ct. Cl. 122, 143 (1889).

Completion of the Army Oontract by the Surety

At the same time as he terminated Dale’s contract, the contracting officer notified Seaboard Surety that it could take over and complete the contract or, alternatively, that the Government would readvertise and have the work performed by contract, in which event the surety and Dale would be held liable for excess costs and actual damages. Seaboard elected to complete the contract and executed a supplemental *726 agreement with the Army for that purpose, which provided, among other things, that the Army would pay to Seaboard all monies due under the contract, including retained percentages.[29] To finish the work, the surety retained a contractor who had been doing other work at the Army Base. The contract was completed at a net loss to the surety of $31,870.38.

Termination of Navy Contract for Default; ASBCA Decision

Meanwhile, Dale, as low bidder, had obtained in June 1951 a contract in the amount of $39,995 from the Navy for installing new underground cables to replace the existing fire alarm and police signal system at the South Boston Annex of the Boston Navy Yard and furnished performance and payments bonds also issued by Seaboard Surety. In mid-February 1952 Dale was forced to suspend work on that contract owing to the manufacturer’s inability, because of a copper cutback, to deliver the needed cable.[30] Several months later Seaboard Surety, which had an indemnity agreement with Dale, brought suit against the latter in the Federal District Court in Boston for recovery of the amount it had lost in perf orming the Army contract. In August 1952 it obtained an ex parte temporary restraining order prohibiting Dale from accepting any payment from the Navy on account of the delivery of the 38-conductor cable without first obtaining the surety’s consent, an order which was followed the next month by issuance of a preliminary injunction of similar import.[31] In the meantime, in August the Navy *727 advised Dale that the cable was en route and that it was expected to make arrangements for its unloading. On September 11, 1952, the Navy wrote Dale that the cable had arrived on August 25; that it did not understand why th*, contractor had not accepted delivery and proceeded with the performance of the work; and that continued delay would endanger performance of the contract. On September 12, 1952, the Navy again wrote Dale that it was not “concerned with the merits of either your position or the surety . . . (and) that the continuance of (the) impasse between you and the surety may result in default of your contract.” Ultimately, on October 3,1952, the Navy terminated the contract immediately for default.[32] Dale appealed to the ASBCA contending that the default was due to causes beyond its control and without its fault or negligence, namely the action of the surety and the District Court in issuing an injunction based on the alleged default under the Army contract. In 1956 the ASBCA,[33] after hearing, denied the appeal, finding that Dale had not proved that it was unable to perform due to lack of financial ability; that the contractor was unwilling *728 and refused to enter into any agreement whereby payments which would have become due it under the contract would have been put into a joint bank account subject to withdrawals by its joint signature with the surety; and that Dale could not be said to have failed to perform the contract due to causes beyond its control and without its fault or negligence.
At this point it is well to observe that in the case of the Navy contract, the ultimate question — unlike that involving the Army contract — is not whether there was a default (for that is conceded), but, rather, whether the default was excusable. This, it is clear, is a question of fact rather than of law. Anthony P. Miller, Inc. v. United States, 161 Ct. Cl. 455, 474-75 (1963), cert. den. 375 U.S. 879. Automatic Screw Products Co. v. United States, 145 Ct. Cl. 94, 169 F. Supp. 951 (1959); Whitlock Corp. v. United States, 141 Ct. Cl. 758, 764, 159 F. Supp. 602, 607 (1958), cert. den. 358 U.S. 815. Thus, under the Wunderlich statute, the decision of the ASBCA is final and conclusive absent a showing that it was fraudulent, arbitrary or capricious, or not based upon substantial evidence. In this connection, the record shows that the purpose of the restraining order was mainly to insure that the cable manufacturer was paid for the cable when delivered so that it would not be a lien claim against the surety. The record further establishes that the Navy was willing to make a payment of 50 per cent of the value of the cable upon delivery; that the manufacturer was willing to release the cable for delivery on these terms; and that the surety was willing to make any reasonable arrangement with Dale, including establishment of joint control arrangements under which, among other things, the amount received from the Navy would be paid to the manufacturer subject to joint concurrence of Dale and the surety. The testimony also demonstrates that Dale refused to consider any arrangement with the surety on the ground that it would interfere with its orderly course of business in the performance of the contract — a reason which is devoid of evidentiary basis. It is apparent from this that the record fully supports the board’s decision that Dale’s default was not due to causes beyond its control and without its fault or negligence, and, accordingly, that decision is final and conclusive.

*729
Damages

It is a settled principle that where the fact of damage has been established, absolute certainty or precise mathematical accuracy as to the amount of damages is not necessary. Such damages will be allowed as in the judgment of fair men resulted from the breach. Dale Construction Co. v. United States, 161 Ct. Cl. 825, 829 (1963); Houston Ready-Cut House Co. v. United States, 119 Ct. Cl. 120, 96 F. Supp. 629 (1951); Reiss & Weinsier v. United States, 126 Ct. Cl. 713, 116 F. Supp. 562 (1953); F. H. McGraw and Co. v. United States, 131 Ct. Cl. 501, 130 F. Supp. 394 (1955); First-Citizens Bank & Trust Co. v. United States, 110 Ct. Cl. 280, 76 F. Supp. 250 (1948); Needles v. United States, 101 Ct. Cl. 535 (1944). Certainly the defendant which “has violated. (its contract should) not be permitted to reap advantage from (its) own wrong . . . (and) to escape liability because of the lack of a perfect measure of the damages caused by (its) breach.” Hoffer Oil Co. v. Carpenter, 34 F. 2d 589, 592 (10th Cir. 1929). See also Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359 (1927); Modern Industrial Bank v. United States, 101 Ct. Cl. 808 (1944). Against this background, not only has the fact of damage been established as to each of the claims listed below, it is found, on the basis of estimates that were the subject matter of credible testimony, that plaintiff is reasonably entitled to recover the following amounts therefor:
(1) $822.54 for costs resulting from defendant’s breach of warranty in connection with City of Boston’s failure to turn off water supply, an amount which includes reimbursement for operation and rental of 3 pumps for 4 days; labor costs for that period; rental of a crane for 8 hours to remove silt from trench; and 10% for overhead.
(2) $230.00 for costs of delays resulting from defendant’s failure to make work space available.
(3) $2000.00 for costs of approximately 20 days of delay resulting from defendant’s action in prohibiting forward work to proceed until the results of bacteria tests on a completed section were received. This amount is based on Dale’s daily cost of operations which generally approximated not less than $100.00.
*730 (4) $625.00 for increased costs resulting from incorrect representation on the plans.
(5) $180.00 for costs resulting from Navy’s removal of a temporary bridge, an amount which includes the expense for repairing the bridge and. costs attributable to delay in not having the bridge available.
(6) $55.00 for cost of.repairing hydrant.
With respect to the claim for increased costs resulting from underground obstructions, the record shows that plaintiff submitted a schedule to defendant’s auditor showing the type of obstruction encountered, the approximate days required to overcome each obstruction, and the specific dates when this was done. By comparing this schedule with a blueprint of the Army Base, defendant’s auditor was able to verify the existence of 79 obstructions, to overcome which, according to the schedule, 95% days were required.
Plaintiff’s witness estimated in his testimony that the actual cost for overcoming these obstructions (not including overhead, profit or stand-by cost for equipment) came to $12,100 — a figure which was arrived at by taking an average of the number of men working on the Army Base each day, computing the cost per day of the men, and multiplying that figure by the number of days of delay. However, this amount appears somewhat overstated in light of the fact that Dale in its appeal to the ASBCA in 1952 from the contracting officer’s termination action claimed a total amount of $7,449.20 for underground obstructions — an amount that it stated represented the sum of total labor costs of $6,900 for 3,450 hours of extra labor at $2.00 per hour; $572.00 for material and equipment costs; and 10% for profit and overhead, less a credit of $700.00 for machine excavation. Considering the more detailed nature of this estimate and the fact that it was prepared some 11 years earlier than the one submitted at trial, it is entitled to greater probative weight, lienee, while there can be no doubt that plaintiff’s performance was materially slowed by a plethora of underground obstructions, it is concluded that a reasonable amount for the costs needed to overcome them was $7,449.20.
Defendant contends, however, that plaintiff may not recover on this claim on the ground that it has failed to ex *731 haust its administrative remedies. Plaintiff, as has been mentioned previously, had made frequent verbal reports to the post engineer as underground obstructions were encountered and the parties ultimately agreed to postpone consideration of the question until the end of the contract prior to final settlement. This remained the situation when the contracting officer terminated the contract in January 1952, and later that month executed an agreement with the surety for completion of the work. Against this background, plaintiff in its appeal to the ASBCA in February 1952 from the termination action included therein a claim of $7,449.20 for underground obstructions. In the following month — while this appeal was pending — the contracting officer wrote Dale that “it is now desired to take up the matter of underground obstructions which you encountered from the beginning until you suspended operations.” The letter continued: “(I)t is requested that you list the obstructions encountered, together with the amounts you claim are due because of excess costs occasioned by these obstructions.” The contracting officer further indicated that the list would be checked and a finding made by him establishing the amount for which Dale might receive credit. The record does not show whether Dale replied to this communication, but, in any event, in June 1952 the contracting officer made findings of fact that Dale, prior to termination, had found it necessary to remove some 54 hidden subsurface obstructions; that trenching operations by backhoe were severely restricted due to these obstructions and necessitated more expensive hand-shovelling methods; and that Seaboard Surety’s claim of $2,435 for these obstructions was fair and reasonable. The contracting officer then proceeded to pay the surety this amount. It is problematical as to whether Dale had standing at this juncture to take an administrative appeal from this determination since the surety, as a result of the termination action, had stepped into its shoes. Thus, by improperly canceling the contract, the contracting officer may well have deprived Dale of a right to a timely administrative appeal from his decision in respect to underground obstructions. Perhaps the ASBCA, once it had upset the default termination, could *732 then have proceeded to resolve the problem on the record before it by treating Dale’s claim for underground obstructions as, in effect, a nune fro tumo appeal from the contracting officer’s findings in that regard. However, the board did not follow that course, but instead held (over Dale’s objection) that plaintiff’s claim for underground obstructions should be submitted to the contracting officer for subsequent action. But, since the contracting officer had decided that matter two years earlier, further recourse to him by plaintiff might have been an idle gesture. See United States v. Smith, 256 U.S. 11, 16 (1921); Lundstrom v. United States, 53 F. Supp. 709, 711 (D. Oreg. 1941), aff’d 139 F. 2d 792 (9th Cir. 1943). Be that as it may, considering the unusual administrative confusion and delay, for which defendant was largely responsible, and considering also that the claim was before the ASBCA when it heard the case, plaintiff’s failure to resort to further administrative proceedings is not a fatal bar to its proceeding here. Reinking Lumber Co. v. United States, 151 Ct. Cl. 307, 311, 283 F. 2d 527, 529 (1960); Garod Radio Corp. v. United States, 158 Ct. Cl. 596, 600, 307 F. 2d 945, 947 (1962); Lester Bros., Inc. v. United States, 151 Ct. Cl. 536, 539 (1960); United States v. Heaton, 195 F. Supp. 742, 746-47 (D. Neb. 1961). “Further hearings and litigation would tend to eat up the substance of these claims.” Armstrong v. United States, 152 Ct. Cl. 731, 738, 287 F. 2d 577, 580 (1961).
While plaintiff is allowed judgment of $7,449.50 for underground obstructions, the Government is entitled to recover from the surety, pursuant to its contingent counterclaim, $2,435 — the amount it paid the latter for underground obstructions encountered by plaintiff. Since the termination was unjustified, it is manifest that the Government’s payment of this sum to the surety was erroneous and may be recovered by way of a third-party counterclaim. Maryland Casualty Co. v. United States, 135 Ct. Cl. 428, 141 F. Supp. 900 (1956); Seaboard Surety Co. v. United States, 144 Ct. Cl. 686 (1959). Plaintiff is also entitled to recover $10,710.37, the amount of retained percentages that was withheld from it by the Government and paid to the surety. By the same token, the Government may recover this sum from the surety pursuant to the contingent counterclaim. Ibid.
*733 Plaintiff claims $15,904 which it estimated to be the total cost of the tools, equipment, spare parts and other items taken by the Army. In this connection it introduced in evidence a 10-page inventory describing each of the items, which was prepared in February 1952 and submitted to the contracting officer at that time. This evidence is found to be persuasive as to the items taken by the Army and not returned. However, in the absence of supporting testimony by way of books, records, invoices, etc., it is believed that plaintiff’s estimate of the total cost thereof is overstated, particularly when it is considered that in its appeal to the ASBCA plaintiff indicated that the approximate cost of these items was $4,000. While it is not possible from the record to determine the exact value of the items, examination of the inventory list makes it sufficiently clear to find, on the basis of a jury verdict, that the total reasonable value of the items in question was at least $4,000 and plaintiff is entitled to judgment in that amount. Dee Hong Lúe v. United States, 150 Ct. Cl. 655, 667, 280 F. 2d 849, 856 (1960).
As previously observed, when Dale’s right to proceed was terminated, the surety, at the defendant’s invitation, took over and completed the contract at a loss of $31,870.38. Dale subsequently consented to entry of judgment against it for a sum including this amount. It seeks recovery of this loss. Defendant contends, however, that under the indemnity agreement between Dale and the surety, as construed by the Circuit Court of Appeals, the surety could have stepped in at any time and completed the contract and that, therefore, Dale’s liability to Seaboard was not caused by the Army’s termination action, but rather was the product of its contractual arrangements with the surety. This argument is not persuasive. In the first place, the Court of Appeals did not hold that Seaboard had carte blanche right to take over the contract; it held rather that the surety could take over only were it shown that Dale’s prosecution of the work under the contract was so slow and so much at variation with specifications that the surety in good faith believed it desirable to step in to protect its interests. See supra, footnote 31. What is more, there was no judicial determination of the issue since the parties entered into a settlement agreement *734 after the court’s remand.[34] Ibid. Second, Seaboard, regardless of its agreement with Dale, could not have become a transferee under the contract without consent of the Government by reason of the anti-assignment statute[35] and there is no showing whatever that in the absence of a default termination, the Government would, in fact, have consented to such assignment. The situation here is that the Government itself precipitated the transfer by its wrongful action. Having forced the surety to take over and complete the contract (as an alternative to paying excess costs) ,[36] the Government cannot then exculpate itself from liability on the ground that it might in other circumstances have consented to a transfer. In short, defendant’s argument overlooks the most salient consideration of all: that the surety took over and completed the contract as the direct and immediate result of the Government’s termination of Dale’s right to proceed. That termination being improper, the Government is liable for the completion loss inasmuch as it was a direct and foreseeable result of the breach. United States v. Behan, 110 U.S. 338, 346 (1884); United States v. Spearin, 248 U.S. 132 (1918); Chain Belt Co. v. United States, 127 Ct. Cl. 38, 115 F. Supp. 701 (1953); Seatrain Lines, Inc. v. United States, 99 Ct. Cl. 272, 317 (1943); Joplin v. United States, 89 Ct. Cl. 345, 360 (1939); Williston on Contracts, § 1344 (Eev. Ed.); *735 Restatement, Contracts, § 330. Cf. Locke v. United States, 151 Ct. Cl. 262, 270-71, 283 F. 2d 521, 526 (1960).
Plaintiff also claims $35,000 for loss of anticipated profits on the Army contract. With respect to this claim, plaintiff’s direct costs, np to the time of termination, as verified by defendant, amounted to $89,507 which included an expenditure of $17,333 for the cast-iron pipe needed for the remainder of the work. Beyond this, plaintiff’s witness estimated that the total additional cost needed to complete the work was $28,745, less an estimated salvage recovery of $6,000, making a total completion cost of $22,745, on which basis plaintiff’s total direct costs for contract performance would be $112,252. To this, of course, must be added overhead cost and depreciation expense for the equipment needed to perform the contract. In this connection, a reasonable amount for plaintiff’s total overhead costs would be 10% of the total direct cost, or $11,225,[37] while a reasonable amount for depreciation would be $6,760,[38] so that plaintiff’s total cost of performance would be $130,237. Since the final contract price (exclusive of underground obstructions) was $162,486.02, plaintiff’s anticipated profit on the contract would thus come to $32,249.02. However, this amount, predicated as it is on plaintiff’s estimated cost of completion of $22,745, appears overstated. For one thing, it is not without significance that the surety’s total completion cost was over $90,000. It is true that generally it is more expensive for a new contractor to complete a job started by another than for the original contractor to finish the work in view of such factors as the need for a learning period, installation of a new plant, training new men, and getting organized. It is also true that the contractor retained by the surety to complete the job was a higher priced one than Dale. Nevertheless, the wide disparity between Dale’s estimated completion cost and the surety’s actual cost therefor militates against the conclusion that Dale could have completed the *736 work for $22,000. Second, when the surety brought suit against it, Dale filed a counterclaim, alleging that its loss of anticipated profits on the Army contract was $10,000— an admission which has considerable relevance here. Third, the amount claimed by Dale is at variance with its usual practice of estimating 10% profit on a job.[39]
In the circumstances of the present case, it would seem that the most reliable method for measuring plaintiff’s total cost of performance is to ascertain its direct cost of performance allocable to the portion of the work that had been completed as of termination and then to determine, by projection of that amount, its direct cost for the remainder of the work. Plaintiff’s total cost of performance would hence be the sum of these figures to which would be added the other relevant cost items disclosed by the record.
At the time of termination plaintiff had installed complete-in-place 4,355 linear feet of cement-asbestos pipe, of which 3,884 feet was 16" cement-asbestos pipe, while 471 feet was 12" cement-asbestos pipe. The unfinished work consisted of installing complete-in-place 2,030 feet of cast-iron pipe and 409 feet of 12" cement-asbestos pipe. In this context, Dale’s total costs of $89,507 up to termination included the following verified expenditures for the unfinished work: (1) $17,333 for cast-iron pipe; (2) $1,100 for unloading that pipe; (3) $752.00 for limestone to cover the cast-iron pipe; [40] and (4) $1,227 for 409 feet of 12" cement-asbestos pipe. Thus, $20,412 of the total expenditure of $89,507 was attributable to the unfinished part of the job while the balance, $69,095, was allocable to the work that had been completed. The record further shows that the cost of the 16" and 12" cement-asbestos pipe that was installed in the completed section of the work amounted to $20,713. Hence, exclusive of pipe cost, Dale’s total direct *737 cost for the work that had been completed was $48,382 ($69,095 less $20,713). Since plaintiff had completed the installation of 4,355 linear feet of pipe, its total direct cost per linear foot therefor, not including the pipe cost, was $11.11 ($48,382 -T- 4,355). Projecting this cost of $11.11 per linear foot to the 2,439 linear feet remaining would result in a completion cost therefor of $27,097.29, exclusive of pipe and limestone (2,439 X $11.11). As to limestone, it appears from the record that in addition to the previous expenditure therefor of $752.00, an additional expenditure of $3,360 would be required. The record also indicates that it would cost about $12,000 more to install continuous sheathing along the cast-iron section of the line than skeleton sheathing.[41] In summary, Dale’s total cost for performance of the contract would be, as follows:
1. Total direct cost for work complete-in-place_ $69, 095.00
2. Projected cost for completing work (not including pipe or limestone cost)_ 27,097.29
3. Cost of pipe for completion of work_ 18, 560. 00
4. Cost of unloading east-iron pipe_ 1,100. 00
5. Cost of limestone for completion of work_ 4,112.00
6. Additional cost for continuous sheathing_ 12, 000. 00
Total Direct Cost_ 131, 964.29
10% for overhead- 13,196.43
Depreciation expense_ 6, 760. 00
Total Cost for Performance of Contract _ 151,920.72
This amount of $151,920.72 subtracted from the final contract price of $162,486.02 (exclusive of underground obstructions which are the subject of a separate claim) would yield Dale a profit of $10,565.30. However, based on Seaboard’s experience, Dale would have obtained $2,733.49 as salvage from cast-iron fittings, etc. Thus, plaintiff’s total profit on the contract would be $13,298.79 and it is entitled to judgment in that amount.
Another item for which plaintiff makes a claim is a standby charge of $25.00 per day for approximately 140-150 days for loss of use of its heavy equipment. This claim must be *738 denied for lack of any proof with respect thereto. Plaintiff also seeks recovery of legal expenses incurred in defending Seaboard’s action against it. However, plaintiff failed to establish a factual basis for the claim. Moreover, this type of legal expense, unrelated to performance of the contract, is not compensable in this court. Dale Construction Co. v. United States, supra, p. 831, and cases there cited. Finally, plaintiff contends that as a result of defendant’s breach of contract its credit was impaired and that it suffered a consequent loss of profits on other contracts for a period of 10 years subsequent to 1952 — a loss which it seeks to recover here. This claim must be denied for two reasons : first, the record is barren of any proof concerning this claim; second, it is too remote to be regarded as a proximate result of defendant’s breach. Hadley v. Baxendale, 9 Ex. (Welsby, Hyrlstone & Gordon) 341; Ramsey v. United States, 121 Ct. Cl. 426 (1951), cert. den. 345 U.S. 944; Restatement, Contracts § 330.
FINDINGS OF FACT
CONTENTS Finding Nos.
Bids for Replacing Water Pipe at Boston Army Base; Pre-Award Discussions Between Dale and Defendant’s
Representatives_ 2-8
Award of Contract to Dale; Indemnification Bonds_ 9
Requirements Pertaining to Sheathing the Trench Excavation _ 16-12
Description of Boston Army Base; Reason for Sheathing Requirement_13-14
Responsibility of Post Engineer Under the Contract; Asserted Right to Waive Specification Requirements Pertaining to
Method of Operations Under Contract_15-16
Requirements of Specifications as to Backfilling Trench and Testing Cast-Iron Pipe_17-18
Post Engineer’s Approval of Dale’s Proposed Method of Operation Under Which Trench in Cast-Iron Pipe Section Would Be Immediately Backfilled to the Grade Level and the Pipe Joints Tested Above Ground_19-20
Start of Work on Cement-Asbestos Section of Line in October 24, 1950; Progress Charts_21-23
Claim in Connection with Failure by City of Boston to Turn Off Water Supply_ 24
*739 Finding Nos.
Provision of Contract Prohibiting Laying of Pipe When Weather Unsuitable; Suspension of Work from Latter Part of December 1950 to Latter Part of March 1951; Supplementary Agreement Extending Completion Date to October 1951___25-27
Resumption in March 1951 of Work on Cement-Asbestos Section of Line in Navy Area_28-29
Delay Resulting Erom Failure of Corps of Engineers to Make Working Space Available_ 30
Dale Prohibited From Opening or Closing Valves Unless It Gave 24 Hours’ Advance Notice_ 31
Complaints by Navy About Dale’s Work; Ultimate Acceptance of Job_ 32 Dale Denied Permission To Operate Two Crews; Operation of Two Shifts for Short Period_ 33
Delays Resulting From Post Engineer’s Requirement of Bacteria Testing- 34
Delays Due to Underground Obstructions_ 35
Incorrect Representations on Plans_ 36
Delay by Defendant in Processing Payments to Dale_ 37
Personal Animosity Between Defendant’s and Dale’s Representatives _ 38
Complaint by Maritime Commission Regarding Dale’s Operations in South Pier Shed Area in August_39-40
Complaints by Contracting Officer About Dale’s Failure To Shore, Brace and Support Railroad Tracks, Provide Temporary Bridges To Cross Trench, or To Sheath a Section of Line; Resolution of Complaints; Removal of Temporary Bridge by Navy_ 41
Requirement of a Weekly Schedule; Failure by Dale To Adhere to Schedule- 42
Plaintiff’s Claims in October 1951 for Replacement of Temporary Line and for Repair of Leak in Pipe Joint_43-45
Delay Due to Longshoremen’s Strike_ 46
Delay in November Caused by Opening of Valve_ 47
Dale’s Request for Time Extension and Subsequent Developments in Respect Thereto_ 48
Claim for Repair of Hydrant_!- 49
Complaints About Dale’s Failure To Sheathe in Cement-Asbestos Pipe Replacement Area_ 50
Approval of Schedules for Installation of Sections of Pipeline in Terminal Street in Vicinity of Dispensary and Administration Building_ 51
Work in Cast-Iron Pipe Area; Excavation of Trench, Removal of Old Pipe, Laying of New Cast-Iron Pipe; Controversy Regarding Sheathing and Testing-52-67
*740 Finding Nos.
Termination of tlie Contract for Default and Conclusions With. Respect Thereto-68-77
Taking Possession by Army of Dale’s Materials, Tools and Equipment After Termination for Default_ 78
Appeal by Dale to ASBCA (Docket No. 1532) ; Findings of ASBCA_79-86
Contracting Officer’s Offer After ASBCA Decision To Negotiate With Dale on Basis of Considering Previous Termination for Default as One for Convenience of Government; Dale’s Failure To Communicate With Contracting Officer for Purpose of Such Negotiations- 87
Completion of the Pipe Contract at the Army Base by Seaboard Surety_88-93
Contract Between Dale and Navy for Installation of Cables at South Boston Annex of the Boston Navy Yard-94 — 106
Seaboard Surety’s Completion of Navy Contract- 107
The Litigation Between Dale and Seaboard Surety and Subsequent Settlement_108-112
Amount Expended by Army Under Contract for Replacement of Pipe at Boston Army Base; Fair Value of Work Performed
Under That Contract- 113
Damages of Plaintiff on Army Contract- 114
Defendant’s Counterclaim Against Seaboard Surety- 115
1. Plaintiff, Dale Construction Co. (Dale), is a Massachusetts corporation, duly organized in 1950, with its principal place of business in Boston, Massachusetts. David A. Bobbins, the treasurer of Dale, and his wife, Helen B. Bobbins, the company’s secretary, own between them about 99 per cent of the company’s stock.

Bids for Replacing Water Pipe at Boston Army Base; Pre-Award Discussions Between Dale and Defendant’s Representatives

2. On June 2,1950, the Boston Army Base issued bid invitations for furnishing the materials and performing the work for replacement of a deteriorated 16" cast-iron high-service water main at the Base. The bid invitation called for replacement of the old water main at the Base and installing in its place an estimated quantity of 6,794 linear feet of pipe, consisting of 2,030 linear feet of 16" diameter cast-iron pipe, 3,884 linear feet of 16" cement-asbestos pipe, and 880 linear feet of 12" cement-asbestos pipe, together with the installation of existing reconditioned valves. On June 12, 1950, *741 Robbins submitted a bid on behalf of Dale in the approximate amount of $164,400.00. This bid price was an estimated one, since payments were to be made on the number of linear feet of pipe actually required to be placed, together with the number of valves needed. Dale bid a unit price of $22.00 per linear foot for 16" cast-iron pipe, $20.00 per linear foot for 16" cement-asbestos pipe, and $16.00 per linear foot for 12" cement-asbestos pipe. While the bid invitation did not specify a time for completing the work, Dale’s bid proposed that work would be commenced on July 17, 1950 and completed on January 12, 1951.
3. Four 'other concerns also submitted bids for the work in the amounts of $240,170, $240,715, $265,789 and $295,245, respectively, as contrasted with Dale’s bid of $164,400.
4. On or about June 23, 1950, after the bids were opened and before the award, Robbins requested orally and by writing that the contracting officer, Harold A. Curtis of the Boston Army Base, disregard Dale’s bid on the ground that the disparity between the amount of its bid and those of the higher bidders indicated that Dale had made a mistake in computing its bid.
5. The contracting officer suggested that Robbins come in and check his figures to determine whether Dale could do the work at the price it bid. Robbins compared his pre-bid estimate against the estimate prepared by the post engineer’s office — an estimate which totalled about $173,000.
6. The contracting officer could not award the contract to the second lowest bidder (who had bid $240,170) without referring the matter to higher authority.
7. The defendant’s fiscal year ended on June 30,1950, and unless the contract was entered into by then, the Army Base would have lost the funds allocated for the project for that fiscal year. In these circumstances, the post engineer (Major and later Lt. Colonel Herbert B. Rice, now retired) was reluctant to allow Dale to withdraw its bid.
8. (a) On or about June 25,1950, Robbins had conferences with Curtis, the contracting officer, and Rice, the post engineer, at which Rice agreed to assist Dale and make the work easier. Rice also told Robbins that while he would require that the job be done in a first-class manner, as required by *742 the basic intent of the specifications, in no respect would he require Dale to do anything unnecessarily expensive or unreasonable. Curtis and Rice also indicated to Robbins that if Dale encountered any obstructions that did not appear in the plans and drawings and Dale were delayed because of that, they would consider any request for an extension of time.
(b) After these conferences, Robbins rescinded the withdrawal of Dale’s bid.

Award of Contract to Bede; Indemnification Bonds

9. (a) On June 27, 1950, the contract was executed between Dale and the defendant, acting through Curtis, the latter’s contracting officer. The provisions of the contract and specifications are contained in defendant’s exhibit 1 and are incorporated herein by reference. The contract contained various standard clauses ordinarily embodied in Government building construction contracts during that period, including provisions dealing with “Changes” (article 3), “Changed conditions” (article 4), “Inspection” (article 6), “Delays-Damages” (article 9), “Disputes” (article 15), “Payments to contractors” (article 16) and “Termination for convenience of the Government” (article 18).
(b) In connection with this contract, Dale furnished a performance bond in the penal sum of $82,000 and a payment bond of $82,000 in favor of the United States, both issued by the Seaboard Surety Company.
(c) Dale and its principal stockholders, David A. and Helen R. Robbins, were required by the surety to execute and deliver written agreements of indemnity in favor of the surety. This was not known to the contracting officer prior to the award of the contract.

Requirements Pertaining to Sheathing the Trench Exca/vation

10. (a) Paragraph 2-03 of the specifications provided in part:
All materials in the trenches for water lines shall be excavated to the lines and grade shown on the Drawings *743 or as otherwise directed. Excavations shall be made to vertical lines and wide enough to permit proper sheathing, bracing, and form work where necessary or required . . .
‡ ‡ $
The Contractor will be required to completely sheathe the trench excavation along the cast-iron pipe replacement line.
(b) The specifications contained no specific provision for sheathing the trench excavation along the cement-asbestos replacement line.
11. (a) Article 27 of the contract dealing with “Accident Prevention” provided in part as follows:
In order to protect the life and health of employees in the performance of this contract, the contractor will comply with all pertinent provisions of the “Safety Requirements for Excavation — Building—Construction” approved by the Chief of Engineers, 16 December 1941, as revised 15 March 1943 (a copy of which is on file in the office of the contracting officer) and as may be amended, and will take or cause to be taken such additional measures, as the contracting officer may determine to be reasonably necessary for this purpose.
% H: # #
The contracting officer will notify the contractor of any noncompliance with the foregoing provisions and the action to be taken. The contractor shall, after receipt of such notice, immediately correct the conditions to which attention has been directed. Such notice, when served on the contractor or his representative at the site of the work, shall be deemed sufficient for the purpose aforesaid. If the contractor fails or refuses to comply promptly, the contracting officer may issue an order stopping all or any part of the work. When satisfactory corrective action is taken, a start order will be issued. No part of the time lost due to any such stop order shall be made the subject of claim for extension of time or for excess costs or damages by the contractor.
(b) GC-15 of the specifications provided:
ACCIDENT PREVENTION, FlEE PREVENTION, AND SANITATION. The handbook, “Safety Requirements for Excavation — Building—Construction” approved by the Chief of Engineers 16 December 1941, as revised 15 *744 March 1943, (copy of which is on file in the office of the authorized representative of the Contracting Officer on the project) and as may be amended, will govern in the prosecution of the work in accordance with the “Accident Prevention” article of the contract.
(c) Section 08, “Safety Requirements” handbook, is captioned “Trench Excavation” and reads as follows:
A. The following provision for shoring and bracing of trenches shall not apply where solid rock, hard slag, or hard shale is encountered or in which employees are not required to be or to work.
B. The sides of trenches in material, other .than those listed in paragraph F, which are 5 feet or more in depth and 8 feet or more in length shall be securely held by shoring and bracing, or sloped to the angle of repose of the material being excavated.
C. If the unit tunnel method is used, the length of earth left in place between the separate unit trenches shall be not less than one:half the depth of the trench and shall be considered as taking the place of shoring and bracing.
D. Whenever or wherever the unit tunnel method is used and where there is apparent danger of slips, slides, or caveins, trenches or tunnels in which men are employed shall be shored and braced or otherwise retained as may be necessary to prevent caving.
E. Trenches over 8 feet in length and 5 feet or more in depth in hard compact material, shall be braced at intervals not exceeding 8 feet, with 2-inch by 6-inch planks, or heavier material, placed vertically in the trench opposite each other, backed up by 2-inch by 10-inch planks bearing against the walls at the same intervals as cross braces, struts, or trench jacks. These braces shall, if possible, extend to the bottom of the trench and be supported by horizontal cross braces or struts. Bracing and shoring of trenches shall be carried along with the excavation and must in no case be omitted, except where a mechanical digger is used, the shoring shall be placed within 6 feet of the lower end of the boom. Undercutting shall not exceed 6 inches on either side of the trench.
F. Trenches in partly saturated, filled or unstable soils or where running material is encountered, such as quicksand, loose gravel, loose shale, or completely saturated material, the sides of the trenches 4 feet or more in depth shall be secured by the use of continuous vertical sheet *745 piling and suitable braces. In trenches over 4 feet in depth wooden sheet piling shall be not less than 2 inches in thickness.
G. Sheet piling shall be held in place by longitudinal beams at vertical intervals of 4 feet. The longitudinal beams shall in turn be supported by the cross braces or struts spaced a maximum of 4 feet. The longitudinal beams shall be in no case less in strength than that of a 4-by 4-inch beam; and when the longitudinal distance between cross braces or struts exceeds 4 feet and less than 6 feet, the longitudinal beam shall be not less than a 4-by 6-inch beam.
H. Vertical braces and longitudinal beams in trenches shall be supported by horizontal cross braces or struts, screw jacks, or timber placed at right angles to both braces, cleated and rigidly screwed or wedged. The timbers or struts, shall be not less in strength than the following trade sizes:
Size of cross Width of trench: traces or struts
1 foot to 3 feet_4x4 inches
3 feet to 6 feet-4x6 inches
6 feet to 8 feet-6x6 inches
I. One horizontal cross brace or strut shall be required for each 4 feet of depth or major fraction thereof.
J. In case it is desired to increase the vertical spacing between longitudinal beams or cross struts, the longitudinal beams, cross struts, and vertical sheet piling shall be increased in size to compensate for the overload.
K. Additional precautions by way of shoring and bracing shall be taken to prevent slides, or cave-ins, when excavations or trenches are made in locations adjacent to backfilled excavations or subjected to vibrations from railroad or highway traffic, the operation of machinery, or any other source.
L. Ladders, extending from the floor of trench excavation to not less than 3 feet above the top ground surface, shall be placed in the trench excavation at 50-foot intervals to be used as a means of entrance and exit therefrom.
12. Sheathing or shoring a trench consists of placing planks or steel sheets in a vertical position against the sides of the open trench and supporting them with cross-braces across the width of the trench. In general, there are two methods of sheathing a trench: One method, referred to as “solid” or “continuous” sheathing, consists of installing con *746 tinuous vertical sheet piling (which is held in place by longitudinal beams). This method is ordinarily used when the trench is in partly saturated, filled or unstable soil, or when running material is encountered. The other method, referred to as “skeleton” or “stay” sheathing, consists of placing planks or steel sheets at intervals of 5 to 10 feet, together with suitable cross-braces. This method is used when the trench is in hard, compact material.

Description of Boston Army Base; Reason for Sheathing Requirement

13. (a) The Boston Army Base is built on a finger of filled land reaching out into Boston Harbor from Summer Street. The Base consists of a main artery, Terminal Street, which is bounded on the north side, as the Base is entered, by a cinder parking lot followed by the Dispensary, the Administration Building, and a series of eight-story warehouse buildings, terminating in the north pier shed. The south side of Terminal Street, as the Base is entered, is first bounded by a parking and open storage area extending to the point opposite the far end of the Administration Building where a series of continuous wharf-shed buildings commence, terminating at the south pier shed. Terminal Street is approximately 86 feet wide but contains two railroad tracks toward the wharf-shed side. The street was subjected to the heavy truck and rail traffic connected with the operation of a port of. embarkation and warehouse storage area.
(b) The Base is bounded on its south side by the harbor channel and on the north side by the South Boston Annex of the Boston Navy Yard. Between the back of the warehouse buildings facing on Terminal Street and the Navy Yard is a street — Dry Dock Avenue — located on the Navy Base. Contrasted with the area of Terminal Street between the wharf-shed and warehouse buildings, the Dry Dock Avenue area behind the Army Base was relatively open and unrestricted.
(c) The 6,794 linear feet of water main to be replaced formed an oval pattern extending first from the junction of the water main with the City of Boston supply on Sum *747 mer Street down Dry Dock Avenue on Navy Base property, across into the harbor end of the Army Base, to the north and south pier shed areas, hack along Terminal Street, and then across the cinder parking area to join the main on the Navy Base side. The water main in the north and south pier shed areas was to be replaced with 12" cement-asbestos pipe; the water main from a point opposite the Administration Building on Terminal Street down to the pier shed area was to be replaced with 16" cast-iron pipe. The remaining water main — that along all of Dry Dock Avenue, across the cinder parking lot toward the entrance to the Base and down Terminal Street to the Administration Building — was to be replaced with 16" cement-asbestos pipe.
(d) When the Base was built there was an old pier located in the section of Terminal Street, extending from Summer Street to between the Administration and Dispensary Buildings, where the ground was expected to be compact. With this exception, the Base was constructed of fill composed of building materials, such as stone and brick, and mud and clay pumped from the channel. The post engineer anticipated that this filled land would be unstable when excavated because of its mud and clay content. He was also concerned with the possibility that the tidal pressure from the adjoining harbor might have an effect on the trench excavation.
14. (a) The primary reason for the provision in section 2-03 of the specifications requiring the contractor “to completely sheathe the trench excavation along the cast-iron pipe replacement line” was the safety factor; i.e., to protect men working in the trench excavation from cave-ins of the sides of the trench.
(b) Such protection for the workmen was considered necessary by the post engineer’s office because of expected unstable soil conditions along the cast-iron pipe area. The office was also of the view that the heavy truck and railroad traffic along Terminal Street might aggravate this situation by producing vibrations that would cause the sides of the trench to cave in.
(c) By contrast, because of the expected compact nature of the soil in the cement-asbestos pipe replacement area, the *748 specifications contained no specific requirement for sheathing the trench excavation in that area.

Responsibility of Post Engineer Under the Contract; Asserted Right To Waive Specification Reguirements Pertaining to Method of Operations Under Contract

15. While the contracting officer was the defendant’s formal representative with respect to the contract, the post engineer had responsibility to supervise the technical work, to supervise the acceptance of the work from a technical standpoint, to insure that the contract was being performed in accordance with the specifications, and to make the necessary ground measurements by which Dale might be paid. Dale’s operations were thus under the immediate supervision of the post engineer and his subordinates.
16. With respect to the specifications requirements, the post engineer considered that there was a difference between those applicable to the quality of the work and those pertaining to the method of operations. He was of the view that he had wide discretion, based on sound engineering principles, to allow variations or departures from those specifications of the contract pertaining to the method of operations, but lacked such discretion in respect to specifications covering the quality of the work or the materials to be installed.

Reguirements of Specifications as to Bachfilling Trench and Testing Cast-Iron Pipe

17. (a)- Paragraph 2-04 of the specifications read as follows:
BackeilliNG
a. General:
After completion and testing of water lines and other construction, the elevation of the final grades, and prior to backfilling, all forms and/or shoring shall be removed, and-the excavation shall' be clean of all trash, lumber, or other debris. Material for backfill • shall be obtained from the required excavation or borrow, and shall be free of trash, lumber, or other debris. Semi-compacted backfill shall be placed in horizontal layers not in excess of twelve inches (12") in thickness, and shall have a moisture content such that the required degree of com *749 paction may be obtained.- Each layer shall be compacted by hand or machine tampers, or by other suitable equipment to a density that will prevent excessive settlement or shrinkage. Backfilling shall be brought to a suitable elevation above grade to provide for anticipated settlement and shrinkage thereof.
b. Cast-Iron Pipe:
All newly laid cast-iron pipe and cast-iron fittings not in manholes or valve boxes shall be covered by a twelve inch (12") coating of lime stone dust plus a five percent (5%) mixture of hydrated lime. The lime stone dust shall be “Tobey Dust”, manufactured by the Lee Lime Corporation, or equal, (85%) eighty-five percent passing a 200 mesh sieve). Prior to placing the mixture of lime stone dust and hydrated lime in the trench, these materials shall be thoroughly mixed in a rotary mixer for a period not less than five (5) minués. The material will be placed in and about the cast-iron pipe and fittings, and thoroughly rammed and tamped. Upon compaction, the cast-iron pipe and fittings shall be covered with at lease twelve inches (12") around all perimeters with this lime stone dust and hydrated lime mixture. Upon completion of the placing of lime stone dust and ny-drated lime mixture, the trench may be backfilled as covered under Paragraph 2-04a.
(b) Section 1-03 of the specifications provided in part:
GENERAL
Pipe for water mains and building service connections may foe of any of the types and materials specified herein, shown on the Drawings, or as directed by the Contracting Officer. The pipe and accessories shall be of new ana unused material, unless otherwise approved by the Contracting Officer. The full length of each section of pipe shall rest solidly upon a pipe bed composed of twelve inch (12") in depth of lime stone dust and five percent (5%) hydrated lime, or a sand béd not less than four inches in depth as described hereinafter, with recesses excavated to accommodate, the bells, joints, and couplings of the pipe. Any pipe that has the grade or joint disrupted after laying shall be taken up and relaid. The interior of the pipe shall be thoroughly cleaned of all foreign matter before being lowered into the trench, and shall be kept clean during laying operations by means of plugs or other approved methods.
*750 18. Section 2-05 of the specifications read in part, as follows:
Cast-IrON Pipe
*
6. Tests. After the pipe is laid, the joints completed, and the trench partially backfilled, leaving the joints exposed for examination, the newly laid pipe, or any valve section of pipe shall, unless otherwise specified, be subject to a pressure test of fifteen pounds per square inch in excess of what the static pressure of the point of reading will be when the system has been in operation. All exposed pipe, joints, fittings, valves and hydrants, shall be carefully examined during the open-trench test. Lead joints showing visible leakage shall be caulked until tight. Cracked or defective pipe, fittings, valves or hydrants disclosed in the pressure test, shall be replaced by the Contractor with sound material, and the test shall be repeated until the test results are satisfactory to the Contracting Officer.
Where actual visible inspection of each joint cannot be made because of necessity for immediate backfilling, where the line is laid below water level and it is impracticable to lower the water level by pumping, or where the joints are made of other material than lead, and the leakage diminishes as the material in the joint ages, suitable means shall be provided by the Contractor for determining the quantity of water lost by leakage under normal operating pressure.

Post Engineer’s Approval of Dale’s Proposed, Method of Operation Under Which Trench i/n Oast-Iron Pipe Section Would Be Immediately Backfilled to the Grade Bevel and the Pipe Joints Tested Above Ground

19. (a) In the early part of July, prior to the time operations under the contract were to start, Robbins had discussions with the post engineer as to the methods for installing and testing the cast-iron pipe. (The parties then contemplated that the cast-iron pipe would be delivered on the job before the cement-asbestos pipe.) At this time the post engineer made it clear to Robbins that he had the option (whichever was most economical to him) of pressure testing a section of newly-installed cast-iron pipe either after the *751 trench had been partially backfilled and the pipe joints were in an exposed condition, or after the trench had been immediately backfilled to the level of the trench — a situation in which the joints would not be visible. The post engineer’s approval of either method of pressure testing cast-iron pipe constituted a variation from section 2-05 of the specifications inasmuch as that section permitted testing with the joint not visible only where the line was laid below water level and immediate backfilling was necessary or where the joint was made of a material (e.g. sulphur) which expanded with age, thus diminishing the leakage. See finding 18. The post engineer considered that such variation from the specifications was “a sort of thing that must be examined in terms of judgment” inasmuch as he didn’t “want to cause the contractor any unnecessary expense.” The post engineer made it clear to Robbins, however, that “the line in place would have to be tested in order for (him) in all conscience to accept the line.”
(b) There are several ways of testing cast-iron pipe joints for leakage after the trench has been completely backfilled and the pipe joints are no longer visible. One method is to make a pressure test on the pipe underground and then measure the leakage that has to be pumped in to maintain this pressure. Another method is to use ultrasonic equipment which operates from the ground and detects the leakage of water underground. Further, if the leak is of a substantial nature, it is visible above ground.
20. (a) In the early part of July, Robbins advised the post engineer that he proposed to install the cast-iron pipe by excavating a section of pipe at a time (about 16 to 25 feet) removing the old pipe, installing the new pipe, covering it with limestone and backfilling immediately to level— with all this work being completed the same day. The post engineer approved this method of operation.
(b) Under this method of operations, testing the cast-iron pipe would be undertaken after the trench had been backfilled to level.
(c) Robbins contemplated that under this method of operations, by immediately backfilling the trench to level in *752 stead of partially backfilling it, he would obviate the need for sheathing the trench along the cast-iron pipe excavation. Further, he concluded that the post engineer’s approval of his method of operations constituted approval for proceeding without sheathing.
(d) The record does not show that Robbins specifically advised the post engineer that he would not ultilize sheathing in his method of operation for installing cast-iron pipe.
(e) Immediate backfilling of a trench to level does not prevent installation of solid sheathing on excavation of the trench and then performing the pipe removal and pipe laying operations while the sheathing is in place. Such sheathing operation requires installation of continuous sheet piling, held in place by longitudinal beams, which in turn are supported by horizontal cross-braces across the width of the trench at intervals of 6 to 8 feet. In order to remove the old pipe, each of the cross-braces is removed seriatim and then replaced as the pipe is lifted out. The new pipe to be installed is lifted free and clear of the roadway by a crane; one end is then deposited in the trench on a board, and then allowed to go down slowly to a horizontal position. As the pipe is lowered and about to strike a cross-brace, that cross-brace is taken out. The sheathing must be removed prior to backfilling the trench to level.
(f) The methods for laying cement-asbestos pipe and cast-iron pipe are the same. However, cement-asbestos pipe is more fragile; it is also brittle and subject to breakage due to shock loads. For that reason, cement-asbestos pipe has to be covered by a coating of 12 inches of sand; for cast-iron pipe the specifications required a coating of 12 inches of limestone dust around the pipe in order to prevent corrosion. From an engineering standpoint, cement-asbestos pipe can be pressure tested either after the trench has been partially backfilled leaving the joints visible, or after the trench has been completely backfilled.

Start of Work on Cement-Asbestos Section of Line on October 24, 1950; Progress Charts

21. As provided in the contract, operations were scheduled to begin on July 17, 1950, and be completed by January 12, *753 1951. However, because of difficulty in obtaining pipe and other materials due to the Korean emergency, work did not commence until October 24,1950. At that time, Dale started work on the cement-asbestos section of the line, rather than the cast-iron pipe section as originally scheduled, because of the supplier’s failure to deliver the cast-iron pipe as promised.
22. (a) Article GC-6 of the specifications provided in part as follows:
PeogRess Charts, SuNbays, Holidays AND Nights (a) The contractor shall within five days or within such time as determined by the Contracting Officer, after date of commencement of work, prepare and submit to the Contracting Officer for approval a practicable and feasible schedule, showing the order in which the Contractor proposes to carry on the work, the date on which he will start the several' salient features (including procurement of materials, plant and equipment) and the contemplated dates for completing the same. The schedule shall be in the form of a progress chart of suitable scale to indicate appropriately the percentage of work scheduled for completion at any time. The Contractor shall enter on the chart the actual progress at the end of each week or at such intervals as directed by the Contracting Officer and shall immediately deliver to the Contracting Officer three copies thereof.
(b) Commencement of this work was undertaken pursuant to a schedule dated October 20, 1950, which Dale submitted in accordance with article GC-6. In this schedule Dale proposed to proceed first on the cement-asbestos section on Dry Dock Avenue for a distance of about 1000 feet in the period from October 20 to November 10,1950. It then proposed tentatively, depending upon securing pipe deliveries, to start and complete by December 15, 1950, the cast-iron pipeline along Terminal Street, as well as the remaining section of cement-asbestos pipe, and to complete the installation in the spring, weather permitting.
23. As a result of the Korean hostilities, the occupancy and operations at the Boston Army Base became greatly increased.

*754
Claim in Connection with Failure by City of Boston To Turn Of Water Supply

24. (a) At the beginning of the job, the post engineer had issued instructions to Dale that all valves, shut-off operations and services would be performed and/or ordered by his office. On October 25, 1950, in accordance with these instructions, Robbins notified the post engineer that Dale desired the water to be shut off from the City of Boston supply in Summer and Fargo Streets to a point about 1000 feet east near the meters. The next day, Cuddy, the principal engineer in the office of the post engineer, instructed City employees to shut off the water for high pressure service from Fargo Street; he also told them to notify him when this was done. Thereafter, Robbins, acting pursuant to instructions, checked with the post engineer’s office and was told the water supply had been shut off. On the following day, an employee of Dale again checked with the post engineer’s representative and received assurance from the latter that the water had been turned off. On that afternoon Dale’s work force cracked the old pipe preparatory to removing it from the trench and installing new cement-asbestos pipe. However, the water supply had not been turned off, with the result that a large amount of water began gushing out of the cracked pipe. It became necessary for Dale to place three pumps in operation and to continue pumping operations until midnight. Early the next day the water from the cracked pipe was still flowing. Water completely filled the trench and spilled over to adjoining areas. An emergency crew from the City water department was called to the site and found that the department had not shut off the proper valve; that the appropriate valve had been asphalted over in the street and, therefore, was not visible. Subsequently the proper valve was closed; however, it was necessary for Dale to continue pumping and dewatering for several days afterward. In all, 5 days were required before Dale could proceed with the work under the contract.
(b) By a letter dated November 4,1950, Dale transmitted to the contracting officer a claim in the amount of $822.54 *755 for rental of pumps, labor expended, crane rental and overhead and profit. On January 16, 1951, the contracting officer wrote Dale, as follows:
In response to your letter of 4 November 1950 regarding claim for alleged damages incurred during the performance under subject contract, you are informed that it is the opinion of the Contracting Officer that claim for the damages outlined in your letter should be made to the City of Boston.
This determination is made after a careful investigation of the facts, as provided in Article 15 of the above contract. In this connection, your attention is invited to the further provisions of this article relative to your right of appeal as set forth therein.
On January 29,1951, Dale addressed the following letter to the contracting officer:
Reference is made to your letter stating that the fault concerning the failure to properly shut off the Summer St. Supply line lies with the City of Boston rather than with the Army.
While we agree with this sentiment, we do not know at this time if our recourse is to the City directly or through the Army. Pending this determination we wish to appeal the decision referred to in the first paragraph.
(c) No further action was apparently taken by Dale on this claim until it was included by a reference (and later detailed in a brief, dated October 14,1952) in an appeal subsequently taken by Dale, on February 14,1952, to the ASBCA from the contracting officer’s termination of the contract for default.
(d) In the course of the proceedings before the ASBCA, the Government counsel stipulated the facts as to the claim, but not as to the amount. He suggested that in the event the claim had merit, it should be returned to the contracting officer for decision as to the amounts involved. Robbins, who was not represented by counsel at this stage of the board’s proceedings, agreed.
(e) The ASBCA ultimately held that since the appeal on this claim was not filed within 30 days after the contracting officer’s adverse decision, it had no jurisdiction to consider it.

*756
.Provision of Contract Prohibiting Laying of Pife When Weather Unsuitable; Suspension of Work From Latter Part of December 1950 to Latter Part of March 1951; Supplementary Agreement Extending Completion Date to September 1951

25. Dale continued work along Dry Dock Avenue until the end of December 1950. At this time, because of the freezing weather, the pipe that was being excavated was completely encased in ice. The post engineer advised Dale that he preferred that it not continue operations because of hazards to the water supply of the Base in case the water in the pipe should freeze. In these circumstances, except for minor operations, work was largely suspended until the latter part of March 1951.
26. Section 1-03 of the specifications provided in part that “pipe shall not be laid . . . when . . . weather conditions are unsuitable for the work, except by permission of the Contracting Officer.”
27. By modification No. 1, dated January 29, 1951, a supplemental agreement was entered into extending the completion date, which was originally scheduled for January 12, 1951, to September 28, 1951. The modification recited that delays were occasioned by difficulties in obtaining materials and extremely bad weather conditions.

Resumption in March 1951 of Work on Cement-Asbestos Section of Line in Nmy Area

28. Beginning at the end of March 1951, Dale proceeded with the laying of the 16" cement-asbestos pipe down Dry Dock Avenue on the Navy Base.
29. During the work along Dry Dock Avenue, a work schedule was important in enabling Navy personnel to be apprised of the work to be undertaken so that they could adjust their activities in such a way as to provide Dale with necessary working space. The contracting officer wrote to Dale on June 6,1951, that the progress chart it had filed was rather sketchy; on June 18 he again wrote Dale stating that “Due to critical shortage of parking facilities at the Boston Army Base, you are again requested to submit a work sched *757 ule showing both time and location of your proposed contract operations in order that working areas be made available for your use.” On July 23, 1951, Dale submitted a progress schedule for the balance of the project.

Delay Resulting From Failure of Corps of Engineers To Malee Worhing Space Available

30. (a) On or about April 20, 1951, Dale’s work in the Navy section on Dry Dock Avenue approached an area leased by the Navy to the New England Division of the Corps of Engineers. The latter refused to remove cars which were triple parked by its employees in the specific area where Dale was supposed to excavate. Dale eventually overcame the problem by barricading the area early one morning with heavy equipment, such as shovels, bulldozers and compressors, and thereby preventing Corps of Engineers’ employees from entering the area. By so doing Dale was able to proceed with the excavating and pipe-laying work. At the ASBCA proceeding, Government counsel stipulated that one week was required to effectuate the removal of the parked cars; that the contract was delayed that week, less the amount of work that Dale performed during that period.
(b) As a result of the Corps of Engineers’ refusal to have the parked cars removed, performance under the contract was delayed for approximately one week.
Dale Prohibited, From Opening or Closing Valves Unless It Came Hours’ Advance Notice
31. (a) The water system at the Base was somewhat complex and the closing of certain valves would affect other parts of the system. Closing certain valves would, for example, cut off all sprinkler fire protection in the building concerned. Accordingly, it was necessary to coordinate valve openings and closings with all interested parties such as the Army Base fire chief, the plumbing foreman, the wharf-shed personnel, and the concerned lessees and concessionaires. On one or two instances Dale had closed valves without notice with the result that on one occasion fire protection was denied; on the other, the drinking water supply was cut-off. By letter dated April 17, 1951, the contracting officer di *758 rected that Dale not operate valves without prior written permission from the Government inspector on notice that had to be given 24 hours in advance. Dale replied on April 20 in part, as follows:
Insofar as the operation of the valves which control the flow of water to buildings we acquiesce.
However, from time to time it is necessary for us to perform certain features of the construction work which involve the opening and closing of valves which we believe should be under our control without notice being given 24 hours in advance.
An example of this type is opening a 12" valve in a line just completed in order to chlorinate the next section or to observe leakage at fittings before backfilling. The various valves to the buildings would remain in their normal (closed) position so that insofar as the building is concerned the valve relations remain the same; another example would be operating a valve to flush out a line.
If we are not allowed to perform the various steps in a normal sequence without waiting 24 hours, the work will be delayed and work stoppages will result.
By letter of May 17 the contracting officer denied Dale’s request to eliminate the 24-hour notice of intent to shut off open valves. The contracting officer stated that a Government inspector was on the job site each day while Dale was engaged in pipe-laying operations and that it was difficult to see why his April 17th letter should be amended. According to the contracting officer, with proper scheduling of work in advance, this requirement should cause no difficulty. By letter of May 21 Bobbins replied that while there was no contract item for such advance notice, he would, of course, abide by the request even though he did not agree with it.
(b) Bobbins’ basic objection to the 24-hour advance notice requirement was that Dale’s operations were delayed by that amount of time in those instances where it did not know specifically when it needed a valve opened or closed in order to do various work on the job.

Complaints by Nmy About Dale’s Work; Ultimate Acceptance of Job

32. (a) In April 1951 and later, the Navy made various complaints to the defendant’s inspector, Sewall B. Hill, a *759 subordinate of the post engineer, about various aspects of the Dry Dock Avenue work. For example, it complained that Dale was failing to clean up the work; that it had damaged a fence; that it had left open spaces under a fence where work was being done on laterals; and had delayed the paving operation. It also complained about the quality of workmanship on the operation.
(b) With respect to paving and fence lines, section 2-16 of the specifications read as follows:
Paved Surfaces, CURBING AND FeNce Lines
a. All paved areas inside the Boston Army Base removed during the course of the work shall be replaced with a two-inch (2") asphalt wearing surface on a seven-inch (7") bituminous penetration base and a twelve-inch (12) sand and gravel sub-base, all in accordance with accepted highway practice.
h. All paved areas located outside the Boston Army Base removed during the course of the work shall be replaced with a pavement of like type as that removed.
c. Curbing and fence lines disturbed during the work, shall be reset or replaced, if necessary, along original lines and grades or as directed by the Contracting Officer.
(c) The Navy tentatively accepted the pipe laying and other work of Dale in mid or late December, 1951. Several minor deficiencies still remained to be corrected in January, 1952.
(d) On June 15,1951, the Navy awarded Dale a contract in the amount of $39,995 to furnish and install new underground cables to replace the existing fire alarm and police system cables at the South Boston Annex of the Boston Navy Yard. See finding 94 infra.

Dale Denied Permission To Operate Two Crews; Operation of Two Shifts for Short Period

33. (a) On May 1,1951, Robbins wrote to the contracting officer as follows:
Would you kindly give some consideration to our operating two crews in the above project.
We realize that traffic and other problems have increased in the Army Base and you may not wish to have facilities tied up on two sides.
*760 The two crews would be separate and distinct utilizing two backhoes and of necessity working different areas. We find that the work can progress with one set of equipment only so fast regardless of the quantity of men employed.
(b) The record does not show that Robbins received an answer to this letter. However, he later had several conversations with the post enginer about the possibility of using two crews. Eventually, in the middle of August 1951, the post engineer advised Robbins that Dale could not operate two crews because of the traffic difficulties on the Base.
(c) No provision of the contract prohibited the contractor from using two crews.
(d) In the middle of June 1951, the Government inspector noted that Dale had an average of 12 workmen per day on the job. He suggested that in order to meet the completion date, the contractor make an effort to maintain an average of 480 man hours per week (i.e., 8 hours per day for a 5-day week) for each of the 12 men. On July 7, 1951, Robbins wrote to the contracting officer concerning underground obstructions that had been encountered and stated that “We propose to try to speed up the work somehow and would greatly appreciate your opinion on how this may be done, utilizing two crews if possible.” The contracting officer replied in part on July 11,1951, that “It is urgently requested that every effort be made to prosecute the contract work to completion, inasmuch as the date of completion has been set for the 28th day of September 1951. This just leaves slightly over two months to complete the remaining portion of the contract work.”
(e) For a time in July and/or August 1951, Dale operated two shifts but discontinued this in the latter part of August when informed by appropriate labor authorities that two shifts would necessitate payment of time and a half.

Belays Resulting From Post Engineer's Requirement of Bacteria Testing

34. (a) Section 2-15 of the specifications provided as follows:
*761 STERILIZATION
Each unit of completed supply line and distribution system shall be sterilized with chlorine before acceptance for domestic operation.
a. Material:
1. Liquid Chlorine. Liquid chlorine shall conform to the requirements of US Army Specifications #4-1.
2. Hypochloride Liquid. Hypochloride liquid shall conform to the requirements of Federal Specifications O-B-441, Class D.
b. Method. The amount of chlorine applied shall be such as to provide a dosage of not less than fifty parts per million. The chlorinating material shall be introduced to the water lines and distribution systems in a manner approved by the Contracting Officer. After a contact period of not less than eight (8) hours, the system shall be flushed with clean water until the residual chlorine content is not greater than 0.2 parts per million. Valves in the lines being sterilized shall be open and closed several times during the contact period.
(b) After a completed section of cement-asbestos pipeline was sterilized by the injection of chlorine, samples of water were taken from the completed section and sent to an Army Medical Laboratory at Fort Devens, Mass, some 40 or 50 miles away, for the purposes of having a bacteria test made. This was an additional safeguard to determine that the pipe was sterile.
(c) Ordinarily about four days elapsed before the results of the bacteria tests were received from the Fort Devens’ laboratory.
(d) The post engineer would not allow Dale to proceed with the next section of the work until the bacteria test was received from Fort Devens, found to be satisfactory, and the completed section was in operation.
(e) A bacteria test was not required by the contract or specifications.
(f) Dobbins voluntarily increased the concentration of chlorine in the water above that required by the contract to insure that the pipe was sterile. He expressed the view to the post engineer that this insured that the pipe was sterile; he also complained that bacteria testing was unnecessary, *762 stating that the procedure he was following was not only in accordance with the specifications but with the standard procedure outlined to him by the City of Boston. Thus, on April 20, 1951, Bobbins wrote to the contracting officer as follows:
There seems to be some confusion about the necessary precautions to safeguard health and possible fire water supply for this project.
Therefore we would like to set forth in detail what precautions and methods we propose to use so that our work will progress a little smoother and we can make a little better time in our operations.
On Dry dock Avenue each segment of water line (between 12" control valves) is approximately 280 feet long and controls one fire line in the corner and two sprinklers and hydrant in the center of each Army Base Section, i.e. A, B, etc.). Because of the nature of the work there are times when two segments of the water line will be inoperative, although with some synchronization this can be reduced to where most of the time only one segment is out. For this area of the work we propose:
1. Install temporary fire line supply by means of a hose between the nearest fire riser which is on and the sprinkler riser. At the worst possible condition this would occur at two sections at one time. Only a single 2%" standard fire hose would be used. Y connections will be provided by us, so that additional hoses for fire lines may be connected if necessary. However, we would supply only one hose line. If more are needed they womd be furnished and installed by others. I understand some Sections have large amounts of materials stored there. However, this is a condition that did not exist at the time of the bidding and if any added expense is necessary to safeguard this material we believe it should be borne by the Army.
2. We would then proceed to remove and install pipe. As soon as one segment is completed we propose to chlorinate it at 100 ppm for a period of two days, then throughly flushing that segment of the line by means of hoses attached to the hydrant at that segment and immediately put that segment of the line into service.
At the present time the above procedure is followed but the line is not put into service until the Army takes a sample of water, and tests it, a procedure which takes four days. All tests to date have been negative; and *763 this delay of four days causes us to stop work which is costly and expensive and also delays us in applying the full pressure to the line so that we can check for possible leaks or defects in the pipe or our work. This then causes a delay in backfilling, which leaves the location unsightly, and also increases the amount of temporary water lines we have to furnish. There is no provision in the contract for the testing other than chlorination before putting into service.
It is not that I object to the testing as such, but I do object to the delay and costs, because of it.
The standard procedure outlined to me by the City of Boston is the same as the specifications and what we propose and have been doing (we exceed the chlorination amount). If the water purity tests are desired by the Army I suggest that they be taken daily. Because of the chlorination sterilization there is little likelihood of any trouble for the initial period of water is on so the tests as taken are valueless. If a source of infection is actually contained in the pipe it would not show for weeks, until the sterilization wears off. That is why I suggest daily tests be taken, during the course of the work and afterwards.
If desired we are prepared to show that the chlorine injected in the pipes exceeds the 50 ppm by the standard orthotoulidine test.
3. The character of the line changes as it approaches the Boiler House and Terminal Street. For these conditions we will furnish a detailed scheme of operations similar to the above.
The contracting officer replied on May 18, 1951:
Beference is made to your letter of April 20, regarding, 1. Installation of fire supply lines and 2. A request to put the new high service lines immediately into service after flushing operations.
With respect to Item 1, your attention is called to Article 1-03 GeneRAl of the contract, wherein it is stated that, “The contractor shall further furnish an alternate water supply, adequate for sanitary use, domestic use, and fire protection, in all the buildings of the Army Base during replacement of existing water lines and service lines to buildings.” This office reserves the right under the above clause, to request the contractor to install more than one line should it deem this installation so advisable.
*764 Present procedure of having water sample tests made prior to setting the new pipe line installations into service has been dictated by the Department of the Army, Corps of Engineers, on their instructions contained in “Water Supply, Distribution and Storage”. Article 9 in the Appendix A of this manual states:
“BacteRial Tests — After any given unit or portion of the water supply system has been sterilized and the system has been thoroughly flushed, with fresh water until the chlorine has been removed, samples of the water from several points in the system shall be taken in thiosul-phate treated sterilized containers and shall be subjected to bacterial examination. If the supply is known to be of good quality and repeated tests of the samples show the presence of coliform organisms, the sterilizing shall be repeated or continued until tests indicated the absence of pollution. The bacterial examination shall be completed before any unit or portion of the system is placed in operation. Samples may be submitted to local State Boards of Health or to commercial testing laboratories if complete bacterial testing facilities are not available.”
In view of the above, Items 1 and 2 contained in the above mentioned letter, are hereby disapproved inasmuch as they affect both the security and safety of personnel and material in the Boston Army Base.
On May 21, 1951, Dale wrote the contracting officer, in part:
At the present time we have temporary water on in Section C-D. In Section B we have the hoses installed and to provide temporary water merely requires opening a hand valve. In Section D, along with the temporary water supply the water is on in the main line, chlorinated and flushed and available for immediate use in Section D. However, the test of the bacteria count has not yet been received and we are not allowed to turn this water on. _
_ With these conditions existing we are not allowed to proceed with the removal of existing pipe and the installation of new pipe. We have not been allowed to shut off the valve opposite Section A and we have gone as far as possible without shutting off this valve. This has been the condition for a week and we are prevented from laying any pipe. The reasons are that the storage of the wool mentioned in our letter of April 20, 1951, presents a hazard which requires water on in Sections *765 C and D from the normal source not the emergency source.
In view of all these conditions you can readily see why we cannot adhere to any schedule much as we desire to do so. Each area excavated differs from the last and from the Plans and Specifications. Our equipment and manpower have been idle for a week except for minor work. The hazard of the storage of the wool was not existing at the time of bidding nor long afterwards.
The above is to be construed as a notice of claim under Article 3 and Article 4 for increase in compensation due to changed conditions and orders. We will present the estimated cost upon your request.
The record does not indicate that the contracting officer took specific action other than that previously set forth regarding this claim.
(g) Bobbins wrote to the Department of Public Health of the Commonwealth of Massachusetts on April 20, 1951, as follows:
We are contractors to the Army Base to renew approximately 7000 feet of 16" high pressure water piping which supplies water to the Army Base for both domestic and fire line purposes.
There is now about 2000 feet of new pipe installed, and the two samples of water submitted to your laboratory were taken near the supply end at the end of the line.
The specifications stated that we must chlorinate the line at 50 ppm of chlorine for 8 hours. However, this is the method we have been following. The line is broken up into 200 foot sections by valves in the main line. We shut off one section, remove and reinstall pipe, and when the section is completed we install sufficient stock solution of high test hypochlorite to produce 100 ppm. We let this stay for two or three days, with the supplying valve just barely open and then flush the line through the nearest hydrant. We have then put that section into service and work on the next section.
If you have any suggestions to make regarding this method please do so. Occasionally tests are made of the water.
Is it necessary or the usual practice to have tests taken for each 200 foot section as it is put into service? The four days required for a report would hamper the speed with which we could work as only one section can be out *766 of service at a time because of the fire hazards. The pipe is laid on filled land, which is oftentimes wet. We keep the end covered with rubber at all times when not working but in all probability there are times when some mud or clay gets in. This we eliminate also by flushing thoroughly by means of hydrants, which are available for each section.
Your advice and reports on the water will be appreciated.
In reply, Eobbins received a letter from the State Commissioner of Public Health dated May 2, 1951, which read as follows:
The Department of Public Health is in receipt of your communication dated April 20, 1951, relative to the chlorination of about 7000 feet of 16-inch high pressure water mains supplying the Army Base in Boston.
The results of the bacterial examination of samples of water collected on April 17 after the main had been chlorinated and flushed show that the water was safe for drinking at the time the samples were collected.
Your procedure of chlorinating 200-foot sections of the main, allowing the chlorine solution to remain in contact with the main for a period of two or three days and then flushing to waste, appears to be satisfactory procedure. Since the dosage of chlorine is 100 parts per million and since this is maintained in the main for a two- or three-day period, it is not necessary in the opinion of the Department to have bacteriological tests made for each 200-foot section.
The Department would be pleased to make bacterial examination of samples of water from the main under construction when the installation has been completed.
Should you care to discuss this matter further you should consult with the Division of Sanitary Engineering of the Department of Public Health, Eoom 511A, State House, Boston.
(h) The report of the defendant’s inspector, Sewall E. Hill, dated May 7,1951, read in part:
I am becoming concerned over the length of time it seems to take in getting a report on the water tests; it is UNSAFE to depend on the present bypass connections and the quicker we can get the line flushed and the sections back into service, the safer it will be.
*767 Hill’s report of May 9,1951, read in part:
It has been suggested to Mr. Bobbins that he hire two extra men and assign them to exclusive work in the laterals but he objects to this as he states he tried it and that because reports on water tests came back so slow the crew got too far ahead, thus complicating the situation on water service maintenance to the sections.
(i) An engineering firm in the Boston area (a representative of which testified on behalf of defendant) provides in its standard specifications for bacteria tests in connection with the installation of water mains, and would insist on such tests, even if advised by the State Public Health Department that they were unnecessary.
(j) The record does not support the conclusion that bacteria testing is standard practice in the industry.
(k) Because of the length of time involved in obtaining results of bacteria tests, Dale’s performance of the contract was delayed for 20 days.

Delays Due to Undergrownd Obstructions

35. (a) Article 4 of the contract provided in part, as follows:
Changed conditions. — Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall with the written approval of the Secretary of War or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.
(b) Beginning in November 1950 and continuing thereafter during the progress of the work, Dale encountered some *768 79 underground obstructions at tbe job area, none of which were visible above ground, shown on the contract drawings, or indicated in the specifications. These obstructions included buried wood piers and heavy timbers which had been filled over many years before; a concrete block weighing almost 2 tons; a concrete encasement; electrical cables and ducts; gas lines; a telephone cable; etc.
(c) Dale made frequent verbal reports about these obstructions to the post engineer’s office as they were encountered and, from time to time representatives of the post engineer made an inspection of the particular obstacle encountered. In addition, by letters dated December 14,1950, March 5, April 20, 30, May 7, August 9, 16, 22 and December 1, 1951, Dale called the contracting officer’s attention to various of the underground obstacles it encountered.
(d) On April 20, 1951, Dale wrote the contracting officer suggesting that some formula be worked out to modify the contract so that it could be paid out of current payments for the extra work involved in connection with subsurface obstructions. Dale’s letter suggested the following:
1. That if the obstruction is merely in a different condition from that shown in the plan no allowance be made.
2. That if a structure shown on the plan does not actually exist (none have been found to date) that this be exchanged as a credit for one that does exist.
3. That where an obstruction exists that is not shown on the plans, a record of labor time be kept as required to excavate around and support such obstacles and this cost be kept as a debit, and that the time and cost necessary to excavate the trench by the contractor’s normal means (power backhoe) be taken as a credit.
(e) On April 30, 1951, Dale again wrote to the contracting officer stating that it had been requested by the post engineer to grade and pave the area where the pipeline was completed and that it was ready and willing to do this at once. The letter continued:
However, in this area many of the subsurface structures mentioned in our letters of December 14, 1950 and April 20,1951 are included. We do not believe that an accurate check of these was maintained except by us, and *769 we may be in dispute over the quantity and quality involved.
At the present time it is not too expensive a proposition to dig these areas again for verification, if necessary, but once paved, the cost would be prohibitive.
Can you suggest some means of agreement on these obstacles, as we will not start this paving until such an agreement is reached.
(f) As a result of this letter, the contracting officer and the post engineer had a conference with Robbins early the next month, at which time, pursuant to the contracting officer’s suggestion, the parties verbally agreed to leave the matter of unchartered underground obstructions to be adjudicated at the end of the contract prior to final settlement, and to follow this procedure on all similar matters in which large amounts were not involved. It was also verbally agreed that no special and independent action would be taken unless a large sum were involved.
(g) By letter of July 7,1951, Dale notified the contracting officer that it had reached more sections of the ground where obstructions were encountered; that Dale and the defendant’s inspector were keeping an account of these obstructions; and that unless Dale heard from the contracting officer to the contrary, it would just keep track of these obstructions for later adjustment. The contracting officer replied by letter, dated July 11, 1951, that these obstructions should be reported in writing at the end of each week’s work and that this would enable his office to make a check of all such obstructions reported by Dale against those on record in his office.
(h) No further action was taken by the defendant with respect to payment for underground obstructions pending completion of the contract work.
(i) The report of Inspector Hill, dated August 15, 1951, stated in part:
Mr. O’Leary stated today that the reason Robbins wants to finish all of the C-A pipe before starting on the C-I is because after he has finished all of the C-A he will put in a claim for all of the obstructions they have hit since starting the project before he starts laying the C-I. He states it amounts to thousands of *770 dollars. Does this give us food for serious THOUGHT \%%%
(j) In accordance with normal industry practice, Dale used a backhoe for excavating the trench. When Dale encountered an underground obstruction, the excavation around the old pipe had to be dug out by hand labor rather than by use of the backhoe. Thus, for such obstacles the amount of delay represented the difference in time between that required for the machine to dig out the excavation and the time required for laborers to dig it out by hand.
(k) An area 8 feet wide, 8 feet long and 10 feet deep can be excavated by a backhoe in about 20 minutes. If because of a subsurface obstruction digging by hand is required, it would take two men 8 hours each, or a total of 16 man-hours, to dig out the same area.
(l) Inspector Hill’s report dated April 9, 1951, stated in part:
The obstacle we unexpectedly hit Friday P.M. April 6th proved to be a part of the sewage system. No damage was done but it just stands to reason that striking those obstacles keeps the Crane Operator on edge and slows up the work all along the line.
(m) Dale’s progress on the work was materially slowed by the 79 underground obstructions which were not shown on the plans. More specifically, the record supports the conclusion that a total of 95'% calendar days was required by Dale to overcome such underground obstructions.

Incorrect Representations on Plcms

36. (a) Dale also incurred additional costs as a result of incorrect representations on the contract plans with respect to 10 items consisting basically of valves and pipes that were to be replaced. The plans showed these items to be of a specific size, but the items were found upon excavation to be a different size so that Dale was required to obtain different materials than were originally scheduled to be used in that portion of the work. Also, in several instances the plans as to these items were incorrect in depicting the location thereof.
*771 (b) As illustrations, in tlie Navy area of the job, a 12" low surface water line actually was closer than shown on the plans to the pipe that had to be replaced so that special precautions had to be taken to protect the 12" line. In February 1951 a 16" valve was found on Dry Dock Avenue instead of the 12" valve as represented on the plans. On April 20, 1951, an 8" cast iron lateral, completely encased in concrete, was found instead of an 6" uncased pipe depicted on the plans. In May 1951 a manhole in a different location than described in the plans was found in the pipeline system completely covered with asphalt paving. On July 23, 1951, Dale found that that portion of the pipeline extending from the Navy area to the Army area near the substation was curved and required for replacement small sections of pipe, whereas the plans showed a straight line of pipe that could be replaced by 13 or 16-foot lengths of straight pipe.

Delay by Defendant in Processing Payments to Dale

37. (a) From time to time, Dale complained to the contracting officer about delay in processing its vouchers for payment.
(b) On various occasions Dale’s requests for payment for work that had been completed were not processed by the contracting officer within a reasonable period of time.
(c) Article 16 of the contract provided as follows:
Payments to contractor. — (a) Unless otherwise provided in the specifications, partial payments will be made as the work progresses at the end of each calendar month, or as soon thereafter as practicable, on estimates made and approved by the Contracting Officer. In preparing estimates the material delivered on the site and preparatory work done may be taken into consideration.
(b) In making such partial payment there shall be retained 10 percent on the estimated amount until final completion and acceptance of all work covered ,by the contract; provided, however, That the contracting officer, at any time after 50 percent of the work has been completed, if he finds that satisfactory progress is being made, may make any of the remaining partial payments in full; and provided further, That on completion and *772 acceptance of each separate building, vessel, public work, or other division of the contract, on which the price is stated separately in the contract, payment may be made in full, including retained percentages thereon, less authorized deductions.
(c) All material and work covered by partial payments made shall thereupon become the sole property of the Government, but this provision shall not be construed as relieving the contractor from the sole responsibility for all materials and work upon which payments have been made or the restoration of any damaged work, or as a waiver of the right of the Government to require the fulfillment of all the terms of the contract.
(d) Upon completion and acceptance of all work required hereunder, the amount due the Contractor under this contract will be paid upon the presentation of a properly executed and duly certified voucher therefor, after the Contractor shall have furnished the Government with a release, if required, of all claims against the Government arising under and by virtue of this contract, other than such claims, if any, as may be specifically excepted by the contractor from the operation of the release in stated amounts to be set forth therein.

Personal Animosity Between Defendant's and Dale's Representatives

38. (a) On June 26, 1951, the contracting officer wrote Robbins that it would be necessary that he or his authorized representative be on the job site at all times during the contract operations, and that his representative must be given authority to make decisions in his name. Robbins replied by letter of July 7 that he had a foreman named DeNaples who had been sent by the Union; that he was put in charge on March 28, 1951, with authority to supervise the work, hire and fire men, and purchase minor items. Robbins indicated that DeNaples was not satisfactory; would not utilize men to the best advantage; and did not follow orders. He advised that he was being given two weeks’ notice as required by the Union, and that starting July 9, 1951, Edward J. O’Leary would be on the site at all times and make all decisions except those of a major nature.
(b) In August 1951, during performance of the work, O’Leary engaged in a heated argument with Rice, the post *773 engineer, as to whether or not the latter had ordered to be repaired or replaced certain old pipe which was not part of the contract. The two exchanged heated words in the course of which O’Leary called Rice a “liar”. This was in the presence of members of Dale’s work force and of Hill, the defendant’s inspector. After this, Rice refused to talk to O’Leary; indeed, if he saw O’Leary and wanted to communicate with him, he (Rice) would address his assistant who would then relay what Rice said to O’Leary.
(o) The contracting officer understood that Robbins was having difficulties with the post engineer and/or his staff. For that reason, in the latter part of Dale’s contract performance, he requested Robbins to channel all further communications and business transactions with the Army through his (the contracting officer’s) office. See finding 60(a), infra.
(d) Rice was described by Inspector Hill and a witness called by the defendant to testify at the trial as a “rigid sort of person”.
(e) The Government inspector, Hill, had personal bias toward Dale’s foreman, O’Leary. This is evidenced by various of his reports. For example, Hill’s report, dated November 8,1951, stated in part, as follows:
Mr. O’Leary ... is on record for falsehoods and evasion of responsibility on several occasions and I feel very insecure in being obliged to work with him.
Hill’s report dated November 12,1951, read in part:
There will be plenty of trouble tomori’ow morning in trying to get one lane of traffic through because there is at least one day’s work to get the area cleaned up enough; it is almost one days work alone to rig the backhoe back on the Shovel Unit and the excavation in the area of the 10,/ valve must be backfilled in order to make room enough for one traffic lane with safety to be considered.
This constitutes flagrant non-compliance because O’Leary was told in plenty of time of the necessity of opening up one lane, but this upstart just doesn’t give a damn.
Remarks :
If you can find out what a man’s weakness is you can most always control him through his weakness IF he is *774 worth controlling at all. I doubt if O’Leary is worth it, BUT his weakness is his egotistical pride in his rank as 1st Lt. in the active reserve. He is supposed to belong to a group of untouchables who are in no danger of being called up for full active service — What a pity ? ? His Commanding Officer should be informed of what he is doing to the Army Base.
(f) The record supports the conclusion that O’Leary was hot-headed and impetuous; it does not support the conclusion that he was given to falsehoods.
(g) Article 7 of the contract provided in part:
. . . The contracting officer may require the contractor to remove from the work such employee as the Contracting Officer deems incompetent, careless, insubordinate, or otherwise objectionable, or whose continued employment on the work is deemed by the Contracting Officer to be contrary to the public interest.
(h) There is no indication in the record that the contracting officer took any steps to have O’Leary removed from the work.
(i) The inspector’s reports contained various comments reflecting on Dale’s lack of honesty, which comments are not supported by the record.

Complaint by Maritime Commission Regarding DtACs Operations in South Pier Shed Area m August

39. (a) By letter dated July 30, 1951, Bobbins confirmed a verbal agreement reached on July 24 that in order not to interfere with the operations of other contractors on the Army Base, Dale would work on the group of valves near the Electrical Substation at the east or harbor end of the Army Base, following which it would install the 12" cement-asbestos pipe in the pier shed area, also at the east end. Bobbins also agreed that in about six weeks Dale would commence work at the west end of the Base, proceeding across the cinder parking lot and then down the Administration Building to complete the 16" cement-asbestos line.
(b) On August 8, 1951, O’Leary wrote to the contracting officer requesting permission to start work on the 12" cement-asbestos pipe in the south pier shed area. He stated that the *775 United States Maritime Commission had been contacted in regard to this and had approved the proposed method of procedure. O’Leary specified that “Not more than fifty (50) lineal feet of trench will remain open in this area at any one time.” On August 9, 1951, the contracting officer approved this method of procedure. It was also agreed that the trench was to be immediately backfilled after the new pipe was laid.
40. (a) Dale started excavation at the south pier shed on August 9, 1951. Inspector Hill’s report of that date read as follows:
Peogkess: Excavation started at South Pier Shed with the definite understanding that no main valves would be closed or pipe cut until temporary water service INCLUDING domestic service was completely secured.
It is to be noted that a flagrant disregard of this understanding took place sometime between 1100 hours and 1500 hours with the result of the South Pier Shed being cut off from all domestic service, i.e. wash basins, drinking water faucets and toilets; due to the 8" pipe connecting the north and south Pier Sheds on the standpipes and sprinkler service the area is not without fire protection. An attempt is being made to service the domestic service with hose from one of the standpipes to the 1" pipe line which is definitely wrong.
Kemarks : It is very evident that the contractor doesn’t know what he is doing and it is the habit of the Foreman to rush bullheaded into the problem without expert advice which is his for the asking; Mr. O’Leary admits he has never had any experience on this type of work but that he is getting plenty of experience.
(b) The inspector’s report for August 10, 1951, read in part:
The temporaiy %" domestic water connection seems to be giving fairly satisfactory service and as long as the demand is light they can get by with it but I have not approved this size hose, therefore, if any outlets are plugged due to lack of volume it will be the contractor’s responsibility. Mr. Bobbins and Mr. O’Leary informed me that Mr. Sweeney of the Maritime Commission has approved this size service but Mr. Sweeney’s stamp of approval means nothing to me, all that I can recognize from Mr. Sweeney or any other Maritime official is complaints, which if made will be investigated and, if possible, corrected.
*776 (c) Hill’s report of August 24, 1951, stated in part that “the inadequate %" temporary hose connection resulted in all of the toilets in the south pier shed becoming plugged up, creating an unsanitary emergency.”
(d) On September 25,1951, H. A. Treat, Terminal Superintendent of the U.S. Department of Commerce’s Maritime Administration, wrote to the Commanding General of the Boston Army Base, attention post engineer, as follows:
The work of the Army’s contractor on water main reconstruction, Dale Construction Company, in the Berth 6 area has resulted in so many limitations on Terminal operations that it becomes necessary to call to your attention the necessity of better provision for protection and use of property when the mains to the North Pier Shed and in Terminal Street are repaired.
Since August 9,1951, when the trench in front of the South Pier Shed was opened, Berth 6 has been without fire protection; Building #9 had no water for about ten days and inadequate amounts and sometimes none since that date; one fire hose station in 2nd floor, Section 1, South Pier Shed has been out of use; railroad and truck traffic has been interfered with because of delays or failure to shore trenches; trenches left open for unreasonably long periods, incompletely back-filled, and ungraded and inadequately tamped after back-filling, also scattered storage of materials, equipment and trash have substantially reduced parking space. Many of these conditions remain today.
The water main in front of the restaurant was broken without warning late on Friday, August 31, 1951, resulting in a complete stoppage of fire protection throughout both Pier Sheds for approximately twenty hours and of water for the restaurant for about fifteen hours. Cargo valued at hundreds of thousands of dollars was in the Pier Sheds, insured on the basis of represented sprinkler and other fire protection. The unexpected break and the lack of prior information prevented the Administration’s Lessee, Boston Tidewater Terminal, Inc. from making any temporary provisions for protecting this cargo except for extra guards on patrol.
We request that this contractor’s work so far undertaken in the Berth 6 area and at the railroad tracks back of the fire station be completed as promptly as possible and that, in the future, prior planning and provisions be required for the following:
*777 (11 Before the line to the North Pier Shed is broken:
(a) Adequate and continuous water supply for fire protection and services in both Pier Sheds, connections for service lines not to require elimination of any fire protection.
(b) Uninterrupted and adequate water, gas, heat, sewer, drain, telephone and electric services and access, both doors, to Base Terminal Restaurant.
(c) Adequate protection to floor and structure of Walk-In refrigerator in restaurant and to restaurant building.
(d) Continuous use of railroad tracks between restaurant and North Pier Shed.
(2) Before the line up Terminal Street is broken:
(a) Adequate and continuous water supply for fire protection and service in all sections of Wharf Shed at all times, also, uninterrupted electric, heating and sewer services in case these may be endangered by the water main repairs.
Ineffective planning and provisions for maintenance of water and other services in these other areas may result in failure of vital and essential protection of property owned by the Government and by private parties disruption of operation of Base Terminal Restaurant, and unnecessary delays to railroad and truck traffic, as well as restriction of parking areas.
(e)On October 2,1951, the contracting officer wrote Dale as follows:
Attached herewith is a copy of a letter received from Mr. H. A. Treat, Terminal Superintendent, U.S. Maritime Commission, with respect to operations by your company in the areas under lease to the U.S. Maritime Commission. It is requested that serious consideration be given to suggestions of Mr. H. A. Treat with respect to future operations in these areas.
Every effort will be made by this office to obtain such clearances as may be required in order that no disruption in the operations of the Boston Army Base may occur, provided that your company submit a weekly schedule based upon reasonably firm estimates as to time and space required. Such schedules will be submitted one full week in advance of the contemplated prosecution. Receipt of such weekly schedules will permit this office to effect such clearances as may be necessary, from the Army and its tenants, so that interruption in the progress of your contract will be kept to a minimum.
*778 Complaints by Contracting Officer About Dale's Failure To Shore, Brace and Support Railroad Tracks, Provide Temporary Bridges To Cross Trench, or To Sheathe a Section of Line; Resolution of Complaints; Removal of Temporary Bridge by Navy
41. (a) Paragraph 2-17 of the specifications provided, as follows:
RailRoad Lines and Bridges
Where the contract work passes under existing railroad lines, the Contractor shall be required to properly shore, brace and support these railroad lines in a manner so that their continued use will not be restricted while the contractor is working in that area. Upon completion of the work, these railroad lines shall be restored where necessary to their original lines, grades and condition.
The Contractor shall furnish and install temporary highway bridges of at least PI-10 capacity in order that ingress and egress of various buildings in the Boston Army Base and the Naval Drydock, South Boston, by occupants, tenants, and visitors, will not be denied. In general, bridges shall be made ample in width to accommodate one lane each of motor vehicle traffic and pedestrian traffic. Handrails shall be furnished. Harbor Street excavation shall be furnished with a two-lane bridge for vehicles and pedestrian traffic. Handrails shall be required. Drawings show approximate location of bridges. Specific locations will be determined by the Contracting Officer.
(b) During the pre-award discussions, the post engineer advised Robbins that two critical railroad lines would have to be shored, braced and supported. Pie also advised Robbins that the balance of the railroad lines would not have to be shored, braced and supported since the Army could re-route the traffic onto other tracks.
(c) On August 20, 1951, the contracting officer sent two letters to Dale stating that its personnel had failed to shore a railroad track over a ditch in the south pier shed area, as well as one in the north pier shed area, as a result of which rail and vehicular traffic were blocked. The contracting officer said this constituted flagrant violations of the contract.
*779 (d) Robbins replied on August 25 that the railroad crossing was put back in condition and trains passed over it in August and that at no time was the passage of trains obstructed; that no bridge was called for in the area by the plans, so he didn’t see how he was in flagrant violation of the contract. He also stated that at the time of awarding the contract, the post engineer had informed him that certain vital tracks would have to be supported, but that the balance could be neglected as there were alternate means to operate the trains to those areas. Expressing the wish to cooperate with the contracting officer’s traffic problems, Robbins added that if no trains were due or alternative methods of routing were available, he didn’t believe he should be forced to spend the maximum amount of funds to perform the contract. Robbins concluded by stating that while it had no direct bearing, a later contractor at the Army Base “has one of these railroad crossings completely removed, without any necessity for shoring.”
(e) The contracting officer replied on August 31, calling attention to the requirements of paragraph 2-17 of the specifications. He said that although no bridge was shown on the drawings for the railroad crossing in the south pier shed area, the provision was still violated. He further stated that Dale did not properly shore the tracks or furnish and install bridges in the area near the Disinfestation Building and the Terminal Restaurant, adding that the contract drawings showed the location of a vehicle and personnel construction bridge in that area. The contracting officer concluded by stating that “Regardless of the fact that alternate methods of routing are available, you are still directed to comply with the provisions of paragraph 2-17 of the contract.”
(f) On September 7, 1951, the contracting officer wrote Dale that it did not properly shore the railroad tracks in the area between the fire station and the sub-station and directed it to comply immediately “so as not to cause any further interruption in the operation of railroads on the base.” On September 10, 1951, the contracting officer wrote to Dale stating in part that it was “imperative that bridges be in *780 stalled suitable to support and maintain two-way vehicular traffic in the congested area of your operations.” This was followed by a further letter dated September 12, 1951, in which the contracting officer said that instructions contained in the previous letters had not been complied with, and that as a result Dale had caused a disruption in the operations of the railroads on the Base. He also stated that failure to comply with instructions had caused the New Haven Railroad to discontinue operations over the railroad tracks running between the sub-station and the fire house and leading to the south pier shed area.
(g) O’Leary replied on behalf of Dale on September 15, stating that an inspection was previously made by the New Haven Railroad of Dale’s shoring and that it was approved; that on September 14 a car and engine passed over the shoring with complete safety; and that the railroad company had notified Dale that it never refused to operate on that track. O’Leary continued that the destination of the train that passed over the crossing was the south pier shed (water side) for which Dale had not obstructed the tracks at all, but that another later contractor had dug under and not shored certain tracks, thus preventing the use of the tracks leading to the south pier shed area. O’Leary complained that Dale was being continually penalized at great monetary cost to allow the operations of the other contractor to continue without restrictions and with minimum costs to it.
(h) On September 24 and 27,1951, the contracting officer wrote Dale that the single railroad track between the electrical sub-station and the Fire Station had not been properly shored and that the trench excavation had not been sheathed.
(i) Commencing about September 20,1951, Dale instructed a portion of its crew which had been working on the Army Base to start excavation operations on a contract awarded Dale by the Navy to replace the existing fire alarm and police system cables at the adjoining South Boston Annex of the Boston Navy Yard.
(j) On September 28,1951, Robbins and Cuddy, the principal engineer in the office of the post engineer, agreed that work would start as of Saturday, September 29, so that, *781 among other things, the area north of the Disinfestation Building would be filled and the adjacent track brought up to grade; the two tracks servicing the pier sheds would be backfilled and the tracks made serviceable for use by the railroad by October 3; and that the track servicing the rear platform of the sub-station would be placed in operating condition as early as possible. This work was then accomplished in the period September 29-October 2,1951.
(k) On September 10, 1951, the contracting officer called Dale’s attention to paragraph 2-17 of the contract regarding temporary bridges and stated that “It is imperative that bridges be installed suitable to support and maintain two-way vehicle traffic in the congested area of your operations.”
(l) Dale owned a prefabricated, temporary wooden bridge, with built-in hand rails and other accessories, designed to support and maintain vehicular and personnel traffic across the trench at different locations. Around the middle of August 1951, the bridge which was stored in the Navy Base area was, unbeknown to Dale, removed by the Navy. Dale, finding the bridge had disappeared, reported the matter to the post engineer. Eventually, in the early part of October 1951, two sections of the bridge were recovered. Dale suffered delay in not having the temporary bridge available; it also incurred expenses in repairing the structure.

Requirement of a Weekly Schedule; Failure by Dale To Adhere to Schedule

42. (a) In or about the middle of August 1951, Dale was required by the post engineer to submit a weekly schedule setting forth the time and location of its operations for the succeeding week. Though not invariably true, Dale ordinarily could not proceed with the work until the schedule was approved by the post engineer, formally or informally.
(b) One of the principal reasons for requiring a weekly schedule was that after the start of Korean hostilities, traffic at the Army Base increased appreciably and parking became critical, thus making it necessary for the post engineer to *782 have advance notice from Dale so that he could make working space available for its use.
(c) There was no specific provision in the contract requiring the submission by the contractor of weekly schedules.
(d) On a number of occasions it was necessary for the post engineer to make repeated requests to Dale before it submitted a weekly schedule.
(e) From time to time Dale failed to complete a portion of the work in accordance with the estimates set forth in its schedules. For example, in July, O’Leary had estimated that Dale would be finished on the Navy area along Dry Dock Avenue on September 15, 1951. As of November 19, 1951, paving operations in that area were little more than half accomplished and the Navy did not tentatively accept the work until December.
(f) As another example, on July 80, 1951, Dale wrote to the contracting officer estimating that the 12" cement-asbestos line to the pier sheds would take 6 weeks. Excavation on the south pier shed line was started on August 9 but the new line was not placed in service, after having been chlorinated and flushed, until October 27, 1951 — or some 79 days after the woi'k was started. Thus, for only a portion of the work that Dale had planned for a six-week period, it consumed more than 11 weeks.

Plaintiff's Claims in October 1951 for Replacement of Temporary Line and- for Repair of Leah in Pipe Joint

43. After the agreement of September 28, 1951, with Cuddy (see finding 41(j)), Dale concentrated in the period September 29-Qctober 2, 1951, on completion of the work therein specified.
44. (a) Meanwhile, Dale submitted a schedule on September 25 and a supplementary schedule on September 29 detailing operations it proposed on the cement-asbestos section of the line. Among other things, it indicated that during this phase of the work, it would be necessary to shut off for one day several valves on Dry Dock Avenue, during which time it indicated there would be no water at the hydrant and wharf hydrant near the U.S. Treasury Scales. Dale ad *783 vised the contracting officer that if water were necessary, it would install a 2 to 2*4" line on the surface of the ground from a hydrant in front of the Dispensary to a hydrant near the Scale House. The contracting officer approved the supplementary schedule on the condition, among others, that a potable water supply be maintained at the wharf-side hydrant either by a pipe or hose line in order to service Army vessels with drinking water.
(ib) Having reached this part of the operation on October 11, Dale began to install a 2%" line consisting of new black iron pipe which it had purchased for this purpose. However, the pipe had been exposed to the elements so that the exterior was rusted and the interior was not completely rust-free. Inspector Hill rejected the pipe and insisted on galvanized pipe; Dale complied and on October 20, 1951, submitted a claim to the contracting officer in the amount of $64.18 for the extra amount involved. The contracting officer disallowed the claim on November 28 stating that the inspector had used sound judgment in rejecting the pipe due to its rusted interior. Based on .the evidence in the record, the contracting officer’s decision disallowing the claim was reasonable.
45. (a) On or about October 8,1951, a leak was discovered in certain cement-asbestos pipe which Dale had installed near the Maritime Bestaurant area. On October 9 and 10 ihe area was reexcavated and it was found that the leak was due to loosened lead caulking in the joints. The joints were recaulked and the excavation backfilled. On October 27, 1951, Bobbins submitted a claim for $97.23 for the extra costs. The evidence established that another contractor, C. J. Maney Company, which had a contract to stabilize the Army Base and was driving a series of long piles to support the Base’s outer walls, had operated a gigantic pile-driver within 3 or 4 feet from where the leak occurred. The vibrations from this pile-driver, it is found, caused the loosening ■of the lead caulking. The contracting officer denied the claim on the ground that this leak was in existence prior to •the advent of Maney on the job and that this had been verbally reported to O’Leary by Hill and Cuddy. This find *784 ing is not supported by any substantial, credible evidence in the record.
(b). Dale has not presented any evidence showing that the damage was attributable to any fault or negligence on the part of the Government.

Delay Due to Longshoremen's Strike

46. (a) For a period of about three weeks in the latter part of October and early November 1951, the longshoremen at the Boston Army Base were on strike and would not allow the movement of trucks or equipment out of the Base. On November 7 the pickets prevented trucks from entering the Base and delivering sand needed by Dale to backfill a section of the 16" cement-asbestos pipeline'it was then laying along Terminal Street.
■ (fo) Inspector' Hill’s report dated November 7, 1951, read as follows:.
For several days, the contractor has had orders in for sand, but the striking Longshoremen refuse to permit the trucks to enter or leave the base; this is a sad state of affairs when a group of gutter rats can shove the IJ.S. Government around. I never thought I would live long enough to see conditions like this.
The contractor has over '65' of 16" C-A pipe in place but as he could obtain no sand 'to cover the pipe he has had to leave the trench open resulting in considerable damage from cave-ins; he had very little shoring .as he was expecting somehow to get a few loads of sand past the pickets yesterday; in spite of the severe storm, there was a workman on duty to receive the load this morning if it arrived, but it is too late now and most of his pipe has been-knocked out of place by trench'water* it will cost him several hundred dollars to repair the damage.
Remarks
I have been trying to get in touch with Mr. Bobbins to deliver information that the Army will let him have sand for the duration of the.strike providing that he returns the sand to the Army as soon as the strike is over.
The sidewalk slabs are becoming displaced in front of the Dispensary. At present, there are five slabs tipping towards the trench which are going to be expensive to repair. The Longshoremen’s Union should be brought into court over this matter and forced to pay for serious damage to U.S. Government property.
*785 (c) The Army supplied Dale all the sand it had on the Base but this was insufficient for the contractor’s requirements.
(d) The report of Inspector Hill, dated November 8,1951, read in part as follows:
Yesterday’s severe storm caused considerable havoc resulting in the entire day being devoted to removing four lengths of 16" C-A pipe which had been laid in place but NOT properly secure with a 12" covering of sand according to Specs; this pipe was knocked out of line by cave-ins and water and had to be removed.
(e) On November 9, 1951, the post engineer visited the site and directed an employee of Dale to have one lane of traffic open by Monday night (November 12) in order for traffic to roll the next morning.

Delay in November Caused by Opening of Val/oe

47. On the evening of November 6, 1951, Bobbins called Inspector .Hill and, in accordance with the 24-hour notice requirement regarding opening and closing of valves (see finding 31(a)), asked him to turn on the water to the new cement-asbestos line across the parking lot inasmuch as Dale was ready to pressure test the line. (The line could not be so tested unless the pipe was braced either by paitially or •fully backfilling.)' At the time Bobbins made the call, the pipe had not been backfilled, but he anticipated that this would be done in the next 24 hours or 2 days. However, because of the longshoremen’s strike, the sand for the backfill had not, in fact, been received. Against this background, on the morning after he received Bobbins’ call, Hill, in accordance with the request that had been made the previous evening, came on the job and turned the water on, apparently unaware that the pipe had not been braced. Since the pipe had not been braced by backfilling, the water pressure moved a 40-foot section of the pipe ahead some 3 or 4 inches and burst the j oints. When Bobbins arrived on the site, he stated that he was not blaming Hill for any damage. The section of pipe was relaid by Dale at a cost of about $100.00.

*786
Dale's Bequest for Time Extension and Subsequent Developments im, Respect Thereto

48. (a) As set forth in finding 27, by virtue of Modification No. 1, the contracting officer had extended the completion date from January 12,1951, to September 28,1951.
(b) On October 27,1951, Robbins wrote to the contracting officer requesting an extension of time on the contract. He stated that there had been unavoidable delays in processing and obtaining materials as a result of Korean hostilities which had begun after the award of the contract; that there were delays caused by unforeseen requirements; and delays caused by requirements of (1) other contractors for space, (2) tenants of their areas, (3) the New England Division of the Corps of Engineers for parking space, and (4) “various and sundry other delays too numerous to detail”. Robbins stated that if Dale were able to work through the winter, “we may expect to be completed by March 1952.” He added that “due to cold weather which may interfere with the temporary water supplies, we may have to stop operations when real freezing weather comes; and in that case we expect to resume work in the spring (probably late March) and complete in mid-summer.”
(c) Subsequently, the contracting officer discussed the matter of a time extension with Robbins. It is found that in the course of these discussions he agreed to extend the time for completion of the contract to June 2,1952, insisting, however, that full operation be resumed at once and that the work be definitely completed by June 2. After these discussions, the contracting officer sent the following letter, dated November 19,1951, to Dale:
1. Reference your request for contract extension dated 27 October 1951.
2. Steps are now being taken to advance the date of completion (final acceptance) from 28 September 1951 to 2 June 1952. This will represent the second (2nd) extension of time granted under the captioned contract.
a. Original Contract Completion Date_12 Jan. 1951
b. Modification No. 1 Completion date_28 Sept. 1951
■c. Proposed Modification Completion. Date_2 June 1952
*787 3. This office will insist on this contract work being accomplished and accepted on or prior to 2 June 1952.
4. Your request for extension of completion date refers vaguely to causes beyond your control, which prevented you from completing the contract as scheduled. For example, your letter refers to:
a. Delays occasioned in procuring and obtaining materials due to the Korean episode.
b. Delays caused by unforeseen requirements.
c. Delays caused by other contractors for space, tenants for their areas, New England Division for parking space and various other and sundry delays too numerous to mention.
5. It is the considered opinion of this office that the above delays were caused rather to (sic) your inability to set a schedule and adhere to it, as witness your activities in the Dry Dock Area of the South Boston Annex, TJ.S. Navy Yard. On 14 May 1951 you agreed to complete all paving operations on Dry Dock Ave. by 11 June 1951. On 21 August 1951 you promised completion by 15 September 1951, but at the present time paving operations are little more than half accomplished.
6. To illustrate further, 9 months’ extension was granted in the 1st Modification to cover any difficulty in obtaining supplies due to the Korean situation. This was more than ample to cover any procuring or shipping delays which might interfere with a properly scheduled job. Delays due to unforeseen requirements might rather be termed delays due to poor scheduling. In fact, all the above listed causes for delay in contract fulfillment would have been non-existant (sic), if acceptable schedules were submitted of your proposed activities. This office repeatedly requested you to submit such schedules, (re: our letters of 17 May, 18 June, 11 July, 23 August, 30 August, 8 September, 2 October, 11 October, and 23 October) so that your work could be integrated with other contractors and agencies engaged along the line of contract work.
7. Finally, this office sees no reason to curtail activities due to winter weather, since the new 16" line immediately East of Building #4 could be installed at that ■time, as no temporary water lines would be involved. Temporary water line protection could also be achieved ■by utilizing the ramp between the Administration Building and Building #4. It is of paramount importance that your company bend every effort toward pushing this contract work to successful completion, in order to meet the final completion date of 2 June 1952.
*788 (d) In order to formalize the time extension, a letter dated January 4, 1952 — the date of mailing does not appear — was sent to Dale enclosing a supplemental agreement fixing a new completion date of June 2, 1952. Dale executed the agreement and mailed it to the contracting officer on January 18, 1952. It was received by the Government on January 21. The contracting officer did not sign the agreement for, by letter dated January 18, 1952, he had terminated the contract for default.

Claim for Be fair of Hydrant

49. On several occasions the contracting officer called Dale’s attention to a leaking hydrant north of Section B. On November 21, 1951, Dale and the contracting officer agreed that Dale would repair the valve; that if the repairs were found to be caused by debris from Dale’s operations, the cost would be borne by Dale; but that if the repairs were found to be required by normal wear and tear, the cost of the repairs would be considered an “extra” under the contract. The cost of the repairs which were performed by the City of Boston’s Water Department in December and paid for by Dale was $110.00. It is found that the leak in the hydrant was partially Dale’s fault and partially the Government’s. Dale was partly to blame because some jute yarn of a type which Dale used in installing the pipeline had gotten into the hydrant; the Government was partly to blame because the rubber gaskets and valve parts of the hydrant were 30 years old and completely inoperative from age and deterioration. Dale claims that the cost of $110.00 should be split equally and that on this basis it is entitled to $55.00.

Complaints About Dale's Failure To Sheathe in Cement-Asbestos Pipe Replacement Area

50. (a) Although the specifications did not require sheathing along the cement-asbestos pipeline, sheathing may be always necessary from a safety standpoint to protect the workmen, particularly when the trench is more than 5 feet deep. (See findings 10(b), 11 (a)-(c).) In laying the cement-asbestos pipe along Dry Dock Avenue, Dale frequently *789 excavated below that depth and in many instances installed skeleton sheathing.
(b) During the latter part of Dale’s operation under the contract, the contracting officer complained from time to time about Dale’s failure to sheathe the trench excavation in the cement-asbestos pipe replacement area. Thus, on September 10,1951, while Dale was still in the cement-asbestos area, the contracting officer advised Dale that in its operations in front of the Terminal Kestaurant, it had at no time attempted to comply with safety requirements as to sheathing. He added that as Dale was “now in the Cast-Iron pipe area, your attention is called to paragraph 2-03 where sheathing is required and certainly this applies to the present conditions.”
(c) On October 31, wheii the cement-asbestos pipeline had reached a point in front of the Dispensary Building, Inspector Hill complained of a deep excavation which lacked sheathing and shoring. On the next day he noted that a severe storm halted Dale’s activities “and caused several bad cave-ins due to the lack of trench shoring and sheathing.” Inspector Hill’s report dated November 13, 1951, stated in part that there was “No backfilling on 160' of open trench ranging in depth from 5y2' to 8'.” The report also stated that “An attempt to shore trench has been made, but not in line with good safe engineering practice; only skeleton shoring spaced too far apart, but it is expected most of the trench will be backfilled by tomorrow night.”

Approval of Schedules for Installation of Sections of Pipeline in Terminal Street in Vicinity of Dispensary and, Administration Building

51. (a) On October 20,1951, Dale submitted a schedule to the contracting officer covering in part proposed operations on the balance of the 16" cement-asbestos pipeline in Terminal Street up to the 12" gate in front of the Administration Building where the pipeline to be installed changed from cement asbestos to cast iron. By letter of November 10,1951, the contracting officer formally approved the schedule, sub *790 ject to several comments, among others, that: “Backfilling operations must follow excavating operations as close as possible so that parking facilities may be returned to normal.” The contracting officer’s letter also specifically directed Dale’s attention to Article 27 of the contract dealing with “Accident Prevention” and “Safety Requirements for Excavation.” See finding 11.
(b) On October 30,1951, Dale submitted a schedule covering in part operations it proposed to begin in the first section of the cast-iron pipe replacement line starting in Terminal Street at the 12" gate in front of the Administration Building. Under Dale’s schedule, it expected to start on the cast-iron section on November 9 and to continue with that so as to reach the corner of Section F by November 19 and the 12" gate at Section F by November 21. In its proposed schedule of this date, Dale stated in part:
Teaefio:
Provide bridge across trench to driveway near Section F, unless we perform work on Saturday or Sunday or evening when there is no traffic and backfill at once to provide equivalent passage space. Also provide bridge to Section F (as shown on plans) unless we perform work on Saturday, Sunday, or evenings and backfill so that the equivalent driveway width is available.
(c) On November 22,1951, Dale received verbal approval from the post engineer to proceed with the cast-iron section of the work in accordance with the October 30th schedule.
(d) However, by a letter dated November 23, 1951, the contracting officer advised Dale that he could not approve the October 30th schedule on the ground that it did not make provision to protect freezing of the temporary water line and the supplying of temporary water to the wharf-shed. After receiving this letter, Robbins went to see Cuddy of the post engineer’s office who said the letter had been prepared some time earlier; that there was a delay in mailing it, but that in the interim the post engineer had decided to' allow Dale to proceed in accordance with its schedule.
*791 'Work in Cast-Iron Pipe Area; Eeecmattion of Trench, Removal of Old Pipe, Laying of New Cast-Iron Pipe; Controversy Regarding Sheathing and Testing
52. (a) On November 26, after arrangements were made for temporary water lines and for protecting the lines from freezing, excavation was started on the trench in front of the Administration Building proceeding toward Section F for purpose of installing the 16" cast-iron pipe.
(b) On November 28 the contracting officer wrote Dale, in part:
We note that as of this date you have started operations on the 16" C-I pipe laying, beyond the 12" valve in front of the Administration Building.
Your attention is called to paragraph 1-03 GtENEral of the specifications and paragraph 2A)3 pertaining to limestone dust and trench sheathing.
You will kindly instruct your foreman to maintain at all times 12" of limestone and lime cover around the 16" cast iron pipe prior to backfilling! No deviation from the specifications will be permitted in this respecct.
Regarding sheathing, you are well aware of the requirements, but we will leave this matter up to the inspector and the Safety Engineer.
53. (a) After Dale began laying the cast-iron pipe on December 3, its operations were slow for the first day or two because ithe crew, as was to be expected, required some familiarization in the work inasmuch as it differed to some extent from that on the cement-asbestos pipeline. One difference was that on the cast-iron pipeline, mechanical joints were used between the pipe sections rather than leaded or special joints that were used previously on the cement-asbestos line.
(b) Within a few days Dale had installed 2 lengths of cast-iron pipe and planned next to cover the pipe with limestone, backfill immediately to the level of the trench, and then pressure test the pipe. The post engineer had previously approved this method of procedure; he also had permitted a variation from the specifications so that Dale had the option of pressure testing the cast-iron pipe either after the trench had been partially backfilled, leaving the joints in an exposed condition, or pressure testing after the trench *792 had been immediately backfilled to the level of the trench — a situation in which the joints would not be visible. Dale had contemplated that backfilling immediately to level would obviate the need for sheathing. See findings 19 and 20.
(c) Despite the post engineer’s approval of this method of operation, Inspector Hill would not permit it; he insisted rather that the joints remain exposed and pressure tested by visual examination, following which the trench could be backfilled. Hill’s report, dated December 4, read in part, as follows:
The contractor has started ahead again with C-I pipe laying and seems to be getting the hang of things O. K. (T) hey got in 2 lengths or about 36' and it is very possible they will lay three additional lengths tonight. As a matter of record it is their intention to lay in place several lengths and immediately backfill in order to do away with the expense of sheating but in my opinion this method is risky due to the possibility of leaks developing in the mechanical joints which would not only add considerably to the contractor’s expense but will be a source of annoyance and unnecessary hazard to the Army Base. Mr. Bobbins states that this type of joint will not leak after the bolts are set up with the correct number of turns but basing my opinion on past experience with this crew I am not going to depend on their judgment and am not approving backfilling prior to pressure testing. I am referring this detail to the Post Engineer for decision.
(d) In these circumstances, the inspector advised Dale that it must start using some accepted type of trench sheathing ; Dale interposed no ob j ection and stated that the material for such sheathing was on the way to the site.
(e) At or about this time, Inspector Hill made the following statement to Bobbins:
You know, it is no skin off my nose, Dave; you could get along without any sheathing at all, but the specifications call for sheathing, and that is the only thing I have to go by. You have got to sheathe, and that is 'all there is to it, if you want to proceed.
According to Hill, Bobbins indicated in reply that he would make an attempt at sheathing but that he was not going to sheathe the whole Army Base.
*793 54. (a) In view of the inspector’s position as set forth in his report of December 4, a conference was held between the post engineer and Robbins on December 5. In the course of this meeting the post engineer told Robbins that he would not allow any limestone and partial backfilling to be placed around the newly-laid pipe prior to its being tested, but insisted that the trench remain open until the pipe was pressure tested for the entire section.
(b) About this same time the post engineer stopped several of Dale’s men from packing limestone dust around the newly-laid cast-iron pipe. Dale at this time had 2 or 3 carloads of limestone on the jobsite.
(c) Surrounding the pipe with limestone and partially backfilling before testing accomplishes two purposes: first, it braces the pipe so that it can be tested; second, in cold weather it insulates the pipe, thereby preventing freezing.
(d) The action taken by the post engineer in prohibiting Dale from covering the newly-laid cast-iron pipe with limestone and partial backfill prior to testing was contrary to section 2-05 of the contract specifications, which, as quoted in finding 18, provided in part that “After the pipe is laid, the joints completed, and the trench partially backfilled, leaving the joints exposed for examination, the newly laid pipe . . . shall... be subject to a pressure test ”
(e) Robbins stated that he would seek to have the pipe manufacturer send a representative to the jobsite to determine whether or not complete backfilling of the trench to level prior to pressure testing was appropriate.
(f) Further, at the conference on December 5, the post engineer issued oral instructions to Robbins to sheathe the trench excavation immediately. Robbins agreed to do so.
55. (a) As of the time of this conference on December 5, Dale had excavated some 100 feet of trench beyond the Administration Building, had removed the old pipe, and laid the new cast-iron pipe. By the following day 125 feet of old pipe had been removed and new pipe laid. However, the trench was left open by Dale in view of the post engineer’s instructions prohibiting any backfilling prior to testing of the pipe. Nor had the trench been sheathed.
*794 (b) The soil in this part of the excavation area was firm and of firm cut. The soil conditions were far superior to what the post engineer’s office had anticipated.
(c) As of December 6 sheathing of the trench was not necessary from a purely engineering standpoint. Under the conditions existing on December 6, had Dale been permitted by the post engineer to place 12 inches of limestone around the new pipe and to have partially backfilled and then pressure tested, a completely satisfactory operation from a sound engineering standpoint could have been achieved without sheathing the open trench.
(d) If Dale had been allowed to place the limestone around the pipe, partially backfill and then test the pipe, it could have completed the testing in about a day and completed the backfill to level in about two days after that.
(e) The requirement of sheathing was basically a safety requirement. During several days beginning on December ■6, soil conditions at the open trench were such that the work in the 125-foot section could have been completed without sheathing.
(f) Dale’s proposed method of immediately backfilling to the' grade level was designed to obviate the expense of sheathing the trench.
56. (a) Between December 6 and 12, Dale did little, if any, work in the 125-foot open trench area in which the new pipe had been laid, though it did obtain on December 7 a small quantity of lumber for sheathing. Bobbins advised the inspector that the reason for the halt in operations was that the post engineer had disapproved Dale’s intended method of pressure testing under which it proposed to backfill before testing. Bobbins further informed the inspector (as he had the post engineer on December 5) that he was sending for an ■expert from the pipe manufacturer “to get us all squared away properly” and was “therefore . . . unable to continue excavation, pipelaying and backfilling until this man arrives on the site.” In this connection, Dale on December 6 wrote to the pipe manufacturer requesting it to send one of its ■engineers to the project to determine whether or not back-filling to level was appropriate prior to testing. The manu- *795 f acturer replied on December 12 that a visit to the site by one of its engineers was unnecessary. It advised Dale that on many pipe jobs the tests had been made after the line was completely backfilled and that there was no reason why a line properly installed should not meet the normal hydrostatic test pressures without trouble, even though the trench were backfilled prior to the testing. The manufacturer also indicated that the practice of backfilling or not prior to testing was normally covered in the specifications for each individual job.
(b) On December 12 the contracting officer wrote Dale:
On December 5, 1951, you were ordered by the Post Engineer, Lt. Colonel Nice, to immediately sheathe the trench in the. area from Building 28, Dispensary Building, to Building 4, and to comply by doing so according to Specifications, and from here on during the entire operation in the OI pipe area. Up to 12 December 1951, you have not complied with instructions. You are hereby directed to sheathe this trench immediately.
57. Upon receipt of this letter Bobbins had a conference with the contracting officer on or about December 13, at which time the contracting officer indicated that Dale could proceed with skeleton sheathing rather than continuous sheathing. In Bobbins’ words the following conversation took place:
I said to Mr. Curtis: “We are under the impression that all orders relating to this contract are to come directly from you, and I received a letter stating that you want the trench sheathed now. And this varies with the prior instructions and the approved schedule under which we are operating, and we are forced to change our method of operation. All we can do is put a claim in. It will change it, and we will put a claim in for having started under one method of operation, and then the other.”
So Mr. Curtis said: “Isn’t there some compromise we can make? Suppose you put in the trench to satisfy the engineers so that they won’t lose face and you won’t lose face,” as he put it, “sheathing consisting of planks about every four or five feet, braced.”
And that is known in the trade as “stay sheathing” or “stay bracing,” as opposed to continuous sheathing. And he said: “That won’t cost you very much and you can doit.”
And I agreed to it.
*796 58. On or about December 14, Robbins directed 3 members of his work force to install skeleton sheathing in the open trench. However, they reported back to Robbins that they were ordered out of the trench by the post engineer for the reason that he would not approve skeleton sheathing.
Robbins then went to see the contracting officer who told him that he would allow Dale to resume and put in skeleton sheathing.
. 59. (a) On December 14 the deputy post commander of the Boston Army Base sent the following letter to Dale:
The work under subject contract is now where I can see it personally and it has been my observation that the work isproceeding very slowly.
As Commanding Officer at this installation, I am naturally concerned that all locations at the Army Base shall have a dependable water supply at the earliest practicable date.
Because of numerous reports of continued inconvenience from your operations, and apparent delay in the progress of your work, I am taking a personal interest in this matter and would like a statement from your company as to your intention to vigorously prosecute the work from now on, in accordance with the specifications and terms of the contract.
A brief letter outlining your intentions in this respect is requested.
(b) Dale replied to this letter on January 19, 1952. See finding 68(g) mfra.
60. (a) On December 18 the contracting officer visited Robbins at his home for purpose of having Dale resume operations at a rate that would eliminate the 125-foot open trench. At this time the contracting officer also understood that Robbins was having difficulties with the post engineer and/or his staff. To avoid further difficulties, the contracting officer requested Robbins to channel all further communications and business transactions with the Army through his office.
(b) On the following day several of Dale’s workmen again started to install skeleton-type sheathing in the open trench. However, they left the site in the afternoon because of the cold weather.
*797 61. For the remainder of December, a succession of cold weather, storms, snow, and then rain-, prevented Dale from performing anything but minor work in the trench which remained open.
62. (a) On December 20 the contracting officer wrote to Dale, in part, as follows:
The following deficiencies have been noted in connec-nection with your work on the pipe line at the Boston Army Base.
1. 6" Hydrant Control valve located on Dry Dock Ave. opposite Section B valve room, Street Box plugged, impossible to turn pressure off or on.
2. Hydrant opposite Section B valve room, leaking since June 1951, now seriously damaged by freezing; refer to letters 8 September, 12 September, 24 September 1951.
8. Section A-NE Indicator Post valve to Standpipe, inoperative, out of service since 18 June 1951, refer to letter 27 September 1951.
4. 16" C-I pipe in place in 125' trench approximate, untested, unsheathed for over three weeks.
5. Entire area, Terminal Street West insufficiently lighted at night and poorly barricaded.
6. 6" Wharf hydrant valve located north side of Dis-infestation Building plugged with dirt, can be operated but with considerable difficulty.
7. No. Fire Hose Gate Yalve installed on Standpipe in Administration Building Basement Hallway.
8. Inoperative Fire Hose Gate valve in front of Administration Building and no Fire Hose valve at all in front of the Dispensary.
Once again we urgently request for the safety and security of the Boston Army Base that these conditions be corrected without any further delay.
(b) On December 26 Dale sent the contracting officer the following letter:
As a result of our conversation I was under the impression that communication (sic) henceforth would all be channelled through your office.
On Thursday, Dec. 20, ,1951 I had four men at the Army Base to backfill a small portion of the Cast Iron line with limestone (as required by the specifications); to put the water on the transite line supplying the Dis *798 pensary (this has been installed for several weeks); and to cap the Cast Iron line to test it.
Col. Eice in the morning stopped these men from working and would not allow them to do any of the three items mentioned above. As a result the men went home at noon because of lack of work, and we are again in a quandary as to what we are supposed to do.
(c) On December 27 the contracting officer had a conference with Bobbins dealing with the foregoing matters. On the next day the contracting officer sent the following communication to Dale:
The Contracting Officer is aware that Item No. 1 of letter from this office dated 20 December 1951 has been completed and note is made of your agreement and promise to correct all other deficiencies listed in that letter right away. This matter will be followed closely and the items checked off one by one as they are completed.
Careful consideration has been given to the matters brought up during your interview of 27 December 1951 and after consulting with all interested parties, the following observations are made:
(1) It cannot be believed that there is any basis in fact and there is no evidence to support the charge that your contract difficulties are due to “personalities.” The Government and its agents, whether military or civilian, have no interest other than satisfactory performance in accordance with the terms of and specifications in the contract at the earliest practicable date.
(2) The fact that your workmen were not allowed to proceed with work not meeting specifications should not constitute grounds for complaint but rather is a situation which should be taken care of by your having competent supervisory personnel to see that contract terms and specifications are complied with as the work progresses.
During our conversation, the distinct impression was created of a negative attitude on your part by such remarks as “I certainly do not intend to do anything not required by the contract,” or words to that effect. Suggestion is made that a more positive attitude be adopted with emphasis on what you will do to meet your obligations under the contract and that this be transmitted into’ immediate and continued action. One of your first acts should be to comply with the directive in letter dated 12 December 1951 to sheathe the trench in front of the Administration Building. It will be noted that the speci *799 fication calls for complete sheathing of the entire length of any trench in which iron pipe is to be laid.. Confirming yesterday’s telephone request, when will you begin and when do you expect to complete the sheathing of this open trench and other necessary work to prepare the line for inspection ?
(d) The position taken by the contracting officer on December 27 that “complete sheathing of the entire length of any pipe in which iron pipe is to be laid” constituted a reversal of the contracting officer’s position as stated on December 13 that the contractor could proceed with skeleton sheathing. See finding 57, supra.
(e) The contracting officer was aware of the fact that the post engineer was preventing Dale from backfilling prior to testing. He was also aware of the strained relations existing between Bobbins and the post engineer and their disputes as to the methods of testing and the type of sheathing.
63. (a) The type of work covered by the contract in question is usually not performed in the Boston area during the winter because of weather conditions. Further, section 1-03 of the specifications provided in part that “pipe shall not be laid . .. when . . . weather conditions are unsuitable for the work, except by permission of the Contracting Officer.” See finding 26. See also findings 25 and 27.
(b) On December 26, 1951, the day before the conference referred to in finding 62 (c), Bobbins wrote to the contracting officer requesting permission to close down the contract work for the winter until March 1, 1952. His letter read as follows:
Permission is requested to close down the above contract for the winter until March 1,1952. This is due to ■the cold and inclement weather we are having and can continue to expect for the balance of the winter.
This type of work is never done during the winter due to the following conditions and hazards.
1. Freezing of water pipe line.
2. Freezing of ground making it difficult, costly, or impossible to excavate without blasting.
3. The workmen under their Union agreements etc. will not work in the cold on outside jobs. They usually stop when the temperature is about 25 degree or below, and that will be the usual case from now until March.
*800 We propose to install the balance of the Cast'Iron line between the ■ Administration Building and Section F, and tie into the existing 12" valve in front of Section F, so that the normal water supply will be on during the interim. In order to accomplish this it will be necessary to have a conference as to how, when, and under what conditions we can continue with this short length of line, as we have been stopped from doing any further work on it.
(c) The contracting officer denied the request to shut down for the winter by letter dated January 10, 1952, which read as follows:
Replying to your letter dated 26 December 1951, received in this office on 28 December 1951, you are informed that your request to close down the above contract for any period cannot be granted because of the slow progress to date. Therefore, the necessity for a conference is not indicated.
There is no evidence to support your claim that you have been “stopped from doing any further work on it,” but only that you, yourself, pulled the men off the job when told that they must proceed according to specifications.
Attention is invited to previous letters outlining deficiencies, one of which is the open trench in front of the Dispensary and Administration Building. This could have been sheathed in good weather and should have been done prior to laying the pipe. Failure to do so has resulted m a situation that is getting worse by the day and might easily result in an emergency condition which could cause further serious damage.
64. On January 2, Dale had 5 men at the site to install continuous sheathing on the open trench. However, a succession of cold weather, storms, snow and rain, had, beginning on December 28, caused the sides of the trench to cave in with the result that the pipe was covered by mud and earth. In these circumstances, the efforts of Dale’s work crew to install the sheathing without re-excavating the pipe were unsuccessful. The condition of the trench made it apparent that the pipe would have to be re-excavated, after which sheathing could be accomplished. Such re-excavation was also necessary in order to obtain compliance with the specification requirement that the pipe be surrounded *801 by 12" of limestone. In these circumstances, Bobbins concluded that it would be necessary to remove all the cast-iron pipe that had been installed, re-excavate the trench, and reinstall the pipe as was originally done, with the exception that this time the trench would be sheathed and left open. Because of the condition of the trench, such an operation was the most practicable one from an engineering standpoint.
65. On January 12, 1952, Bobbins sent the following letter to the contracting officer:
On Oct. 30 we submitted a schedule covering operations for the first section of cast iron pipe. This schedule was submitted in accordance with instructions from the Post Engineer whereby a weekly or sectional schedule had to be submitted one week in advance and approved before we would be allowed to work on that section. On November 21 Mr. O’Leary received verbal permission and approval of this schedule, which I checked on Nov. 22, to proceed on this work aiid proceeded to work. On Nov. 29 we received a written approval which, however, contained some modifications of the verbal approval but these modifications at the moment do not concern us.
The schedule as submitted by us and as approved by the engineers provided in part that we would backfill the trench immediately after the pipe was installed so that there would be a minimum of open trench, and this occurring only where the pipe was actually being installed. This procedure had been discussed from the beginning of the work and was set forth by us and at all times had received the approval of the engineers.
On or about Dec. 5 I was summoned to the Post Engineer’s office where I was notified by Col. Bice, that no backfilling would be allowed and the trench must remain open until tested for the entire section. At that time' our work was in progress and we had installed approximately five lengths of pipe, starting Dec. 1, 1951. This was a complete change from the previous approval of the schedule, both verbal and written, and from what we had discussed at the beginning and during the progress of the work.
We had installed this cast iron pipe on wood blocks (see sketch “A” attached) so that—
1. We could properly align pipe.
2. Maintain one foot clearance below pipe for the limestone and lime backfill as required by the specification. *802 These blocks were to be removed as the limestone was packed around it. (This was a request of the Engineers to which we agreed.)
However, starting on Dec. 5 we stopped laying the pipe in accordance with the ultimatum given me, and in order to protect the work already done, so that it would meet the specifications as to backfill, I sent three of our men to the Army Base with instructions just to pack the limestone under and around the pipe. These men were stopped from doing this operation by Mr. Hill. I then attempted later to place this limestone again as I knew what would occur m the trench if I didn’t, and also to cap the pipe to prevent debris coming in and to allow testing the sections laid and our men were stopped from doing this work by Col. Bice.
Shortly thereafter we had a succession of cold weather, storms, snow, and then a warm rain.
At the first opportunity I sent carpenters and laborers to sheath the trench, after stay braces had been installed. This sheathing installation was done only at your insistence and was not in accordance with the approved operation schedule.
These men worked all day and found that the water seeping in and the rain had washed sufficient earth in to cover the pipe (see attached sketch “B”). They attempted to remove the earth from underneath the pipe to put it in the condition it was on Dec. 4 but after a full day’s work with four men and equipment they had made no progress whatsoever.
This trench was in the best material we have yet encountered on the contract, being of firm gravel and was clean cut straight trench, and at the time we were working it was dry, ready to receive the limestone fill. As this trench level is in the general elevation of high tide which is only a short distance away? the trench becomes filled with water after a short while. Therefore it is necessary to work continuously and steadily to combat the water which hinders the installation of the pipe or the limestone.
The pipe is now so surrounded by earth and mud, and the trench is too narrow to re-excavate under the pipe, that now, in order to comply with the specifications as to the limestone bedding it is necessary to remove all the cast iron pipe installed, and re-excavate the trench, and reinstall the pipe as was originally done, with the exception that this time you want the trench sheathed and left open.
*803 If the trench is left open and again we are not allowed to backfill, at least with the limestone, we will have the same condition again, whereby mud and dirt surrounds the pipe preventing placing the limestone. The water and mud enters the trench from the bottom as well as from the sides. The contract requirement we have to fulfill is shown on attached sketch “C”.
As nothing further can be done with the pipe as it is now we are going to remove it and backfill the trench, so our machine can pass over it and re-excavate it, starting from the beginning. As we definitely feel that this extra work and cost was contrary to the approved schedules, we are submitting herewith a claim for the additional cost incurred, which is set forth on the attached sheet.
As we are confused over the conflicting stories and methods we are asked to proceed on, some of which are impractical, we ask you to set forth in detail, just what you desire and each step by step procedure you want us to follow. It is evident that some time ago we lost our status as an independent contractor and are merely following specific instructions from the Army.
Enclosed with the letter was a claim for $648.60 which Robbins stated was the estimated cost, profit and overhead for excavation of the trench, removing and reinstalling the cast-iron pipe, and backfilling.
66. (a) Upon receipt of Dale’s letter of January 12,1952, the contracting officer requested Robbins to submit a new schedule. Accordingly, by letter dated January 15, 1952, Dale sent the following letter, embodying a proposed schedule, to the contracting officer:
In accordance with your request we are submitting another schedule proposed for completing work on the above project.
You will note that we have scheduled no work until March 1, 1952. Winter weather will cause freezing of the temporary lines on wharf shed where no water is drawn from them; and the frost in the ground, such as exists now, prevents our machine from excavating the ground. We hope that by March 1, 1952 the frost will be out of the ground? this date is usually accepted for this work in this locality.
It is interesting to note that on high priority work for the New England Division at Otis Field, Burlington, and at other bases involving earthmoving, pipe laying, and surfacing operations, that operations have been *804 suspended because of the cold weather and frost in the ground. The Navy at their new air base at Weymouth have only a token force operating until spring. The time during this period is not computed in the contract time.
The contract time estimated by me now is for substantial completion for August 1,1952. Work if attempted during January and February would be minor in nature and would not materially affect the time, as on cold or inclement weather the men go home rather than work. This we cannot control and is condoned by the Union and is an item of their agreement.
This schedule is based on a minimum of delays caused by outside sources where we have to stop work and move to other areas or stop work altogether as has been prevalent in the past. Also that delays caused by Army tests, procedures, revisions, etc. be kept to a minimum.
As far as contract time goes, this was one of the items discussed just prior and after the award, of the contract and I was assured that- while it was desired to have the work done as soon as possible, extensions of time necessary to complete the work would be furnished as required, and no costs or other charges would be assessed against me for whatever time was needed, as long as the job was not abandoned, and believe me, we are not abandoning the job.
Will you kindly consider the enclosed schedules and let me know your reaction.
(b) On January 18 Dale sent the following letter to the contracting officer:
Reference is made to our letter of Jan. 12, 1952 and progress chart submitted Jan. 15, 1952. We have not as yet had a reply and do not know how you wish us to proceed.
The weather the past few days has been good and we are evidently experiencing the expected “January thaw”. During this period of good weather, which cannot be expected to last, we could accomplish some of the work if we knew how you wished us to proceed.
In the meantime, pending receipt of these replies, we are taking care of the items requested in your letters.
6,7. From January 9 to January 18 Dale continued its work under the contract. However, most of its efforts were confined to correcting the deficiencies (not including the sheathing) that had been called to its attention by the contracting officer. See finding 62 (a).

*805
Termination of the Contract for Default and Conclusions With Respect Thereto

68. (a) On January 18,1952, the contracting officer, without prior notice, sent the following letter to Dale terminating the contract immediately for default:
Reference is made to your Contract No. DA 19-128-AI-56 dated 27 June 1950 for replacement of deteriorated 16" cast-iron high service water main, Boston Army Base, Boston 10, Mass.
You are informed of the following findings made by the Contracting Officer:
(1) Deficiencies occurring in past performance were not corrected within a reasonable time after notice thereof and some still remain uncorreoted.
(2) Progress is not being made at a rate that will insure completion by the date specified, as extended.
(8) Instructions to proceed in accordance with specifications, first verbally and then directed in letter of 12 December 1950, have not been complied with. There has been little activity since that date and at present no work has been done for a considerable period of time.
In view of the foregoing, there is no recourse but to declare the contract inexcusably in default. Pursuant to the authority vested in the Government in Article 9 of the contract, your right to perform thereunder is terminated immediately upon receipt of this letter.
It is the Government’s intention to prosecute the work to completion by contract or otherwise and to hold you and your surety liable for any excess costs occasioned the Government thereby. The Government reserves all rights and remedies provided by law or under the contract in addition to charging excess costs.
This notice constitutes a finding of fact pursuant to Article 15 (Disputes) of the contract, from which you have the right of appeal as specified therein.
(b) On the same date the contracting officer sent the following additional letter to Dale:
With further reference to Contract No. DA 19-128-AI-56 and letter from this office dated 18 January 1952, notice is given of a typographical error contained therein. With particular reference to line 2 of paragraph 2, sub- *806 paragraph. 3, the date of 12 December 1950 is deleted and the following is substituted therefor:
12 December 1951.
All other terms and conditions of the original notice remain unchanged and in full force and effect.
(c) Article 15, the “disputes” provision of the contract read in part:
Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the Contractor at his address shown herein. Within 30 days from said mailing the Contractor may appeal in writing to the Secretary of War, whose written decision or that of his designated representative or representatives thereon shall be final and conclusive upon the parties hereto. The Secretary of War may, in his discretion, designate an individual, or individuals, other than the Contracting Officer, or a board as his authorized representative to determine appeals under this Article. The Contractor shall be afforded an opportunity to be heard and offer evidence in support of his appeal. . . . Pending decision of a dispute hereunder the Contractor shall diligently proceed with the performance of this contract. Any sum or sums allowed to the Contractor under the provisions of this Article shall be paid by the United States as part of the cost of the articles or work herein contracted for and shall be deemed to be within the contemplation of this contract.
(d) Article 9 of the contract entitled “Delays-Damages” provided:
If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor *807 and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. If the contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances and plant as may be on the site of the work and necessary therefor; Provided, that the right of the contractor to proceed shall not be terminated under this article because of any delays in the completion of the work due to unforseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to acts of God, or of the public enemy, Acts of the Government _ (including, but not restricted to any preference, priority or allocation order) acts of another contractor in the performance of a contract with the Government, fire, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the contractor shall within 10 days from the beginning of any such delay (unless the contracting officer, with the approval of the Secretary of War or his duly authorized representative, shall grant a further period of time prior to the dates of final settlement of the contract) notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal within 30 days, by the contractor to the Secretary of War or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.
(e) Article GC-6 of the specifications provided in part:
(b) The contractor shall furnish sufficient forces, construction plant and equipment, and shall work such hours, including night shifts, overtime operations and Sunday and holiday work, as may be necessary to insure the prosecution of the work in accordance with the approved progress schedule. If, in the opinion of the Contracting Officer, the Contractor falls behind the progress schedule, the Contractor shall take such steps as may be necessary to improve his progress and the Contracting Officer may require him to increase the number of shifts, and/or overtime operations, days of work and/or the *808 amount of construction plant, all without additional cost to the Government.
(c) Failure of the Contractor to comply with the requirements of the Contracting Officer under this provision shall be grounds for determination by the Contracting Officer that the Contractor is not prosecuting the work with such diligence as will insure completion within the time specified. Upon such determination the Contracting Officer may terminate the Contractor’s right to proceed with the work, or any separable part thereof, in accordance with the Delays-Damages Article of the contract.
(f) Article 6 of the contract provided iii part:
Inspection. — (a) All material and workmanship (if not otherwise designated by the specifications) shall be subject to inspection, examination, and test by Government inspectors at any and all times during manufacture and/or construction and at any and all places where such manufacture and/or construction are carried on. The Government shall have the right to reject defective material and workmanship or require its correction.' Dejected workmanship shall be satisfactorily corrected and rejected material shall be satisfactorily replaced with proper material without charge therefor, and the contractor shall promptly segregate and remove the rejected material from the premises. If the Contractor fails to proceed at once with the replacement of rejected material and/or the correction of defective workmanship the Government may, by contract or otherwise, replace such material and/or correct such workmanship and charge the cost thereof to the contractor, or may terminate the right of the contractor to proceed as provided in Article 9 of this contract, the contractor and surety being liable for any damage to the same extent as provided in said Article 9 for terminations thereunder.
(g) Dale received the notice of termination for default on the afternoon of January 21, 1952. Prior to that, on January 19, 1952, Dobbins had written to the post commander setting forth his intention to “perform and complete the work as soon as it is possible' consistent with good practice and economical operation”. In this communication, which was in reply to the post commander’s letter of December 14,1951 (see finding 59), Dobbins set forth at length his version of a review of the job as a whole and the problems with which Dale had been confronted.
*809 69. It was within the discretion of the contracting officer to accept or reject Dale’s proposed schedule of January 15, 1952. The usual procedure of the contracting officer in this respect was to refer a proposed schedule to the post engineer to determine if it was acceptable from an engineering standpoint and if not to return it to the contractor as unacceptable.
• 70. The contracting officer took no action to approve Dale’s proposed schedule of January 15,1952. In general, without approval of a schedule, Dale could not proceed with the work proposed. See finding 42 (a).'
71. The contracting officer made.the decision to terminate the contract after receipt of Dale’s proposed schedule submitted in its-letter of January 15, 1952. This decision was made after consultation with the post engineer.
72. (a) As of January 18, 1952, when the contract was terminated, Dale had completed about two-thirds of the work. The contract required the installation of about 4,764 feet of cement-asbestos pipe and 2,030 feet of cast-iron pipe. At time of termination, Dale had installed, complete-in-place, about 4,355 feet of cement-asbestos pipe. Barring further delays resulting from subsurface obstructions or Government-caused delays of a nature that had hitherto retarded progress of the work, Dale could have completed the work by June 2,1952, if the contracting officer had required it to work during the winter.
(b) Excluding delays caused by suspension of the work the previous winter, delays caused by subsurface obstructions and delays caused by the Government, Dale’s progress in the past was such as to support the conclusion that it could have completed the job on or before June 2,1952, if the contracting officer had required it to work during the winter.
(c) The contracting officer’s conclusion that Dale was “. . . not making making progress at a rate that will insure completion by the date specified, as extended,” is not supported by the evidence in the record.
73. (a) At the time of termination Dale was ready, willing and able to proceed with the work to completion in accordance with contract specifications.
(b) At the time of termination, Dale had on the work-site all the cast-iron pipe needed for the remainder of the job, *810 several carloads of limestone, as well as various items of heavy equipment necessary to complete the work.
74. (a) At no time did Dale refuse the contracting officer’s directions to sheathe the open trench in the cast-iron pipe area, or otherwise comply with contract specifications.
(b) Dale intended to proceed with the work, including the installation of continuous sheathing, in accordance with the contracting officer’s directive. Dale made it clear, however, that it was making a claim for what it regarded as extra costs in connection with installing continuous sheathing.
75. (a) The contracting officer terminated the contract for default principally because of Dale’s intention to submit a claim for extra costs incurred in installing continuous sheathing in the open trench.
(b) There is testimony in the record by the contracting officer and an engineer later employed by Seaboard Surety that the existence of the open trench of 125 feet represented an emergency and that conditions at the site were “deplorable”. The record establishes that Dale was ready, willing and able to re-excavate the trench, remove the pipe, install continuous sheathing, and thus correct the existing condition.
76. Apart from the matter of sheathing, most of the other deficiencies in contract performance had been corrected prior to the time of termination in a maimer acceptable to the contracting officer. A few such deficiencies still existed at the date of the termination; these were minor in nature; the contractor had evidenced a clear intention to correct them promptly; and the time needed for their correction would not have prevented the contract from being completed by June 2,1952.
77. In the circumstances of this case, the contracting officer’s action in terminating the contract for default was unreasonable and unjustified.
Talcing Possession by Army of Dale's Materials, Tools and Equipment After Termination for Default
78. (a) Article 9 of the contract provided in part:
... If the contractor’s right to proceed is . . . terminated (for default), the Government may take possession of and utilize in completing the work such ma *811 terials, appliances and plant as may be on the site of the work and necessary therefor. . . .
(b) Paragraph 6 of the agreement between Dale and Seaboard Surety contained in the Application for Contract or Proposal Bond provided as follows:
For the better protection and security of the Surety, the undersigned, as of the date hereof, hereby assigns, transfers, and conveys to the Surety, the SEABOARD SURETY COMPANY, all right, title and interest of the undersigned in and to all supplies, tools, plant, equipment, and materials (whether completely manufactured or not) wherever located which are now or may hereafter be purchased, used or acquired for use, entirely or partly, in the performance of said contract, and also all rights in and to all subcontracts relating to said work which have been or may hereafter be made, together with the materials embraced therein, and as well all the rights, title and interest of the undersigned in and to all bonds executed to the undersigned securing the performance by said subcontractors of such subcontracts; and the undersigned does hereby authorize and empower the Surety, its authorized agents or attorneys, to enter upon and take posssesion of said supplies, tools, plant, equipment, materials and subcontracts, and enforce, use and enjoy the title thereto and the possession thereof in the event of any default on the part of the undersigned in the performance of the contract herein-above referred to, failure of the undersigned to promptly pay, satisfy and discharge any and all obligations which might constitute possible claim under the bond, or breach of the terms of this agreement.
(c) At the time of the Army’s termination of the contract Dale had stored on the job site about 1872 feet of cast-iron pipe (the amount necessary to complete the job), for which it had expended the sum of $17,338. The Army took this material and turned it over to the surety for use in completing the work. Also on the work site at the termination date, and taken by the Army for utilization in completion of the job, were 2*4 carloads of limestone dust for which Dale paid $752.00 and lumbar for which Dale had paid $520.85.
(d) At the time of termination, the Army also took possession of some 200 separate items belonging to Dale which *812 were on the work site but were neither necessary for completing the work nor subject to incorporation in the work. These items included a complete clutch and pressure plate, oil filters, cargo hooks, grease guns, auto and building jacks, hardware poles, surplus 16" cement-asbestos pipe, empty drums, a spare starter motor, truck tires, tools of various kinds, rubber boots, etc.
(e) On January 21, 1952, Robbins wrote to the Army contracting officer stating that Dale had specified tools and materials on the site which could not be used on the job but which Army guards had prevented it from removing. Robbins also went to see the contracting officer and told him that Dale had immediate need for some of the equipment for the job at the South Boston Annex of the Boston Navy Yard. About a week later the contracting officer released a few items of equipment. On February 11, 1952, Robbins wrote to the Army contracting officer submitting a 10-page inventory of various items of equipment, tools and cables that were on the Army site and which, he said, the Army would not allow Dale to remove. Robbins’ letter read:
We submit for your verification the enclosed inventory of our premises at the Army Base which includes, construction shacks, etc.
It appears that these premises are not properly secured, appear to be abandoned, and are being pilfered constantly, and the contents and materials are.being removed by looters. .
As we mentioned to you before, there are many many items which cannot be used on the above, contract work by anyone, being spare parts for our machines which are not there, expensive grease buckets for same, reels, and cable belonging to our job in the adjoining area, and hand tools of every description belonging to our-employees as well as me, and pipe and fittings (especially 16" transite) which I offered to sell the. Government but which was refused,' and which line was • completed.
Your acts in not allowing us to take our materials: required for our other Government work can only result in our filing claims with the Government for extra expense, delays, and loss of materials to us by actions of' the Government (the Army).
*813 May we bear from you soon ? The cost of this material runs into thousands of dollars. ■
(f) On February 23, 1952, Robbins wrote Seaboard as follows: ■
Enclosed for your verification is a schedule of materials, etc. which we had on the site Friday January 18,-1952 and none of which we were allowed to remove by the Army. Many of these items are of no use or value on the above project, and some items specifically belong to our adjoining job in the .Navy Yard and at White Plains, for which you áre the bonding company. The Army refuses to allow us to take any of this material and writes that they have made an inventory with you.
I have strong reason to believe that the tools and equipment are being rapidly pilfered, and that no effort is made to secure same, and have eye witnesses who report this.
As under the contract the ‘ Army can only retain materials and tools to be used on this job then from their letter I infer that the surety has authorized them to retain all the materials and tools under your Indemnity. In that case I would recommend that immediate steps be taken to safeguard this material, for I will look to the Army and the surety for this material.
The items which by no stretch-of, the imagination can be used in- the above job are still .worth several thousand dollars.
(g) Some months later the Army contracting officer released a few items, consisting primarily of scrap lumber. These materials were given to Dale so as to enable the grounds to be cleaned up.
(h) The Army failed to release to Dale the balance of the items. As a result it was necessary for Dale to buy or rent duplicate items.
(i) A few items that were taken by the Army and not returned to Dale were to be used exclusively on the Navy contract.
(j) There is no evidence in the record that any of the tools, equipment, spare parts, surplus pipe, etc., which are the subject of findings 78 (d)-(i), were taken or utilized by Seaboard in the completion of the Army contract. ’

*814
Appeal By Dale to ASBCA (Docket No. 1582); Findings of ASBCA

79. Upon receipt of the termination notice, Dale, by letter dated February 14,1952, filed the following notice of appeal to the Secretary of War:
Appeal is hereby taken from the decision of the Contracting Officer, Boston Army Base, in regard to Contract DA 19-128-AI-56, Replacement of Deteriorated 16" C.I. Water Main, Boston Army Base, for which a termination notice was issued by said Contracting Officer dated 18 January 1952, and received by us January 21, 1952.
In addition, appeal is also taken for adjudication of various other items which have arisen during the course of said contract. Some of these items were originally appealed but nothing has been heard, others were continuing factors up to the time of the termination notice.
In connection with this appeal we wish to be heard and present witnesses, and we respectfully request a hearing.
The basis of our appeal will be presented within a week.
80. The ASBCA (Docket No. 1532) held hearings in Washington, D.C. on May 19 through May 22,1953, and in Boston, Massachusetts, on June 11,12,13 and 15, 1953.
81. At the hearing before the board, the defendant waived reliance on certain alleged deficiences and Dale gave extensive testimony with respect to the remaining.
82. The ASBCA’s decision, which was issued on August 10,1954, reads in pertinent part:
As stated in the termination notice the Government rests its order to terminate this contract on three specific findings in which certain allegations of default are made against the appellant:
(1) Failure to correct deficiencies in past performance within a reasonable time.
(2) Failure to make progress at a rate that would insure completion of the contract within the contract period.
(3) Failure to proceed in accordance with contract specifications.
As to the first of these findings the evidence is clear that throughout the contract period the contracting of *815 ficer and his representatives, particularly the Post Engineer and the Inspector, advised the appellant both orally and in writing of alleged deficiencies. In the main they were minor deficiencies which could be and were corrected, although in the case of the more important deficiencies there was some disagreement before acceptable corrections were made. It must be noted, however, that in citing deficiencies in past performance as a factor warranting termination of the contract, the contracting officer indicates that the alleged deficiencies had been corrected before the notice of termination was issued although not always within what the contracting officer regarded as a reasonable time.
We believe that deficiencies in past performance of the contract, eventually corrected in a manner acceptable to the Government, may not be used as a basis for subsequently terminating the contract for default. Of the deficiencies which the contracting officer states were still uncorrected on the date of termination, only the appellant’s failure to sheathe is important and since this deficiency also constitutes the principal basis of the third finding it will be considered in connection therewith.
In the Government’s second finding it is alleged as a matter of default that “Progress is not being made at a rate that will insure completion by the date specified, as extended.”
Although contract operations were almost at a standstill on 18 January 1952, when the contract was terminated, the evidence shows .that more than two-thirds of the required quantity of new pipe had been placed. This tends to negate the conclusion that the contractor would not have completed the contract by 2 June 1952, the completion date agreed to by the parties. Moreover, it does not appear that the contracting officer terminated this contract because of the slowness with which the work was progressing. At the hearing the contracting officer when asked: * * * when did you arrive at the decision that you were going to terminate the contract?” replied that he did so when he received a letter from the contractor about 16 January 1952 which he regarded “* * * as a rejection of the offer of the Government to proceed at once and complete by June 2nd.” This was apparently the contractor’s letter of 15 January 1952 transmitting for approval a schedule in which a suspension of operations until 1 March was proposed. An examination of this letter indicates clearly that it cannot be considered as a rejection of a Government offer to *816 extend the contract period to 2 June 1952 nor does it indicate an intention on the part of the contractor to abandon the contract. The letter in fact states precisely the contrary. Moreover the Government’s letter of 19 November 1951, which indicated its intention to extend ■the completion date to 2 June 1952, did not necessarily preclude an additional extension of time if such further extension were justified. It merely expressed the contracting officer’s opinion that as or 19 November 1951 an extension beyond 2 June 1952 was not justified.
It seems evident to the Board that what moved the contracting officer to terminate this contract on 18 January 1952 was not so much his belief that the contractor would not complete the contract by the completion date thereof, but rather the disagreement between the contractor and Government personnel, particularly the Post Engineer, as to the sheathing requirements of the contract.
The contracting officer’s third finding in which default is specified, is the appellant’s alleged failure to proceed in accordance with specifications. This has reference to the contractor’s original insistence that after opening a trench it had a right to proceed without sheathing. The contract requirement relating to sheathing is contained in Section 2-03 of the specification which provides in pertinent part:
“All materials in the trenches for water lines shall be excavated to the lines and grade shown on the Drawings or as otherwise directed. Excavations shall be made to vertical lines and wide enough to permit proper sheathing, bracing, and form work where necessary or required.
* ❖ * # *
“The Contractor will be required to completely sheathe the trench excavation along the cast-iron pipe replacement line.” [italic added]
íj»
As to the contract requirement with respect to sheathing we believe, as the Government maintains, that complete sheathing was specified in the area in which new cast-iron pipe was to be placed, and that in the area which called for asbestos-cement pipe, sheathing was required only when necessary, presumably in the interest of safety. Hence we must conclude that by permitting the contractor to proceed without sheathing in the area where the contract did not necessarily call for it, the *817 Government did not waive the requirement for the area in which complete sheathing was specified. Moreover there is no evidence that the parties reached an oral understanding to waive the contract requirement as to sheathing.
Since we have already found that sheathing was required along the cast-iron pipe replacement line and that the requirement was not waived by any oral agreement of the parties, evidence of their prior discussion in the matter of sheathing is important only in evaluating the significance of the contractor’s continued insistence that it could proceed without sheathing. The Government maintains that the appellant failed to sheathe after it was specifically ordered to do so by the contracting officer and that such failure indicated an intention on the part of the appellant not to carry out the contract specifications and thus rendered the contract “inexcusably in default.”
We are unable to draw this conclusion from the contractor’s failure to sheathe. The evidence shows that the order to sheathe was first communicated to the contractor orally on 5 December 1951 and reiterated in a letter dated 12 December 1951 whereas the contract was not terminated until 18 January 1952. We do not believe that the evidence supports the contracting officer’s findings of 18 January 1952 that the contract was then inexcusably in default; or that the contractor had indicated an intention not to comply with the contract specifications. In our opinion the contractor’s failure to sheathe when ordered was due to the disagreement as to the intent of the specifications and as to who would pay for the cost of complete sheathing. It seems evident that if the contractor had been permitted to proceed along the lines suggested in its letter of 12 January 1952, which included complete sheathing of the trench it would have completed all the work called for by the contract. The Government never approved or disapproved the appellant’s suggested method of procedure. The contractor’s claim that it was entitled to extra compensation for sheathing, while perhaps not allowable under the specific terms of the contract, is a separate matter which did not affect its ability or its intention to successfully complete the contract. Certainly the assertion of such a claim did not afford an adequate basis for terminating the contract for default.
In view of the above and for the reasons stated we hold that the alleged grounds for terminating this contract under Article 9 thereof, asserted by the contracting of *818 ficer in bis findings of 18 January 1952, are not supported by the evidence of record.
* * * * *
83. (a) These findings of the ASBCA are supported by substantial evidence in the record before the board.
(b) At the trial before this court, the defendant failed to prove by a preponderance of the credible evidence that these findings of the board were fraudulent, arbitrary or capricious, or not supported by substantial evidence.
84. Also included in the appeal by Dale was a claim for $822.54 for damages resulting from the failure by City of Boston employees to turn off a high pressure valve. The ASBCA held that since the appeal was not taken within 30 days after the contracting officer’s denial of the claim, it had no jurisdiction under the disputes clause. See findings 24(a)-(e), supra.
85. For similar reasons the board denied an appeal from a decision by the contracting officer, dated November 23, 1951, denying Dale’s claim for the issuance of certificates exempting it from payment of the State gasoline tax insofar as that tax was applied to gasoline consumed by Dale’s equipment while at work on the contract.
86. The ASBCA made no findings on the claim asserted by Dale for changed conditions caused by underground obstructions encountered during performance of the contract. The board ruled, over Dale’s objection, that the claim should be presented to the contracting officer for subsequent action.

Contracting Officer’s Offer After ASBCA Decision To Negotiate With Dale on Basis of Considering Previous Termination for Default as One for Cowoenience of Government; Dale's Failure To Commmicate with Contracting Officer for Pur¶ose of Such Negotiations

87. (a) Following the ASBCA decision the contracting officer, on November 16, 1954, wrote to Dale as follows:
Pursuant to instructions from higher headquarters, you are informed that the previous termination for default is deemed to be termination for convenience of the government and this office is now ready to negotiate in connection therewith.
*819 (b) Not having received a reply, the contracting officer on December 9,1954, sent this further letter to Dale:
Inasmuch as letter from this office, dated 16 November 1954, notifying you that this office is ready to negotiate in connection with your terminated contract, has not been acknowledged, you are again advised that this office is ready to enter into negotiation.
This notice is being sent registered mail to be sure that you have received the notice and that the matter has your attention.
(c) On January 12,1955, Robbins wrote to the contracting officer:
Reference is made to your recent letters in regard to entering into negotiation in connection with the above contract.
At the present time I am tied up with another important matter. I will get in touch with you as soon as I am free to start negotiations in connection with this contract.
(d) At no time thereafter did Dale contact the contracting officer to initiate any negotiations in regard to the contract.
(e) Article 18 of the contract, entitled “Termination for Convenience of the Government”, provided in part, as follows:
Auticle 18. Termination for Convenience of the Government, — (a) The Government may terminate this contract in whole or in part at any time by a notice in writing from the Contracting Officer to the Contractor, specifying the date upon which such termination shall become effective and the extent to which the performance of such contract shall be terminated. Termination shall be effective upon the date and to the extent specified in said notice.
& ij< # ❖
(c) Upon compliance by the Contractor with the above provisions of this Article and subject to deductions or credit for payments previously made, and without duplication of any such payments, the Government shall pay to the Contractor such sum as the Contracting Officer and the Contractor may agree by Supplemental Agreement is reasonably necessary to compensate the Contractor for his costs, expenditures, liabilities, com *820 mitments and work with respect to this contract, other than the expenditures and costs referred to in paragraph (e) of this Article. The Contracting Officer shall include in such sum such allowance for profit with respect to the contract as is reasonable under all the circumstances.
* * * * *
(e) The Government shall pay to the Contractor such sum as the Contracting Officer and the Contractor may agree upon for expenditures made and costs incurred with the approval of the Contracting Officer (a) after the date of termination for the protection of Government property, and (b) for such other expenditures and costs as may be necessary in connection with the settlement of this contract, and in the absence of such agreement as to the amount of such expenditures and costs shall reimburse the Contractor for the same.
$ H* $ ‡ ‡
(k) Upon the making of the payments called for by this Article, all obligations of the Government to make further payments or to carry out other undertakings hereunder shall cease, forthwith and forever, except that all rights and obligations of the respective parties under the Articles, if any, of this contract applicable to patent infringements and reproduction rights shall remain in full force and effect.
(1) The Government shall terminate this contract only in accordance with this Article, except as otherwise provided by law or by Article 9 (Delays-Damages). Notwithstanding Article 9 (Delay s-Damages) and any defaults of the Contractor, the Government shall terminate this contract only in accordance with this Article if such termination is simultaneous with or part of or in connection with a general termination of war contracts, at about the time of, or following the cessation of the present hostilities or the end of the present war, unless the Contracting Officer finds that the defaults of the Contractor (1) have been gross or wilful and (2) have caused substantial damage to the Government.

Completion of the Pipe Contract at the Army Base by Seaboard Surety

88. (a) As required by the contract, Dale had furnished a performance bond in the penal sum of $82,000 and a pay *821 ment bond of $82,000, both issued by the Seaboard Surety Company. These bonds had been issued by Seaboard as a result of the application Dale and its principal stockholders (Eobbins and his wife) had filed with that company on July 14,1950. See findings 9 (b) and (c).
(b) The bond application, executed July 14, 1950, contained the following pertinent provisions:
H» *í*
4th. To indemnify and keep indemnified the Surety and hold and save it harmless from and against any and all liability^ losses, costs, damages, attorneys’ and counsel fees, and disbursements, and expenses of whatever kind or nature which the Surety may sustain or incur by reason or in consequence of having executed or procured the execution of the bond or bonds hereinabove applied for and/or any renewal, continuation, extension or successor thereof and all other bonds heretofore or hereafter executed or procured for or at the request of the undersigned, and/or which the Surety may sustain or incur in taking any steps it may deem necessary, in making any investigation, in defending or prosecuting any actions, suits and/or other proceedings which may be brought under or in connection therewith, and/or in recovering or attempting to recover salvage or any unpaid bond premium, in obtaining or attempting to obtain release from liability, or in enforcing any of the covenants of this agreement; to pay over, reimburse and make good to the Surety, its successors or assigns, all money which the Surety or its representatives shall pay, or cause to be paid or become liable to pay, by reason of the execution of the bond or bonds hereinabove applied for and/or any renewal, continuance, extension or successor thereof and all other bonds heretofore or hereafter executed or procured for or at the request of the undersigned, such payment to be made to the Surety as soon as it shall become liable therefor, whether the Surety shall have paid out such sum or any part thereof, or not.
*****
6th. For the better protection and security of the Surety, the undersigned, as of the date hereof, hereby assigns, transfers, and conveys to the Surety, the SEASONED SUEETY COMPANY, all right, title and interest of the undersigned in and to all supplies, tools, plant, equipment, and materials (whether completely manufactured or not) wherever located which are now *822 or may hereafter be purchased, used or acquired for use, entirely or partly, in the performance of said contract, and also all rights in and to all subcontracts relating to said work which have been or may hereafter be made, together with the materials embraced therein, and as well all the rights, title and interest of the undersigned in and to all bonds executed to the undersigned securing the performance by said subcontractors of such subcontracts; and the undersigned does hereby authorize and empower the Surety, its authorized agents or attorneys, to enter upon and take possession of said supplies, tools, plant, equipment, materials and subcontracts, and enforce, use and enjoy the title thereto and the possession thereof in the event of any default on the part of the undersigned in the performance of the contract herein-above referred to, failure of the undersigned to promptly pay, satisfy and discharge any and all obligations which might constitute possible claim under the bond, or breach of the terms of this agreement.
7th. In further consideration of the execution of said bond, the undersigned in the event of any breach, delay or default in said contract, failure of the undersigned to promptly pay, satisfy and discharge any and all obligations which might constitute possible claim under the bond, or breach of the terms of this agreement, hereby assigns, transfers and conveys to the Surety all the deferred payments and retained percentages, and any and all monies and properties that may be due and payable to the undersigned, or that thereafter may become due and payable to the undersigned on account of said contract or on account of extra work or materials supplied in connection therewith and any and all other monies or properties of the undersigned, hereby agreeing that such money and the proceeds of such payments and properties shall be the sole property of the Surety and to be by it credited upon any loss, cost, damage, charge, expense sustained or incurred by it under the bond or bonds here-inabove applied for and any other bond or bonds heretofore or hereafter executed at the request of the undersigned. If for any reason the Surety shall deem it necessary to enforce any assignment, transfer or conveyance as provided in Section 6 and 7 hereof, the undersigned and each of them hereby expressly authorize and empower any person or persons designated by the Surety to execute in the name of the undersigned any instrument or instruments necessary and requisite to secure absolute title to the Surety of any funds, property and/ or rights in said Sections 6 and 7 assigned, transferred, and conveyed. The delegation of authority by the un *823 dersigned to execute such instrument or instruments shall be distinct and several, and the powers hereby conferred are hereby convenanted and deemed to be irrevocable and coupled with an interest.
•k 4» $
9th. That the Surety shall, at its option and in its sole discretion, have the right to take possession of all or any part of the work of the said contract, whenever, in its sole opinion, such action is desirable or necessary, and at the expense of the undersigned and each of them to complete, or cause the completion of, any such work, or re-let, or consent to the re-letting or completion of, such contract.
10th. If for any reason the Surety shall be required or shall deem it necessary to set up a reserve in any amount to cover any contingent claim or claims, loss, costs, attorney’s fees and disbursements and/or expenses in connection with said bond by reason of default of the undersigned, abandonment of contract, liens filed, unpaid and past due bills, dispute with the owner or obligee or for any reason whatsoever, and regardless of any proceedings contemplated or taken by the principal or the pend-ency of any appeal, the undersigned jointly and severally hereby convenant and agree immediately upon demand to deposit with the Surety, in current funds, an amount sufficient to cover such reserve and any increase thereof, such funds to be held by the Surety as collateral, in addition to the indemnity afforded by this instrument, with the right to use such funds or any part thereof, at any time, in payment or compromise of any judgment, claims, liability, loss, damage, attorney’s fees and disbursements and/or other expenses; and if the Surety is required to enforce performance of this covenant by action at law or in equity, the costs, charges, and expenses, including counsel or attorneys’ fees, which it may thereby incur, shall be included in such action and paid by the undersigned. Demand shall be sufficient if sent by registered mail to the undersigned at the address given herein or last known to the Surety, whether or not actually received.
89. During December 1951 the contracting officer had transmitted to Seaboard copies of several letters he had sent to Dale. On January 18, 1952, the same day as he terminated the contract for default, the contracting officer sent the following letter to Seaboard:
You are hereby informed that the right of the contractor to proceed under subject contract lias been termi *824 nated. Inclosed is copy of termination notice dated 18 January 1952.
_ You may take over and complete the work at your election, or the Government will readvertise and perform the work by contract. In any event, you and the contractor will be held liable for any excess costs incurred by the Government, as well as for actual damages, if any.
It is requested that the matter of taking over and completing the project be given your, full and prompt consideration and that your decision be mailed to reach this office on or before 28 January 1952 — sooner, if possible.
90. Seaboard was aware that Dale would appeal the termination for default. Nevertheless it exercised its election to step in and complete the contract. Effective January 23, 1952, Supplemental Agreement No. 3 to the pipe contract was executed between Seaboard and the United States as follows:
This supplemeNtal agreement entered into this 23rd day of January 1952, by and and between the ÜNited Stapes oe America, hereinafter called the Government, represented by the Contracting Officer executing this Agreement, and Seaboaed Surety CompANy, a New York corporation having an office at 75 Maiden Lane, New York, New York, hereinafter called the Surety Witnesseth That,
Whereas, following the default of Dale Construction Company, hereinafter called the Contractor, to complete the performance of that certain Contract No. DA 19-128-AI-56, dated June 27,1950 between the Government and the Contractor, hereinafter called the Contract, providing for the furnishing by the Contractor of all labor and materials and the performance by the Contractor of all work required for the construction and completion of the replacement of deteriorated 16-inch cast iron high service water main, Boston Army Base, Boston, Massachusetts, all as set forth in said contract and specifications, schedules and drawings referred to therein, the Government duly terminated the right of said Contractor to proceed with the work under said Contract; and
Whereas, the Government desires to effect the unde-layed completion of said contract in order to preserve continuity of performance and to expedite completion and to avoid the delay and inconvenience of a re-letting; and
_ Whereas, the Surety is willing and desirous to exercise its election to complete, or to procure the completion *825 of the said contract, as a measure of cooperation with the Government, provided it can be assured that in so doing, it will receive the contract payments as hereinafter set forth:
Now, THEREFORE, m consideration of the premises, the parties hereto have agreed and do hereby agree severally and respectively as follows:
1. The Surety undertakes and agrees to perform, or to procure the performance of, all work not completed under the Contract. The Surety represents that the Contractor has, for good and valid consideration, assigned to the Surety all its right, or claim of right, in and to any and all contract balances, including earned but unpaid estimates and earned retained percentages, and any right or rights it may have to request additional compensation for work already performed but not included in payments to date, all as more particularly set forth in the Seventh Paragraph of the agreements contained in application for contract or proposal bond dated July 14, 1950, signed by said Contractor, a photostat copy of which instrument is hereto attached and made a part hereof.
2. The Government hereby re-obligates all available contract balances under said contract for the completion of the work in accordance with its terms, as modified by this Agreement, and hereby agrees that it will pay direct to the Surety, as the same shall become progressively payable in accordance with the payment provisions of said contract as modified by this agreement, all sums now due and payable and to become due and payable upon and under said contract, including all unearned contract balances, all earned retained percentages, all earned but unpaid estimates, and any and all other monies contracted to be paid thereunder, without reduction or set-off for any liability, of any nature, of the Contractor to the Government which arises independently of such Contract, EXCEPT that the Government shall pay any excess over all costs of completion by the Surety, as the Contracting Officer may determine, to any appropriate claimant, as his interest may appear. Any dispute as to the amount of the completion costs shall be considered as a dispute under the Disputes Article of the Contract.
8. The Contract completion date is hereby extended to June 2,1952.
4. This agreement shall extend to and be binding upon the parties hereto, their respective successors and assigns.
*826 5. Except for this modification and except as it may heretofore have been modified, all terms and conditions of said Contract shall be and remain the same.
IN witNess wheREOR, the parties hereto have executed this Supplemental Agreement as of the day and year first above written.
91. Because of the time of the year, and in view of the condition of the open trench, Seaboard concluded that it was necessary immediately to relay the pipe in the open trench, close the open excavations and make temporary water connections to the buildings that would not be affected by freezing. Seaboard negotiated a cost-plus contract with the C. J. Maney Company on January 23 for this work up to Section F of the warehouse building. The Maney company was chosen for the work because it already had a base of operations on the Army Base in connection with a contract it was then performing to stabilize the Base, and thus had the foremen and other men available immediately to commence the work. The cost-plus work by Maney was mainly concentrated in the weeks ending January 26, February 6 and 12,1952, but in all, extended to March J, 1952. For that work Maney charged Seaboard the sum of $11,484.59.
92. (a) During the completion of the cost-plus work by Maney, Seaboard negotiated with several other companies with respect to the proposed award of a contract to complete all the remaining work under the Army pipe contract. On February 21, 1952, Seaboard awarded the completion contract to Maney. The total payments by Seaboard to Maney for both the cost-plus work and the completion work amounted to $95,956.28.
(b) As a part of its operations in completing the work for Seaboard, Maney installed continuous sheathing in the trench along Terminal Street. Prior to testing, Maney partially back-filled the pipe between the joints, leaving the joints exposed.
(c) Seaboard incurred other expenses in connection with its undertaking to complete the work at the Army Base, including the sum of $2,460 for engineering and supervisory service and the sum of $3,949.03 for legal services and expenses. Dale had not paid certain of its materialmen with *827 the result that lien claims in the amount of $2,953.75 were paid by Seaboard. Against these lien claims, however, Seaboard was able to apply $2,187.50 it obtained from a company which had owed that amount to Dale. This left a net balance of $766.25 in lien claims which Seaboard paid. In addition, in its completion work on the contract, Seaboard was able to recover $2,733.49 from the salvage of cast-iron pipe, fittings, etc.
(d) Total payments by the Army under the contract equalled $164,921.02, of which $96,393.33 had been paid to Dale. The remaining amount of $68,527.69 was paid to Seaboard and included the sum of $2,435 for underground obstructions encountered by Dale during the period of its contract performance prior to termination. The $68,527.69 paid to Seaboard included the sum of $1,217.06 for underground obstructions encountered by Seaboard during its completion of the contract. In addition, under the provisions of the contract the Army had retained an amount equalling 10 per cent of payments made as security for the completion of the project. As of the date of termination on January 18,1952, the amount retained by the Army equalled $10,710.37 and this amount, as well as subsequent retained amounts, was included in the $68,527.69 paid to Seaboard.
(e) In summary, in its completion of the work required under the contract and in payment of lien claims stemming from Dale’s performance, Seaboard incurred a loss over and above amounts received of $31,870.38.
93. (a) During completion of the contract work by Seaboard, the contracting officer on March 21, 1952, wrote the following letter to Dale with a copy to Seaboard and to the post engineer:
It is now desired to take up the matter of unforeseen obstructions which you encountered from the beginning until you suspended operations. Therefore, it is requested that you list the obstructions encountered, together with the amounts you claim are due because of excess costs occasioned by these obstructions.
This list will be checked and a finding made by the Contracting Officer establishing the amount for which you may receive credit.
*828 (b) This letter was sent to Dale some five weeks after Dale had filed notice of appeal from the termination of the contract. See finding 79. The record does not show whether Dale replied to this communication.

Oontract Between Dale a/nd Navy for Installation of Cables at South Boston Annex of the Boston Na/oy 7a/rd

94. (a) About a year after it obtained the pipe contract for the Army Base, Dale, on June 15, 1951, was, as low bidder, awarded contract NOY-24709 by the Navy in the amount of $39,995. See finding 32(d). The contract required that Dale furnish all the materials and perform the work necessary in providing and securing new underground cables to replace the existing fire alarm and police signal system at the South Boston Annex of the Boston Navy Yard. The contract further provided that the work was to be commenced within 10 calendar days after receipt of a notice to proceed and was to be completed within 240 calendar days after receipt of the notice to proceed. Liquidated damages of $40.00 per day were agreed upon for delay in completion of the work.
(b) The contract contained the following pertinent provisions :
* * * ❖ *
Article 4. — PerformaNce of the Work
(a) W orltmianship — Material—W orkmen. — Unless otherwise specifically provided for in the specifications, all workmanship, equipment, materials, and articles incorporated in the work covered by this contract are to be of the most suitable grade of their respective kinds for the purpose. Where equipment, materials, or articles are referred to in the specifications as “equal to” any particular standard, the Officer in Charge shall decide the question of equality. The Contractor shall furnish to the Officer in Charge for his approval the name of the manufacturer of machinery, mechanical and other equipment which he contemplates incorporating in the work, together with their performance capacities and such other information as may be pertinent or required by the Officer in Charge. When, and to the extent, required by the specifications, or by the Officer *829 in Charge, the Contractor shall furnish the Officer in Charge for approval full information concerning the materials or articles which he contemplates incorporating in the work. Samples of materials shall be submitted for approval when so directed. Machinery, equipment, materials, and articles installed or used without such approval shall be at the risk of subsequent rejection.
% * * *
Article 5. — Specifications AND DRAWINGS
% :Ji * :]: ‡
(e) Interpretation and Instructions. — All questions regarding the figures, drawings, plans, and specifications and the interpretation thereof and the resolving of conflicts and inconsistencies therein shall be determined by the Contracting Officer, and such determination shall be final, subject only to appeal under the provisions of Article 16.
* * * * *
Article 10. — Changes and Extras
(a) The Contracting Officer may at any time or times, by a written order, and without notice to the sureties, make changes in the drawings or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the cost of doing the work under this contract, or in the time required for its performance, an equitable adjustment in the pertinent contract terms shall be made as hereinafter provided and the contract shall be modified in writing accordingly. Any claim of the Contractor for such an adjustment must be made in writing to the Officer in Charge within 10 days from the receipt of such change order or within such longer period as may be allowed by the Contracting Officer. If the Officer in Charge considers that such change should result in a decrease in the Contractor’s compensation or time for performance or both, he shall so notify the Contractor. In either case, the equitable adjustment shall be made in accordance with the mutual agreement of the parties, provided, however, that if the parties are unable to agree, the Contracting Officer shall determine such equitable adjustment, if any, to be made in the contract terms, and his determination shall be final, subject only to appeal under the terms of Article 16. In making such determination, the Contracting Officer shall, in those instances where the adjustment to be made *830 in compensation is estimated by the Officer in Charge to amount to $10,000 or more, convene, and give full consideration to the report of, an advisory board of three members, consisting of two Government representatives appointed by the Contracting Officer and one representative appointed by the Contractor. This board shall estimate and report to the Contracting Officer the amount of the change in cost, time or both, resulting from the ordered change. In making such estimate, the estimated cost of additions shall be based upon the estimated actual cost to the Contractor and the estimated cost of deductions shall be based upon the estimated cost to the Contractor as of the time the contract was made. To such cost estimates, 6 percent shall be added by said board to adjust the Contractor’s profits. In arriving.at the amount of the change in price, if any, allowance may be made at the discretion of the Contracting Officer for overhead and general expenses, plant rental, and other similar items.
(2) Nothing provided in this article shall excuse the Contractor from diligently proceeding with the prosecution of the work so changed.
Article 11. — Liquidated Damages
(a) If the Contractor fails to complete the work or any part thereof within the time specified in Article 1, or applicable extension thereof, it will be difficult or impossible to ascertain the actual damages for the delay and in lieu thereof the Contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay until the delayed work is completed or accepted, the amount as set forth in the specifications or in Article 1. If, after the expiration of the time specified in Article 1, or applicable extension thereof, the Government terminates the right of the Contractor to proceed and does not elect to complete the work, liquidated damages shall be paid as above provided for each calendar day after the time specified in Article 1, or applicable extension thereof, until the effective date of the termination of the Contractor’s right to proceed. If the Government terminates the right of the Contractor to proceed and elects to complete the work as provided in Article 25, liquidated damages shall, if the Government exercises due diligence in completing the work, be paid as above provided for each day after the time specified in Article 1, or applicable extension thereof, until the delayed work is completed *831 or accepted. The Contractor and his sureties shall be liable for all such liquidated damages accruing, as here-inabove provided. It is agreed, however, that the Contractor shall not be charged with liquidated or actual damages because of any delays in the completion of the work due to causes beyond the control and without the fault or negligence of the Contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government or any State or political subdivision thereof (including, but not restricted to the operation of any governmental preferences, priorities or allocations of equipment or material), acts of another Contractor in the performance of a contract with the Government, fires, floods, explosions, earthquakes, or other catastrophes, epidemics, quarantine restrictions, strikes,, freight embargoes, unusually severe wea/ther, or' delays of subcontractors or material suppliers due to such causes (unless the Contracting Officer shall have ordered the Contractor to procure such work or material from other sources), if the Contractor shall within 10 days, from the beginning of any such delay, or such longer period as may be allowed by the Contracting Officer,, notify the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of the delay and extend the time for completing the work or any part thereof when in his judgment the findings of fact justify such an extension. The determination of the Contracting Officer shall be final,, subject only to appeal under the provisions of Article 16.
(b) If no amount for liquidated damages is stated in the specifications or elsewhere in this contract, then,, notwithstanding the provisions of this article, no liquidated damages shall be assessed hereunder.
*****
Article 16. — Disputes
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal' by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized rep *832 resentative for the hearing of such appeals shall be final and conclusive; Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
Hí «í* íf»
Article 25. — TERMINATION for Default
(a) The performance of work under this contract may, subject to the provisions of paragraph (a) of Article 26, be terminated by the Government in accordance with this article in whole, or from time to time in part, whenever the Contractor shall default in performance, or shall so fail to make progress in the prosecution of the work hereunder as, in the opinion of the Contracting Officer, to endanger performance of this contract in accordance with its terms. Termination of work hereunder shall be effected by delivery to the Contractor of a Default Notice of Termination specifying that termination is for default or failure, the extent to which performance of work under this contract shall be terminated, and the date upon which such termination shall become effective.
* * * * *
(f) This contract shall not be terminated and the Contractor shall not be chai'ged with any liability to the Government under the provisions of this article where the default or failure of the Contractor is due to causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to those causes with respect to which it is provided in Article 11 that the Contractor shall not be charged with liquidated damages for delay. In the event that a Default Notice of Termination has been delivered to the Contractor and it is thereafter determined that the default or failure is due to causes beyond the control and ■ without the fault or negligence of the Contractor, performance of work under this contract shall be deemed to have been terminated, effective as of the effective date of the Default Notice of Termination, pursuant to Article 26. The Government shall, in case of such de *833 termination, promptly cancel the notice under this article and shall issue the notice provided in paragraph (a) of Article 26, and the rights and obligations of the parties shall in such event be governed by Article 26.
$ $ ‡ *
Article 26. — TERMINATION at the Ojption oe the GOVERNMENT
* * * * *
(d) In the event of the failure of the Contractor and the Contracting Officer to agree as provided in paragraph (c) upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this Article or the amount to be paid the Contractor for completing the part of the work not terminated, the Government, but without duplication of any amounts agreed upon in accordance with paragraph (c), shall pay to the Contractor the following amounts:
(1) In respect of all contract work performed prior to the effective date of the Notice of Termination, the total (without duplication of any items) of (i) the cost of such work; (ii) the cost of settling and paying claims arising out of the termination of work under subcontracts or orders as provided in paragraph (b) (5) above, exclusive of the amounts paid or payable on account ox supplies or materials delivered or services furnished by the subcontractor prior to the effective date of the Notice of Termination of work under this contract, which amounts shall be included in the cost on account of which payment is made under subdivision (i) above; and (iii) a sum equal to 2 percent of the part of the amount determined under subdivision (i) which represents the cost of articles or materials delivered to the site but not incorporated in the work in place on the effective date of the Notice of Termination, plus a sum equal to 8 percent of the remainder of such amount, but the aggregate of such sums shall not exceed 6 percent of the whole of the amount determined under subdivision (i), which for the purpose of this subdivision (iii) shall exclude any charges for interest on borrowings.
95. On July 12, 1951, Dale executed an Application for Contract or Proposal Bond from Seaboard Surety. Seaboard, on the basis of this application and in reliance on a prior general indemnity agreement executed on November 21, 1950, in favor of Seaboard by Dale’s principal shareholders, *834 David A. and Helen E. Eobbins, executed and furnished the payment and performance bonds in the penal sums of $39,995 required by the contract. The Bond Application contained provisions in its 4th, 6th, 7th, 9th and 10th paragraphs identical to those quoted in finding 89(b).
96. (a) Notice to proceed with the work was issued on July 16, 1951. On August 28 the D. A. Eobbins Electric Company placed an order with the Graybar Electric Company for the cable which Dale proposed to install in performing the contract. The purchase order was placed by the D. A. Eobbins Electric Company as this company, owned by David A. Eobbins, had a long-established credit relationship with Graybar, and Eobbins wanted to avoid the bother of establishing a new credit relationship between Dale and Graybar.. The main portion of the purchase order consisted of 20- and 24-conductor cables. On September 18,1951, the cable manufacturer with which Graybar was to place the order, the Okonite Company, provided Eobbins with a quotation on the price for this cable.
(b) On September 15, 1951, Dale wrote to the Navy stating that it had placed with Hazard-Okonite a tentative order for the cable specified, pending approval of the prints and other data it had submitted to the Navy. Dale’s letter also* listed several other types of cable it could furnish.
(c) On September 10, 1951, the local office of the Okonite* Company in Boston sent the Eobbins’ order of August 28* for 20- and 24-conductor cables to its plant at Wilkes-Barre for manufacture since it did not at the time maintain this-type of cable in stock. As of August 28 Dale had been-promised shipment of the cable in 14 to 16 weeks. In short, Eobbins could reasonably have expected shipment by December 15.
(d) Dale started work on the Navy contract in or about mid-September 1951.
(e) On September 25,1951, Dale wrote to the Navy stating,, among other things, that it had ordered 20- and 24-conductox*-cables and that these were the number indicated on the plans- and referred to in the specifications. The Navy replied on October 2, 1951, that Dale’s “interpretation of the contract; *835 requirements relative to the multi conductor cable is in error, and does not provide all of the conductors specified.” The Navy’s letter further advised Dale that the contract drawings required one cable containing 16 conductors for the fire alarm system and 11 twisted pairs for the telephone system, for a total of 38 conductors. Dale was also advised in this letter of its right of appeal under the Disputes Clause. On November 2, 1951, Dale appealed to the Secretary of the Navy from this decision relative to the number of conductors in the cable. By agreement of the parties processing of that appeal (ASBCA Docket No. 1202) was suspended pending resolution by the ASBCA of an appeal from a later decision by the contracting officer (ASBCA No. 1655) terminating Dale’s contract with the Navy for default. See findings 103-05, inclusive, infra. Ultimately, on May 29, 1958, Dale’s appeal in ASBCA No. 1202 was sustained, the board concluding that the contractor’s interpretation of the contract — rather than the Navy’s — was the proper one. The ASBCA remanded the case to the contracting officer for an adjustment in price due to changes made in the contract requirement. Thereafter an adjustment in price in the amount of $15,685 was made and is not here in issue. See finding 107 (d).
97. (a) In the meantime and in accordance with the contracting officer’s direction, Dale on October 4,1951, canceled the order for 20- and 24-conductor cables and ordered the one 38-conductor cable. Previously, Okonite, on August 31, 1951, had furnished Bobbins with a quotation on the price of 38-conductor cable.
(b) The change in the cable order was transmitted by Okonite’s Boston Office to its Wilkes-Barre plant on October 11. As was the case with the 20- and 24-conductor cables it replaced, the 38-conductor cable was a special order item. The time required for manufacture of the latter type of cable would have been substantially the same as for the former type except to the extent that it would have taken less time to make up the one 38-conductor cable than to manufacture both the 20- and 24-conductor cables. Thus, even though five weeks elapsed between Bobbins’ original and amended cable orders (i.e., the period between August 28 *836 and October 4,1951) no significant delay was thereby caused Dale.
98. Because of a copper cutback, the manufacturer advised Bobbins that manufacture of the 38-conductor cable was unavoidably delayed and that it would be scheduled for shipment on August 20, 1952. Dale proceeded with the work as far as it could without the cable until mid-February 1952, at which time it was forced to suspend operations due to the delay in obtaining the cable.
99. At this time in mid-February 1952, various of Dale’s tools, equipment and materials had been taken by the Army pursuant to the agency’s termination of Dale’s contract for default. A few of these items were needed for use on the Navy contract. See finding 78 (i).
100. (a) On May 1,1952, Seaboard filed a complaint in the United States District Court, District of Massachusetts, against Dale, David A. Bobbins and Helen B. Bobbins, seeking to recover on the indemnity agreement covering the Army contract. The complaint alleged, among other things, that the Army had terminated its contract with Dale because of the latter’s breach; that Dale had failed to pay bills for labor and material supplied to it in connection with the contract; and that these creditors had demanded payment from Seaboard. The complaint further alleged that by reason of these circumstances Seaboard found it necessary to reserve from its assets $27,000 to cover contingent claims upon its bonds in connection with Dale’s default on the Army contract. Seaboard sought an order requiring the defendants to perform their agreements and deposit $27,000 with Seaboard to be held by the latter pursuant to the provisions of the indemnity agreement. Seaboard also sought judgment against the defendants for the amount it had lost in completing the Army contract. On June 12, 1952, Dale filed an answer to the complaint, together with a counterclaim, in which it alleged, among other things, that Seaboard “. . . wrongfully, intentionally and maliciously induced and persuaded the United States ... to break its contract (DA19-128-AI-56) with . . . Dale . . ., and to refuse to proceed further therewith, and to enter into a contract with others for the performance of said contract.” In the counterclaim *837 Dale asserted that at the time of the breach by the Army, it was due $10,500 for earned estimates, $11,000 for retained percentages, “together with further loss of equipment and materials converted for said contract amounting to . . . $15,000.00. . . .” The counterclaim also alleged that Dale had been deprived of “its profits to be realized from (the Army) contract . . . in the amount of . . . $10,000.00. . .
(b) In July 1952, while this litigation was pending, Dale completed a contract it had received from the Army for work at the Watertown, Massachusetts Arsenal.
(c) On August 18, 1952, Seaboard obtained an ex parte temporary restraining order from the District Court prohibiting Dale from accepting any payment from the Navy on account of the delivery of the 38-conductor cable without first obtaining the written consent of Seaboard. Susequently the court on September 25, 1952, after a hearing, issued a preliminary injunction restraining Dale from accepting any payment from the Navy for the cable delivered to the work site unless the written consent of Seaboard was first obtained. The court made the following findings of fact, among others:
*****
3. A small portion of the work required to be performed has been undertaken by Dale and it has received payments aggregating approximately seven thousand seven hundred twenty-six (7,726) dollars. Work under the contract has been delayed pending delivery of a substantial quantity of electric cable, ordered by the defendant D. A. Eobbins d/b/a D. A. Eobbins Electric Company as a subcontractor of Dale Construction Company from Graybar Electric Company.
4. The cable required for the completion of the contract has been manufactured and is ready for delivery in Boston, provided Graybar Electric Company can be assured of payment out of the contract balances for the cost of the cable in the amount of twenty-six thousand (26,000) dollars, approximately.
5. The balance still due Dale under the contract is adequate to cover the amount due Graybar and, to the extent of the debt to Graybar, should be applied and used for this purpose.
6. Dale Construction Company has heretofore been declared in default under a contract entered into with the United States of America by the Department of the *838 Army for construction of 16" water main at Boston Army Base. By reason of its default, plaintiff, Seaboard Surety Company, as surety was required to complete said contract at a cost to it of twenty-three thousand nine hundred twenty dollars and ten cents ($23,920.10) in excess of the funds retained by the Army for this purpose.
*****
10. The contracting officer or officers acting for the Navy Department have expressed a willingness to make a payment of fifty (50) per cent of the value of the cable upon delivery and to issue requisitions for further payments as the cable is installed and incorporated, in the work. Graybar Electric Co. has expressed its willingness to release the cable for delivery upon the foregoing terms and the plaintiff, Seaboard Surety Company, is prepared to consent to the application of the contract balance for this purpose or to pay any other persons supplying material or labor for the completion of said contract.
11. If the payments due under the contract are paid over to Dale and are not applied to the payment of Gray-bar Electric Company and other materialmen, the plaintiff, Seaboai’d Surety Company, might well suffer irreparable loss and damage.
12. Defendant, Dale Construction Company, cannot be damaged by a restriction requiring the balance due under the contract with the Navy Department to be applied first to the payment of Graybar and other material-men who supply the material necessary to complete the work remaining to be performed under said contract, since, in any event, the Dale Construction Company, as contractor on the j ob, has the primary obligation to make these payments.
101. (a) On August 21, 1952, the Navy wrote Dale that it had received word that the cable had been shipped from Okonite’s plant in Wilkes-Barre on August 20' and was presently en route. Dale was reminded that it was expected to make all arrangements for its unloading.
(b) On September 11, 1952, the Navy addressed the following letter to Dale:
This office has received word from your supplier, Graybar Electric Compaixy, that there is presently 19,060 feet of fire alarm cable at the New York New Haven Bailroad, South Boston Yards, which arrived *839 approximately August 25th and which information was given you over the phone by a representative of the Graybar Electric Company. This cable, presently on hand, is identified as cable ordered for subject project.
Whereas work under subject project was shut down approximately 12 February 1952, and delay from that date to the date of delivery of the cable could possibly be classified as beyond your control, there is lack of understanding in this office as to your reasons for not accepting delivery of the cable and proceeding with the prosecution of the work at this time. This lack of understanding has been added to by information received from the Graybar Electric Company, your supplier for the cable, that you have refused acceptance of this cable as being inopportune due to the extensive previous delays.
The situation as it now exists and has existed since the delivery of the cable in the railroad yards is considered due to fault and negligence on the part of the contractor in prosecuting the work and continued delay in recommencing the installation of the cable is considered as endangering the performance of this contract in accordance with its terms.
It is directed that you clarify your intentions to proceed with the work and inform this office of these intentions without delay.
(c) On September 12, 1952, the Navy wrote to Dale as follows:
This office has been in touch with your office today concerning the matter of delivery of cable by Graybar Electric Company for use on the subject contract. It is understood that the situation preventing delivery of the cable arises out of a restraining order issued by the U.S. District Court at the request of your surety, the Seaboard Surety Company, which restrains you from accepting payment for the cable to be delivered by Gray-bar Electric Company.
This office is not concerned with the merits of either-your position or of the surety. It is concerned with the effect of the situation on the progress of the work under the subject contract. It is most important that the cable not be returned to the manufacturer by reason of failure or inability of the supplier to deliver the cable.
You are hereby advised that the continuance of this impasse between you and your surety may result in default of your contract.
*840 102. By a letter dated October 3, 1952, the Navy notified Dale that its “Contract NOy-24709 ... is hereby terminated, in whole, for your default, effective 3 October 1952.”
103. By letter dated October 17, 1952, Dale appealed the contracting officer’s termination for default. The letter stated in part as follows:
This appeal is based on, in part, the following:
1. Default is due to causes beyond the control and without fault or negligence of this contractor, namely the actions of the Surety and/or the U.S. District Court in issuing injunction.
2. The action of the Surety and the Court is based on an alleged default at the Boston Army Base from which an appeal was taken and is pending before ASBCA, and has not been adjudicated.
3. That if the cable had been delivered as originally scheduled or its revised schedule, this contractor would have been able to complete its work, and that said delays were caused entirely by the operation of governmental preferences, priorities, or allocation of materials and inability to obtain for this contractor a directive covering said cable.
4. That termination be made under Article 26 instead of Article 25 otherwise irreparable harm and excessive litigation is caused this contractor.
104. (a) The ASBCA (Docket No. 1655) held hearings in Boston, Massachusetts, on October 4 through October 7, 1955.
(b) As set forth in finding 82, the ASBCA in Docket No. 1532 had previously held on August 10,1954, that the alleged grounds asserted by the Army for termination for default of Dale’s contract were not supported by the evidence of record.
,105. On June 29, 1956, the ASBCA denied the appeal in Docket No. 1655. The board’s decision read in pertinent part as follows:
18. The fundamental issue involved in the instant case, as presented by the parties to the Board, concerns the question as to whether or not Appellant’s failure to perform was due to causes beyond its control and without its fault or negligence.
ifr % # ífc &
22. In our opinion the preponderance of the credible evidence establishes the fact that so long as the restraining order obtained by Seaboard was outstanding Appel *841 lant would not enter into any arrangements with Seaboard whereby either all or part of any excess of payments which would have become due Appellant under the subject contract would have been retained by Seaboard, as security for2 or for application on, the losses which it considered it had sustained on Appellant’s Army contract, even though such arrangement would thereby have enabled Appellant to complete perf onnance of the subject contract. The Board holds that Appellant as a matter of law is in error, to the extent that Appellant considers that the position which it thus took allows it to prevail in this proceeding. Although each of the two contracts here referred to was with the same contracting party, namely, the Government, the fact remains that they were separate contracts. Assuming, without deciding, that the unjustified termination by the Government of Appellant’s Army contract constituted a substantial breach of that contract, which might have justified Appellant in refusing for the time being to perform any supposed obligations which the Government might have insisted Appellant was still subject to under that contract (see Paint and Pack, ASBCA No. 1341, decided 30 October 1953) nevertheless such a breach of the Army contract as is here assumed was not a breach of the subject contract, and would not in and of itself justify a refusal by Appellant to continue with the performance required of it under the terms of the subject contract. "Whether or not Appellant, in other proceedings, might by possibility be able to prove enhanced cost of performing the subject contract as damages to which it may have become entitled for what is here assumed to have been a breach of the Army contract is not a matter for determination by the Board in this proceeding; no reason appears, however, which would justify us in holding in this case that inconvenience or enhancement of cost of performance of the subject contract should be regarded as constituting a cause of failure to perform the subject contract which was beyond Appellant’s control or without its fault or negligence, merely because the occasion for such inconvenience or enhanced cost arose out of the improper termination by the Government of Appellant’s Army contract. On the basis of all the evidence before the Board we find that Appellant has not proved that it was unable to perform due to lack of financial ability.
23. In the instant case the Board finds, for instance, no attempt made to charge Appellant an exorbitant rate of interest for the use of money, or anything comparable thereto. Pending the outcome of Appellant’s appeal *842 under its Army contract the Seaboard Surety Company appears to have had a bona fide and reasonable belief that it was entitled, pursuant to the terms of the indemnification agreement executed in its favor by David A. Robbins, Helen R. Robbins, and Appellant, to seek enforcement and application of articles 4 and 10 thereof by obtaining funds for that purpose from payments which might thereafter become due Appellant under the subject contract.
24. The Board finds, on all the credible evidence, that Appellant was unwilling and refused to enter into any agreement whereby payments which would have become due Appellant under the subject contract, in the event of its continued performance, would have been put into a joint bank account subject to withdrawals only by joint signatures of Appellant and Seaboard Surety Company. Appellant has attempted to justify its refusal to agree to such an arrangement on the ground that such an arrangement would have unduly interfered with, and disrupted, Appellant’s orderly and efficient conduct of its business in its performance of the subject contract. This the Board does not believe. The Board finds that Appellant, unless it was to be given a release by Seaboard of all possible claims against it in connection with the Army contract, was unwilling, and refused, to agree to any arrangement whereby any portion of progress payments remaining after payment of lien claimants under the subject contracts would have been retained, in whole or in part, by Seaboard Surety Company as a reserve fund pursuant to the terms of the indemnification agreement, or applied by Seaboard on losses apparently sustained by Seaboard on Appellant’s Army, or other, contracts, under which Appellant, and/or David A. Robbins and Helen R. Robbins had agreed to indemnify Seaboard Surety Company. Appellant has attempted to justify its refusal to agree to such an arrangement on the ground that thus to agree would have constituted a waiver of any defenses Appellant or David A. Robbins or Helen R. Robbins would otherwise have had in legal actions then pending or subsequently to be brought against them by Seaboard Surety Company. In the opinion of the Board such a position, if indeed it ever was taken in good faith, was not reasonable. No evidence has been introduced to show that Appellant ever sought to obtain appropriate “without prejudice” clauses, or escrow arrangements, in this connection, nor is there any evidence which in the opinion of the Board shows that such clauses or appropriate escrow arrangements *843 would not have been agreed to by Seaboard Surety Company, or would not have been effective. Seaboard Surety Company, in fact at one time during its negotiations with Appellant and Mr. Bobbins, actually proposed certain escrow arrangements, in connection with, funds which Mr. Bobbins represented that he might be able to obtain from his mother-in-law.
25. In brief, the Board finds that although from its own practical viewpoint of self-interest Appellant may have acted reasonably in protecting its assets or future income from exposure to capture by a third party (Seaboard Surety Company) which believed it was entitled to such capture as it could effect, Appellant under all the circumstances here disclosed cannot be said to have failed to perform the subject contract due to causes beyond its control and without its fault or negligence. Although the Board finds that Seaboard Surety Company not only was not motivated exclusively or primarily by a desire to secure completion of the subject Navy contract by Appellant but did intend to secure such funds as might prove to be available for application to Seaboard’s apparent losses on Appellant’s Army, and other, contracts, the Board also finds, on all the credible evidence, that if Appellant had exhibited or communicated to Seaboard Surety Company a willingness to agree to what the Board here considers would have been not exorbitant requirements, Seaboard Surety Company would in all probability have agreed to such terms as would not only have enabled Appellant to complete performance of the subject contract but also would not have subjected Appellant to any ultimate loss which Appellant was not legally obligated to endure. In the opinion of the Board the evidence, for a certainty, does not establish as a fact that Seaboard would have refused to agree to any such terms.
106. The foregoing findings are supported by substantial evidence before the board. Dale has failed to present any evidence in the trial before this court that the board’s findings were fraudulent, arbitrary or capricious or not supported by substantial evidence.

Seaboard Surety's Completion of Navy Contract

107. (a) In the meantime, on October 24, 1952, some three weeks after the Navy had terminated Dale’s contract for default, Seaboard received a proposal from the electrical contracting firm of Kenworthy & Taylor, Inc. to complete *844 the Navy contract for the lump-sum price of '$25,159, provided that Seaboard supplied all the cable required for the job. Seaboard then paid Graybar Electric Company the sum of $24,977.56 for the cable and $298.96 to the New Haven Railroad for demurrage charges.
(b) On November 5,1952, Seaboard Surety and the Navy entered into a supplemental agreement in which Seaboard indicated its willingness to exercise its option to complete, or to procure the completion of the contract; represented that Dale had “. . . for good and valid consideration, assigned to the Surety all its right, or claim of right, in and to any and all contract balances, including earned but unpaid estimates and earned retained percentages, and any right or rights it may have to request additional compensation for work already performed but not included in payments to date . . .” In turn the Navy agreed to pay all contract balances, up to Seaboard’s completion cost, to Seaboard.
(c) Also on November 5, 1952, Seaboard entered into a contract with Kenworthy & Taylor in which the latter-agreed to complete the Navy contract, using cable furnished by Seaboard, for the sum of $25,159. Kenworthy & Taylor completed work under the contract on March 4, 1953, being-paid a total amount, including extras, of $27,860.67. In addition, Seaboard expended for completion of the work; $2,677.86 for legal services and expenses, and $1,940 for engineering service and supervision. Accordingly, Seaboard’s-completion costs on the Navy contract totalled $57,755.05.
(d) Dale’s third appeal to the ASBCA in Docket No. 1202 (involving the question as to whether 38-conductor cable-was required under the Navy contract) was sustained, the-board finding on May 29,1958, that Dale was entitled to recover its extra costs in providing 38-conductor cable. See-finding 96 (e). In view of the ASBCA’s decision in Docket No. 1202, the Navy and Seaboard Surety entered into Supplemental Agreement No. 2 increasing the contract price by-$15,685. Thus, the total price under the Navy contract to-talled $55,680, of which $23,180.91 had been previously paid to Seaboard and $7,726.23 had been paid to Dale in progress payments prior to October 3, 1952. Supplemental Agreement No. 2 also extended the performance time under the *845 Navy contract 173 calendar days from March 14,1952, to and including September 3,1952, due to delay in procurement of necessary material. This agreement further extended the performance time 120 calendar days from November 4,1952, to and including March 4, 1953, for procurement delays encountered by Seaboard. The period of October 4,1952, to and including November 4,1952, was determined to be delay for the convenience of the Government so that there was no assessment of liquidated damages for this period. However, under the Supplemental Agreement liquidated damages were assessed for 31 calendar days (from September 3, 1952 to and including October 4,1952) at the rate of $40.00 per calendar day for a total assessment of $1,240. Deducting liquidated damages of $1,240 from the amount otherwise owing, Seaboard in January 1960 received from the Navy a fourth and final payment of $23,532.86. Thus, Seaboard received total payments under the Navy contract in the amount of $46,713.77. In addition, Seaboard realized $53.33 in salvage during performance of the contract. Accordingly, subtracting total receipts by Seaboard of $46,767.10 from its completion costs of $57,755.05, the result is that Seaboard suffered a completion loss on the Navy contract of $10,987.95.

The Litigation Between Dale and Seaboard Surety and Subsequent Settlement

108. As set forth in finding 100(a), Seaboard on May 1, 1952, filed a complaint in the United States District Court for the District of Massachusetts seeking, among other things, judgment against Dale and the Bobbins for its completion costs and other expenses in connection with the Army contract. On April 23, 1953, Seaboard filed a Supplemental Complaint in that court against Dale and the Bobbins to obtain judgment for the amount it had lost in completing the Navy contract.
109. (a) On January 31, 1955, the District Court, after trial, filed a Memorandum Opinion ordering the case dismissed. The court stated that Seaboard was aware that Dale would appeal the notice of termination of the Army contract for default; that under the indemnity agreement, Seaboard had the election, after the termination, of having the Government proceed to do the work and then seek to recover on the *846 bond, or at its own risk, to finish, tlie work itself. The court noted that Seaboard followed this latter course realizing that the default determination might be reversed on appeal; that this very thing happened; that the decision of the administrative body was conclusive upon the parties; and that as a result Dale’s contract was still in existence. Since Dale was not in default, the court stated that Seaboard was under no legal liability to complete the contract and that its payment to the contractor who finished the job was, therefore, voluntary.
(b) On April 29, 1955, the District Court denied Seaboard’s motion for a new trial and on May 4, 1955, entered a judgment of dismissal.
(c) On June 4, 1955, the court allowed an amendment of the judgment of Dismissal to include a dismissal of Dale’s counterclaim relating to the Army contract “as the evidence was insufficient to show that Seaboard maliciously and wrongfully caused the contract breach.”
110. On Seaboard’s appeal, the Circuit Court of Appeals on March 22, 1956, reversed the decision of the District Court. See 230 F. 2d 625. The Circuit Court held that it was not necessary to rule on the question of the ASBCA decision inasmuch as the terms of the indemnity agreement between Dale and Seaboard “provides instead that the surety has the right to step in and take over the work at the contractor’s expense whenever in its sole opinion such action is either desirable or necessary.” In these circumstances the court held that “. . . it does not make default by the contractor-principal, Dale, a condition precedent to the right of the surety, Seaboard, to take over and complete all or any part of the work the contractor engaged to perform.” In the court’s view, the basic issue in the case was not whether Dale defaulted on the Army contract but whether its “prosecution of the work under the contract was so slow and so much at variation with specifications, that Seaboard in good faith believed it was either desirable or necessary for it to protect its interests as surety.” Since in the court’s opinion this issue had not been passed upon by the District Court, the case was remanded for determination of Seaboard’s good faith.
*847 111. On October 6, 1956, Seaboard, Dale and the Robbins entered into a settlement agreement which read in part:
Whereas, following the default termination by the respective Contracting Officers of Dale’s right to proceed with the performance of the Army and Navy contracts first above described, SeaboaRD, being called upon by the Government to procure completion of such contracts, did procure such completion and thereby incurred a loss of approximately sixty-eight thousand dollars ($68,000) for the payment of which it made demand upon Dale-RobbiNS under their indemnity agreements, and
Whereas, Dale filed appeals from the said default decisions of the Army and Navy Contracting Officers and as the result of such appeals the Armed Services Board of Contract Appeals, in separate proceedings, reversed the default decision of the Army Contracting Officer and affirmed the default decision of the Navy Contracting Officer, and Dale has petitioned for a rehearing of the Navy appeal, and
Whereas, SeaboaRD brought suit against Dale-RobbiNS in the United States District Court, District of Massachusetts, in Civil Action No. 52-507 for the enforcement of the said indemnity agreements and the recovery of Seaboard’s loss incurred as above and incurred also in the defense against and payment of lien claims filed against its bonds, in which litigation Dale-RobbiNS filed counter claims against Seaboard alleging damages based upon the alleged bad faith of Seaboard in influencing or procuring the default decisions of the Army and Navy Contracting Officers hereinabove referred to, which litigation is still pending, and
Whereas, the parties desire to adjust their differences for the purpose of enabling Dale-RobbiNS, with Seaboard’s cooperation, to prosecute the Dale claims against the Government to a successful conclusion, for the mutual benefit of the parties in restoring them, wholly or partially, for their respective alleged damages.
Now, therefore, in consideration of the premises the said parties mutually agree as follows:
1. Final judgment for the amount of sixty-eight thousand dollars ($68,000) will be entered forthwith in the said Civil Action No. 52-507 in favor of Seaboard and against Dale-RobbiNS and for dismissal of the Dale-RobbiNs counterclaims with prejudice and without costs and the parties mutually agree that execution upon such *848 judgment shall be withheld by Seaboaed pending performance of this agreement and said judgments shall be without right of appeal on the part of Dale-Eobbins.
2. The parties shall exchange mutual releases wherein each of them shall release the other of them from all sums of money, accounts, actions, suits, proceedings, claims and demands whatsoever which either of them at any time has or had up to the date of this agreement against the other for or by reason of or in respect of any act, cause, matter or thing.
*}•
_ 4. Dale-Eobbins shall forthwith diligently and actively prosecute all claims of Dale Construction Company against the Government under the Army and Navy contracts, including all claims for damages arising out of the default decisions of the Army and Navy Contracting Officers, and including also any claims which Dale may have for extras under either of those contracts and Seaboaed shall not separately and independently prosecute any such claims on its own behalf against Government.
5. Dale-Eobbins shall actively and diligently prosecute its claim now pending before the Navy Panel of the Armed Services Board of Contract Appeals for interpretation of the contract terms for the cable requirements of said Navy contract, and after deduction of one thousand dollars ($1,000) for expenses and counsel fees, if any, fifty per cent (50%) of the net balance remaining from said recovery shall be paid over to Seaboaed and applied by it against the amount due it under this agreement.
6. Seaboaed will co-operate with Dale-Eobbins in making available whatever proofs are now available to Seaboaed for the purpose of assisting in the prosecution of said claims, it being explicity understood and agreed, however, that the good faith of Seaboaed’s previous conduct in dealing with any matters involved in the Army and Navy contracts or in any other contract or in any relationship of Seaboaed with Dale-Eobbins shall not be placed in issue, it being mutually conceded that Seaboaed’s conduct did not express or imply bad faith at any time and that Dale’s conduct did not warrant the default decisions of the two Contracting Officers.
7. The proceeds of any and all recoveries from Government on account of any and all such claims shall be distributed as follows and in the following order of priority:
*849 (a) All actual court costs, costs of printing briefs and petitions, cost of stenographic transcripts, if re-, quired, incurred by either of the parties in effectuating such recovery shall be first repaid.
(b) Fifteen percent (15%) shall be paid to Edward H. Appelstein for legal services previously rendered on behalf of Dale-RobbiNS.
(c) Of the balance remaining, after the distribution as in Paragraphs (a) and (b) aforesaid, and payment of outside counsel as hereinafter provided in Paragraph 7 (f), SeaboaRD shall have the priority for the next payment of twenty thousand dollars ($20,000).
(d) Of the balance then remaining, Dale shall have the priority for the next payment of twenty thousand dollars ($20,000).
(e) Any remaining balance shall be divided equally between Seaboard and Dale provided, however, that Seaboard shall not be paid more than sixty-eight thousand dollars ($68,000) in all (except for any reimbursement of expenses).
(f) The parties agree that all legal fees in the prosecution of these claims shall be paid by each of them to their respective attorneys out of their proportion of the proceeds of any recovery therefrom. Provided, however, in the event outside counsel shall be required to prosecute these claims, the selection of such counsel shall be determined by the parties and compensation of such counsel shall not exceed five per cent (5%) of any recovery.
112. Pursuant to the above-quoted agreement, a stipulation for the entry of judgment in the amount of $68,000 in favor of Seaboard and against Dale, Helen R. and David A. Robbins was filed in the District Court.

Amount Expended by Army Under Contract for Replacement of Pipe at Boston Army Base; Fair Value of Work Performed Under that Contract

113. (a) By Modification No. 6 to Supplemental Agreement No. 6 entered into between the Army contracting officer and Seaboard Surety on June 17,1952, the original estimated contract price of $164,400 was increased to $168,270.42. This increase resulted from the agreement of the contracting officer under this modification to pay to Seaboard the following additional sums: (1) $2,435 for underground obstructions encountered by Dale during its performance under the *850 contract; (2) $1,217.06 for underground obstructions encountered by Seaboard; and (3) $218.36 for installation by Seaboard of a new service line which had not been shown on the contract drawings.
(b) As detailed in finding 92(d), total payments by the Army under the contract amounted to $164,921.02, of which $96,393.33 was paid to Dale and $68,527.69 to Seaboard.
(c) The fair value of the work performed under the Army contract was not less than $216,740. In this connection, an expert retained by the Government testified that the fair value of the work was $216,740. Dobbins estimated the fair value at $245,000, while an expert retained by Dale estimated the fair value at $270,000.

Damages of Plaintiff on Army Gontraot

114. (a) The record before the court establishes that prior to the termination of the Army contract plaintiff suffered the following damages:
(1) Added costs in connection with City of Boston’s failure to turn off water sup-ply_ $822.54
(Seefindings 24 (a)-(e))
(2) Increased costs resulting from delays caused by defendant’s failure to make work space available_ 230. 00
(See findings 30 (a) and (b))
(3) Increased costs resulting from delays caused by defendant’s requirement for bacteria testing_ 2, 000.00
(See findings 34 (a)-(k))
(4) Increased costs as a result of underground obstructions not shown on the plans or drawings- 7,449.20
(Seefindings 35 (a)-(m))
(5) Increased costs resulting from incorrect representations on plans_ 625. 00
(Seefindings36 (a) and (b))
(6) Increased costs resulting from Navy’s removal of a temporary bridge_ 180. 00
(See finding 41(1))
(7) Cost of repairing hydrant_ 55. 00 (See finding 49)
Total_$11,361. 74
*851 (b) The record before the court also establishes that plaintiff, in addition, suffered the following damages as a result of the contracting officer’s termination of the Army contract for default:
(1) Retained percentages withheld from plaintiff and paid instead to Seaboard Surety_$10,710.37
(2) Value of plaintiff’s tools, equipment, spare parts, surplus pipe, and other property taken by Army on termination of contract_ 4,000.00
(See findings78 (d)-(j))
(3) Plaintiff’s liability to Seaboard Surety for loss incurred by latter in completing the Army contract_ 31, 870.43
(4) Loss of anticipated profits_ 13,298.79
Total_$59, 879. 59
(c) Plaintiff’s total damages in connection with the Army contract_$71,241. 33

Defendant's Counterclaim Against Seaboard Surety

115. The record before the court shows that under its contingent counterclaim defendant is entitled to recover from Seaboard Surety the following payments it erroneously made to the latter:
(a) Retained percentages withheld by defendant from plaintiff and paid instead to Seaboard Surety-$10,710.37
(b) Underground obstructions encountered by plaintiff for which payment was made by defendant to Seaboard Surety- 2,435. 00
Total $13,145. 37
CONCLUSION OE LAW
Upon the foregoing findings of fact which are made part of the judgment herein, the court concludes as a matter of law (1) that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United *852 States Seventy-one Thousand, Two Hundred Forty-one Dollars and Thirty-three Cents ($71,241.33), and (2) that the United States is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the Seaboard Surety Company Thirteen Thousand, One Hundred Forty-five Dollars and Thirty-seven Cents ($13,145.37).

 Originally the contractor had submitted a schedule proposing to begin worfc on the cast-iron pipe section. It started on the cement-asbestos section instead because of a supplier’s failure to deliver cast-iron pipe at the time promised.

 Of course, no finality attaches to the contracting officer’s decision since his authority under the contract does not extend to determining claims for unliquidated damages. See e.g. Continental Ill. Nat. Bank v. United States, 126 Ct. Cl. 631, 640, 115 F. Supp. 892, 897 (1953); Holton, Seelye & Co. v. United States, 106 Ct. Cl. 477, 500, 65 F. Supp. 903, 907 (1946); Langevin v. United States, 100 Ct. Cl. 15, 31 (1943).

 Section 1-03 of the specifications provided in part that “pipe shall not be laid . . . when . . . weather conditions are unsuitable for the work, except by permission of the Contracting Officer.”

 Various complaints were made by Government representatives about Dale’s work in the Navy area, and a number of deficiencies were pointed out. However, in December 1951 the Navy tentatively accepted that portion of the job. As discussed below, the contract completion date was later extended to June 2,1952.

 Because of the complexity of the water system at the Base, this order of the post engineer appears to have been reasonable.

 The contract contained no provision requiring the submission. of weekly schedules.

 It Ras previously been mentioned that paragraph 1-03 of the specifications provided in part that “pipe shall not be laid . . . when . . . weather conditions are unsuitable for the work, except by permission of the Contracting Officer.”

 In order to formalize the time extension, the contracting officer wrote Dale on January 4, 1952, enclosing a supplemental agreement fixing a new completion date of June 2, 1952. Dale executed the formal agreement and mailed it to the contracting officer on January 18, 1952. The contracting officer received the instrument on January 21 but did not execute it inasmuch as he had terminated the contract for default on January 18.
While not formalized, it is apparent that a binding agreement for a time extension was, in fact, effected; it is immaterial that the parties may have contemplated a later, more formal instrument. United States v. Purcell Envelope Co.; 249 U.S. 313,319 (1919) ; Ship Const. Co. v. United States, 91 Ct. Cl. 419, 456 (1940), cert. den. 312 U.S. 699. North American Iron & Steel Co. v. United States, 130 F. Supp. 723, 724 (EDNY 1955), and cases cited; Escote Mfg. Co. v. United States, 144 Ct. Cl. 452, 459, 169 F. Supp. 483, 488 (1959). What is more, in later dealings with the contractor, the Government treated the contract as extended to June 2, 1952, and “it would be unreasonable for (this court) to hold otherwise at this late stage.” G. L. Christian and Associates v. United States, 160 Ct. Cl. 1, 10 (1963), 312 F. 2d 418, 423, cert den. 375 U.S. 954.

 As previously noted, the contract caUed for the installation of some 4,764 feet of cement-asbestos pipe and 2,030 feet of cast-iron pipe. Supra,

 Sheathing or shoring a trench consists of placing- planks or steel sheets in a vertical position against the sides of the open trench. These planks or sheets are supported by cross-braces extending across the width of the trench.

 Continuous sheathing consists of securing the sides of the trench by use of continuous vertical sheet piling and suitable braces. Skeleton or stay sheathing consists of placing planks or steel sheets (supported by suitable-cross-braces), at intervals of 5 to 10 feet.

 At this time, the parties had contemplated that work would be started on the east-iron portion of the line rather than the cement-asbestos section. Supra, footnote 1.

 There are several ways of testing pipe joints for leakage even tho.ugh the trench has been completely backfilled and the joints are no longer visible.

 As previously noted, the specifications reguired the contractor “to completely sheathe the trench excavation along the cast-iron replacement line”, while the “Safety” provisions required only skeleton sheathing for excavations in hard, compact material (where the trench was 5 feet or more in depth). Further, under the “Safety” provisions, the trench was reguired to be secured by the use of “continuous sheet piling . . .” only where the soil was unstable. In view of the disparate specification and safety provisions, there is a serious question as to whether the contract as a whole required the trench excavations in those parts of the cast-iron replacement area where the soil was hard and compact (as was the case here) to be “completely” sheathed in accordance with the specifications or skeleton sheathed in accordance with the “Safety” provisions. Another question is whether the term in the specifications “to completely sheathe” the trench excavation required that “continuous” sheathing be installed in accordance with the “Safety” provisions or merely required that the entire trench excavation be sheathed, with the type of sheathing dependent on whether the soil was hard and compact or unstable. While these questions are close, I believe that on balance the contract, reasonably interpreted, required the contractor to install “continuous sheathing” on all trench excavations in the cast-iron area. In the first place, the specifications, being specific and directed to a particular area, control over the “Safety” provisions which are general in scope. This is in accordance with the settled rule that where an agreement contains general and specific provisions which are in any respect inconsistent or conflicting, the provision directed to a particular matter controls over the provision which is general in its terms. Smoot v. United States, 237 U.S. 38 (1915) ; Callahan Constr. Co. v. United States, 91 Ct. Cl. 538, 634 (1940) ; Fernandez v. Rickert Rice Mills, 119 F. 2d 809, 817 (1st Cir. 1941). Second, an interpretation that only skeleton sheathing was required for a trench excavation ini the cast-iron area where the soil was hard and compact would render the specification requirement superfluous at least as to trench excavations 5 feet or more in depth. In such circumstances, an interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it inoperative, void, meaningless or superfluous. Bethlehem Steel Co. v. United States, 75 Ct. Cl. 845, 868 (1932); P. Sanford Ross, Inc. v. United States, 50 Ct. Cl. 168, 174 (1915) ; Fred R. Comb Co. v. United States, 100 Ct. Cl. 259 (1943) ; New Wrinkle v. John L. Armitage & Co., 238 F. 2d 753, 757 (3d Cir. 1956); Meighan v. Finn, 146 F. 2d 594, 595 (2d Cir. 1944), affirmed 325 U.S. 300 (1945) ; Cities Service Gas Co. v. Kelley-Dempsey & Co., 111 F. 2d 247, 249 (10th Cir. 1940) ; F. W. Woolworth Co. v. Peterson, 78 F. 2d 47, 48 (10th Cir. 1935) ; 4 Williston, Contracts, § 619 at 731 (3d ed. 1961) ; 2 Sutherland, Statutory Construction, § 4705 (3d ed. 1943).

 Around this time the inspector informed Dale that it “could get along without any sheathing at all, but the specifications call for sheathing, and that is the only thing I have to go by.” The inspector further told Dale “You have got to sheathe, and that is all there is to it, if you want to proceed.” The post engineer testified that he had no indication, to the best of his recollection, that the contractor “ever requested capping (the) pipe and testing (the) length, without placing the sheathing in the trench.” He stated that “had the contractor so indicated ... he would have considered it very seriously.”

 The post engineer testified that he depended on the Government Inspector implicitly and that If the latter had approved skeleton sheathing, he would never reverse a decision of that nature. As previously noted (supra, footnote 15), the inspector had advised Dale that it could get along without any sheathing at all.

 Also on December 26 Dale wrote to the contracting officer requesting permission to close down the work until March 1, 1952, due to the cold and inclement weather.

 This letter was received by Dale on January 21.

 The Government inspector participated in the discussions leading to the decision to terminate the contract. Considering the inspector’s bias and the strained relations between the post engineer and the contractor, it is not beyond the realm of possibility that personal animosity had some bearing on the termination action.

 Of course, had such further delays actually occurred or If unusually severe weather prevented work on the job, the contracting officer would have been required by Article 9 of the contract to have allowed further time extensions.

 The' contracting officer also testified that his “main reason for .termination was that we had an emergency condition that must be corrected right away and that I had no authority to authorize an additional cost to do it.”

 After the ASBCA decision, the contracting officer wrote plaintiff offering to enter into negotiations on the basis of treating the termination as one for convenience of the Government. Plaintiff failed to contact the contracting officer for this purpose but, rather, instituted suit here several years later. It may be noted that the contract here in issue did not contain a provision adopted in 1962 which specifies that if “it is determined that the contractor was not in default . . . the rights and obligations of the parties shall, if the contract contains a clause providing for termination for convenience of the Government, be the same as if the notice of termination had been issued pursuant to such clause.” See ASPR Rev. No. 10, July 30, 1962. See also Klein v. United States, 152 Ct. Cl. 8, 285 F. 2d 778 (1961).

 It is interesting to note that since United States v. Garlo Bianchi, 373 U.S. 709, decided June 3, 1963, the Government, in a number of other cases pending in this court, argues (directly contrary to its position here) that under the disputes article, Bianchi requires that all factual controversies must be resolved by the administrative board, and that when the ultimate question is one of law, this court must decide that question only on the basis of facts found by the board. The Government’s brief in the present case was filed before the Bianchi decision so it is not known whether the position it has taken here still remains unchanged.

 At an earlier stage in the litigation, the court denied without prejudice, plaintiff's motion for summary judgment, which motion was grounded on the argument that the board’s decision was final and conclusive. The court also denied, without prejudice, a later motion filed by plaintiff that it enter an order that the decision of the ASBCA was final and conclusive as to the findings of fact contained therein. Plaintiff’s position on that motion was that the Government was not entitled by law to a de novo trial.

 Cf. Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 805-08, 337 F. 2d 861 (1963) ; WPG Enterprises, Inc. v. United States, 163 Ct. Cl. 1, 8, 323 F. 2d 874 (1963).

 That Article provided in part: “. . . If the contractor’s right to proceed is . . . terminated (for default), the Government may take possession of and utilize in completing the work such materials, appliances and plant as may be on the site of the work and necessary therefor . . .”

 The surety, as mentioned below, elected to complete the work under the contract.

 In many cases it is “easier ... to prove past costs of preparation of performance than future costs, and the plaintiff, in order that he may be sure of making out his case at least to the extent of past expenses is allowed to state his claim for past expenses, and, in addition, to claim for the ‘profit’ he would have made upon the contract. Clearly if this ‘profit’ were understood to mean the entire value to the plaintiff of the contract at the time of repudiation . . . there would be a double recovery if expenses were added to this. What is meant, however, is that the plaintiff may recover past expenses, plus *725 any net profit lie would have made If the contract had been performed on both sides; i.e., the difference between the total cost to the plaintiff of full performance, including the actual past expenses, and the price to be paid to the plaintiff on completion, if that is larger. This reaches precisely the same result as the simpler formula of damages which allows the plaintiff the difference between the contract price and the cost to the plaintiff of completing performance. The advantage of the more complex expenses plus net profit formula is that, if the plaintiff fails in his attempt to show that there would have been a profit, he may still recover his expenses, on the assumption that the value of the contract would at least have covered the outlay.” McCormick on Damages (1935 ed.) § 142.

 As of the time of the termination, the Army had paid Dale $96,393.33 and had retained an additional $10,710.37 as security for completion of the work — -an amount the Army later paid to Seaboard.

 During performance of this contract a dispute arose between Dale and the Navy as to whether the contract required 20 and 24-conductor cable, as the contractor maintained, or 38-conduetor cable as the Navy maintained. Dale had placed an order for the former type of conductor cable but changed the order in accordance with a Navy directive insisting on the latter type; however, the contractor experienced no undue delay as a result, ultimately, the ASBCA, on appeal, sustained Dale’s position, concluding that its interpretation of the contract was the proper one.

 The complaint was later amended to seek losses for damages incurred by the surety in completing the Navy contract. Dale filed a counterclaim alleging that the surety had maliciously and wrongfully induced the Government to break its contract with Dale. The District Court dismissed the complaint *727 on the ground that the ASBCA decision in connection with termination of the Army contract was final and conclusive and that since Dale was not in default, the surety’s payments were voluntary. It also dismissed Dale’s counterclaim finding that the evidence was insufficient to show that the surety maliciously and wrongfully caused the contract breach. The Circuit Court of Appeals reversed the order dismissing the complaint, holding that under the indemnity agreement, default by Dale was not a condition precedent for the surety to take over and complete the work and that the basic issue, therefore, was not whether Dale had defaulted on the Army contract but whether its prosecution of the work was so slow and so much at variation with the specifications that the surety in good faith believed it was either desirable or necessary for it to protect its interests. Since that issue had not been passed upon by the District Court, the case was remanded for further proceedings. However, there was no final judicial determination of this issue since the parties later entered into aj settlement arrangement pursuant to which a consent judgment was entered against Dale in the amount of $68,000, which judgment was to be payable in a specified order of priority from any recovery against the Government. The $68,000 amount included the surety’s completion loss of $31,870.38 on the Army contract, while the balance consisted of alleged losses incurred by the surety on the Navy contract. However, by virtue of later payments, including one for $15,685 as a result of an ASBCA decision on a claim for extras, the surety’s actual loss on the Navy contract was $10,987.95. The parties also exchanged mutual releases and stipulated that the surety’s conduct did not express or imply bad faith and that Dale’s conduct did not warrant the default decisions of the two contracting officers,

 Seaboard Surety elected to complete the Navy contract.

 As previously mentioned, the ASBCA had held some two years before that the grounds given by the contracting officer for terminating the Army contract for default were not supported by the evidence of record.

 The mutual concession in that agreement that the surety’s conduct did not express or imply bad faith was clearly a stipulation for settlement purposes only, as was the concession that Dale’s conduct did not warrant the default decisions.

 That statute provides in part (41 USC § 15) that “no contract . . . shall be transferred by the party to whom such contract ... is given to any other party, and any such transfer shall cause the annulment of the contract . . . transferred, so far as the United States are concerned.” See McPhail v. United States, 149 Ct. Cl. 179, 181 F. Supp. 251 (1960) ; Moffla v. United States, 135 Ct. Cl. 604, 142 F. Supp. 891 (1956).

 “It is to be emphasized that upon termination of the . . . contract it is the government that has the right to taire over the work and arrange for its completion. The obligation of the surety on the performance bond is to pay the excess cost occasioned by the necessity of the government otherwise to havd the work done. Sureties, under the language of the Delays-Damages article, appear to have no right to complete the work themselves. Quite generally they are permitted to do so. This, it seems, is not because of any right they possess. It is by way of courtesy from the government; and by taking advantage of such concession, they try to hold down their losses.” Anderson, Damages for Delays In The Lam of Government Contracts, 21 S. Cal. L. Rev. 125,127 (1948).

 See Dale Construction Co. v. United States, 161 Ct. Cl. 825, 830 (1963).

 Dale had purchased, at a cost of $33,800, various Items of heavy equipment for performing the contract, including a backhoe, a eranej a dump truck, pumps, etc. It would seem that 20% of the cost of this equipment (or $6,760) is a reasonable depreciation allowance attributable to the contract.

 üp to termination Dale Rad been paid $96,393.33 by the Army and was owed an additional $10,710.37 for retained percentages, for a total amount paid and owing of $107,103.70. It is not clear from the record whether this amount was solely for the work complete-in-place or also covered some of the contractor’s expenditures for the balance of the work. In these circumstances the record affords no basis for ascertaining Dale’s profit rate at termination and using that rate to determine its profit on the entire contract.

 Limestone was to be used only for the cast-iron section of the line.

 The record establishes that plaintiff had installed skeleton sheathing along the sides of various trench excavations in the cement-asbestos section of the line.